**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNIVERSAL UNDERWRITERS INSURANCE COMPANY, a Kansas corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. FILED: MAY 19, 2008 |
| BRYAN TSIKOURIS, an individual, | ) ) | 08 cv 2890    JH |
| Defendant. | ) ) ) | JUDGE DER-YEGHIAYAN |
| | | MAGISTRATE JUDGE NOLAN |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES plaintiff Universal Underwriters Insurance Company ("UUIC" or the "Company"), by its undersigned counsel, and for its Complaint for Injunctive and Other Relief against defendant Bryan Tsikouris ("Tsikouris") alleges and states as follows:

### NATURE OF THE CASE

1.      Defendant Tsikouris became employed by UUIC in or about March 1998 as an Account Executive. As an Account Executive, Tsikouris was responsible for selling commercial insurance products and services to UUIC business customers.

2.      Tsikouris subsequently assumed a management role with UUIC that required him to actively manage Account Executives assigned to him and the customers located in each of those Account Executive's assigned territory.

3.      Subsequent thereto, Tsikouris resumed the role of Account Executive with responsibility for a specific territory.

4.    Tsikouris acknowledged at the commencement of his employment with UUIC that he would become privy to certain confidential and proprietary information and trade secrets belonging to UUIC as a direct result of his employment with UUIC.

5.    In order to prevent inappropriate use of such information, both during and after his employment with UUIC, the Company required Tsikouris to execute an employment agreement which contained certain obligations and post-employment restrictions as a condition of his employment with UUIC.  (A copy of Tsikouris' employment agreement is attached hereto as Exhibit A.)

6.    In particular, Tsikouris agreed not to disclose to any third party while employed by UUIC, and at any time after his employment with UUIC terminated, among other things, any confidential information related to UUIC's customers, including information regarding a customer's identity, the premiums charged the customer by UUIC, and the expiration dates of UUIC written policies.

7.    In addition, Tsikouris agreed that, for a period of two years after his employment with UUIC terminated, he would not "procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by" UUIC within one year prior to the termination of his employment with the Company.

8.    As expected, Tsikouris was given access to and became privy to UUIC confidential and proprietary information and trade secrets throughout his employment with UUIC.

9.    Tsikouris resigned his employment with UUIC effective May 17, 2007.

10.     UUIC believes that Tsikouris copied information relating to, among other things, UUIC's customers, premiums charged, expiration dates of policies, the loss experience and profitability of customers' accounts, UUIC's prospect lists, and rate computations.

11.     Such information is valuable because it provides a UUIC competitor with critical information concerning UUIC clients.  For example, (i) with information concerning the date UUIC customer policies expire and are up for renewal, a competitor knows precisely when to target said client; and (ii) with information concerning the client's loss experience, premiums charged by UUIC, and rate computations, a competitor can calculate the profitability of the client's insurance requirements and undercut UUIC's premium prices.

12.     This is precisely why UUIC maintains such information in a secure manner and why it requires its employees to execute employment agreements containing certain post-employment restrictions.

13.     Tsikouris joined Lamb, Little & Co. ("Lamb, Little") shortly after tendering his resignation to UUIC.

14.     Lamb, Little is also in the business of selling commercial insurance products and services to business customers.

15.     Since Tsikouris resigned his position with UUIC and began working with Lamb, Little, he

> (i)     successfully solicited the business of one of his former UUIC customers, causing that customer to move a portion of its insurance business from UUIC to the agency now represented by Tsikouris (the value of this business lost to Tsikouris equals approximately $500,000);
>
> (ii)    previously submitted a proposal to one of his former UUIC customers for business then held by UUIC that was up for renewal; and

3

  (iii) submitted a proposal for the insurance business of another of his former UUIC clients. UUIC has also submitted a proposal for the renewal of that client's insurance business. The client is scheduled to make a decision regarding Tsikouris' and UUIC's proposals in *less than one week.*

16. In addition, UUIC is informed and believes that Tsikouris has disclosed and/or otherwise utilized confidential and proprietary and trade secret information belonging to UUIC in order to move business away from UUIC to Lamb, Little.

17. Tsikouris has breached the post-employment restrictions contained in his employment agreement by soliciting and accepting business from and/or aiding Lamb, Little to procure policies of insurance from businesses who were UUIC customers.

18. UUIC has suffered irreparable harm to its business and goodwill as a result of Tsikouris' breach.

19. UUIC will continue to suffer such irreparable harm if Tsikouris is not immediately enjoined from continuing in his illegal conduct as fully described herein.

## PARTIES

20. Plaintiff UUIC is a corporation organized under the laws of the State of Kansas. UUIC's principle office is maintained in Overland Park, Kansas. UUIC is a wholly-owned subsidiary of Zurich American Insurance Company.

21. Defendant Bryan Tsikouris is an individual who, on information and belief, currently resides in the State of Illinois.

## JURISDICTION

22. This Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff UUIC is a Kansas corporation with its principal place of business in Kansas. Defendant Tsikouris is a

citizen of the State of Illinois. The amount in controversy exceeds $75,000 exclusive of interests and costs.

## BACKGROUND FACTS

**A.** **Tsikouris' Access to UUIC Confidential and Proprietary Information and Trade Secrets.**

23.     UUIC is in the business of providing its clients with insurance products and services.

24.     Tsikouris was employed by UUIC, both as an Account Executive and a manager of Account Executives. Throughout his employment with UUIC, Tsikouris was responsible for selling commercial insurance products and services to UUIC business customers within designated territories.

25.     Tsikouris' territory while employed by UUIC included portions of Illinois.

26.     Tsikouris acknowledged and understood that, as a result of his employment with UUIC, he would receive and/or have access to critical confidential and proprietary information and trade secrets belonging to UUIC, that such information would give UUIC competitors an unfair advantage in the market, and that as a result, UUIC required that such information be kept in a secret and confidential manner.

27.     Such information included, but was not limited to, information related to UUIC's customers, premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, UUIC's prospect list, and rate computations.

28.     Such information is confidential and proprietary to UUIC and is valuable in the industry because it provides UUIC competitors with critical information concerning UUIC clients and business. This information is either not available or extremely difficult to ascertain from public sources, and cannot be easily duplicated.

29.    UUIC has spent a significant amount of time and resources developing and maintaining information about its customers and potential customers. In addition, UUIC provides its account executives and managers, including Tsikouris, with significant resources, both financial and otherwise, to help develop and maintain relationships with UUIC customers.

30.    In most cases, Tsikouris was the sole and/or primary UUIC contact with the UUIC customer accounts he managed.

31.    While a manager, Tsikouris and the Account Executives reporting to Tsikouris were responsible for maintaining UUIC customer accounts located in each Account Executive's assigned territory.

32.    Attempting to sell a policy at or around a customer's policy expiration date maximizes the potential for actually selling a policy to that customer. Knowing and understanding the customer's loss experience, its insurance requirements and the premiums charged by UUIC virtually guarantees the ability to undercut UUIC and cause the policyholder to move its business.

33.    To the extent such confidential and proprietary information and trade secrets were maintained in UUIC computer databases, access to such databases was password restricted.

34.    Access to UUIC computer databases and documents containing such confidential and proprietary and trade secret information was limited to only those employees that needed to know said information in order to carry out the business of the Company.

35.    As an additional measure of protection, UUIC required all employees with access to such information, including Tsikouris, to execute employment agreements as a condition of their employments with UUIC.

36.    Tsikouris' employment agreement contained language that specifically restricted his use of UUIC confidential and proprietary information and trade secrets.

37.    In particular, Tsikouris acknowledged and agreed that:

5.    (a) ...all contract rights with [UUIC]'s policyholders, agents, subagents, brokers and employees, and all expirations and the use and control of records, copies of policies in force, pending applications for policies of insurance on hand, [UUIC]'s policies received by Employee, inspection reports, appraisals, maps, underwriting surveys, financial information of policyholders, rate computations, payroll audits, inventory reports and distributions of values are, and shall at all times remain, the property of [UUIC];

(b)  The list of [UUIC]'s customers, the premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, [UUIC]'s prospect list with expiration dates as they may exist from time to time, inspection reports, appraisals, maps, underwriting surveys, financial information of subscribers, rate computations, payroll audits, inventory reports and distributions of values and all its manuals, descriptions of procedures and techniques, and electronic data processing programs are confidential, constitute trade secrets, and are and shall remain the property of [UUIC]. Employee will not, during or after the term of his employment, without [UUIC]'s written consent, disclose any of the foregoing items or any part or parts thereof, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever... After termination of employment, Employee will not retain, or deliver to any other person, any of the items hereinabove mentioned, or copies thereof; and

(c)  In the event of a breach or threatened breach by Employee of the provisions of this paragraph, Employer shall be entitled to an injunction restraining Employee from interfering with [UUIC]'s property rights described in subparagraph (a) hereof, and from disclosing, in whole or in part, for a period of two (2) years following termination, the list of Employer's customers or any or all of the foregoing items, and from retaining, delivering and disclosing the contents to any other person, firm, corporation, association or other entity, directly or indirectly in competition with Employer, of such list or items, or from rendering, for a period of two (2) years from the date of termination hereof, any services to any person, firm, corporation, association, or other entity to whom such list or items, in whole or in part, have been delivered or disclosed or are threatened to be delivered or disclosed....

(Employment Agreement at ¶ 5.)

38.    As an additional measure of protection, Tsikouris' employment agreement contained the following post-employment restrictions:

7.    (a)    For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

* * * *

(c)    For a period of two (2) years following termination of this Agreement or retirement, Employee shall not directly or indirectly solicit, encourage or attempt to induce any person, firm, corporation or association within the territory or territories to which Employee was assigned at any time within two years of such termination or retirement, and which was insured at such time by Employer, or any of its affiliated companies, to discontinue, cancel, terminate or decline renewal of such insurance with Employer.

(Employment Agreement at ¶ 7.)

39.    In reliance on Tsikouris' commitment to abide by the terms and conditions contained in Paragraphs 5 and 7 of his employment agreement, UUIC gave Tsikouris access to certain of the Company's confidential and proprietary and trade secret information.

**B.    Tsikouris' Unauthorized Use of UUIC Confidential Information and Trade Secrets.**

40.    On May 17, 2007, Tsikouris resigned his employment and began working with Lamb, Little.

41.    Lamb, Little competes with UUIC and its affiliates in the market.

42.    Shortly after joining Lamb, Little, Tsikouris began soliciting potential customers located within the territory to which he was assigned while employed by UUIC for the purpose of selling insurance products and services.

43.    Tsikouris is actively soliciting his former UUIC customers to buy the same, or substantially similar, products and services that UUIC currently sells and/or has sold for years.

44.    Since joining Lamb, Little, Tsikouris has successfully diverted away from UUIC the business of at least one UUIC customer by using the relationship he developed with this customer while employed by UUIC in conjunction with the confidential and proprietary and trade secrets belonging to UUIC as identified herein.

45.    Tsikouris' violative solicitations are easily confirmed and indisputable.

46.    For example, the owner of one UUIC client that was Tsikouris' account while he was employed by UUIC, Glenview Auto Body ("Glenview"), disclosed that Tsikouris solicited Glenview's business and submitted a quote for Glenview's business which competed with UUIC's quote.  (Declaration of Joe Pottala ("Pottala Decl"), at ¶ 3, a copy of which is attached hereto as Exhibit B; Declaration of Nicholas DiCarlo ("DiCarlo Decl"), at ¶ 5, a copy of which is attached hereto as Exhibit C).

47.    The owner of UUIC client Chicago Parts and Sound ("CPS"), another former client of Tsikouris, disclosed that Tsikouris solicited CPS for its insurance business and now has a competing proposal pending with CPS for CPS' insurance business.  CPS is expected to make a decision between UUIC's proposal and Tsikouris' proposal on May 22, 2008.  Pottala Decl at ¶ 4.

48.    In or around September of 2007, a representative of UUIC client Gerber Collision ("Gerber") disclosed that Tsikouris solicited Gerber for its insurance business.  Around the same time, a UUIC employee observed Tsikouris waiting in the lobby of Gerber's office.  Declaration of Brent Wolosyn ("Wolosyn Decl"), at ¶ 3, a copy of which is attached hereto as Exhibit D.

49.    Tsikouris had been the Account Executive responsible for managing the Gerber account on behalf of UUIC.  DiCarlo Decl at ¶ 3.

50.    Gerber subsequently moved its workers' compensation insurance business from UUIC to Tsikouris.  *Id.* at ¶ 4; Wolosyn Decl at ¶ 4 and Ex. 1 (attaching email from owner of Gerber confirming that Gerber had moved its workers' compensation insurance business to Tsikouris).

51.    Gerber had been UUIC's largest account in the region.  DiCarlo Decl at ¶ 4.

52.    Tsikouris' conduct is indisputable, egregious, and has damaged UUIC's business.

53.    On more than one occasion, UUIC has requested that Tsikouris abide by the post-employment restrictive covenants contained in his employment agreement, but Tsikouris refuses to comply.  *See e.g.* Letter from J. Hedrick to B. Tsikouris dated August 29, 2007, a copy of which is attached hereto as Exhibit E.

54.    Tsikouris' violative conduct will undoubtedly continue unless the requested injunction is immediately issued.

## COUNT I
### (Misappropriation and Threatened Misappropriation of Trade Secrets)
### (Pursuant to Illinois Law)

55.    UUIC repeats and realleges Paragraphs 1 through 54 above as if fully set forth herein.

56.    By virtue of his employment with UUIC, Tsikouris had access to and acquired confidential and proprietary information belonging to UUIC.  This information constitutes "trade secrets" within the meaning of Section 2(d) of the ITSA, 765 ILCS § 1065/2(d).

57.     UUIC's trade secret information includes, without limitation, UUIC customer lists, information regarding premiums charged to customers, expiration dates of policies, the loss experience and profitability of customer accounts, UUIC's prospect list, and rate computations.

58.     As detailed in the foregoing allegations, Tsikouris has wrongfully and unlawfully acquired UUIC's trade secrets through improper means without UUIC's express or implied consent.

59.     Upon information and belief, Tsikouris has wrongfully and unlawfully used and disclosed, and will continue to use and disclose, UUIC's confidential and proprietary information and trade secrets during the course of his association with Lamb, Little and will do so with knowledge that such disclosures are without UUIC's express or implied consent and in violation of the terms of his employment agreement, the duties owed to UUIC and the rights of UUIC.

60.     Tsikouris cannot sell to his former UUIC customers without using UUIC's proprietary and trade secret information.  For example:

a.     Tsikouris cannot make decisions on how to position Lamb, Little's insurance products and services in the market or about how to compete with UUIC's products and services without drawing on his knowledge of UUIC's long and short term sales and marketing strategies;

b.     Tsikouris cannot sell insurance products and services on Lamb, Little's behalf to certain UUIC customers without utilizing confidential information regarding these customers including, for example, their buying requirements, pricing sensitivity and market strategies obtained during his employment with UUIC; and

c.      Tsikouris cannot participate in strategy discussions regarding marketing and promoting a competitor's insurance product offerings to certain UUIC customers without relying on UUIC confidential information.

61.     At all relevant times, as an employee of UUIC who executed the employment agreement, Tsikouris knew or had reason to know that his knowledge of and access to UUIC's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the information. UUIC takes reasonable measures to maintain the secrecy of and protect its trade secrets.

62.     Tsikouris has "misappropriated" and/or threatened to "misappropriate" UUIC's trade secrets within the meaning of Section 2(b) of the ITSA, 765 ILCS §1065/2(b), including without limitation through the conduct alleged herein. The ITSA provides remedies for both the actual and threatened "misappropriation."

63.     As a direct and proximate result of Tsikouris' actual and threatened misappropriation of UUIC's trade secrets in violation of the ITSA, UUIC has suffered and will continue to suffer immediate and irreparable injury to its business and goodwill. This injury, while substantial, is difficult to calculate with precision. UUIC has no adequate remedy at law to protect it from the unlawful and continuing actual and threatened misappropriation of its trade secrets by Tsikouris.

64.     UUIC has a substantial likelihood of success on the merits of this claim due to Tsikouris' clear, actual and threatened misappropriation of UUIC's trade secrets under the ITSA.

65.     The threat of harm to UUIC in the absence of injunctive relief far outweighs the threat of harm to Tsikouris if an injunction is granted. UUIC faces substantial but difficult to calculate financial loss and loss of goodwill, whereas the only "hardship" imposed on Tsikouris

is to prevent him from reaping any illicit gain or benefit from his actual and threatened misappropriation of UUIC's trade secrets.

66.    The public interest would be served by granting the relief sought in that the public interest clearly favors preventing persons such as Tsikouris from profiting from his improper and unlawful conduct.

67.    The threatened and actual misappropriation by Tsikouris alleged herein under the ITSA is willful and malicious and entitles UUIC to appropriate damages to remedy the injuries caused as well as punitive damages, costs, and attorneys' fees.

## COUNT II
### (Breach of Contract)
### (Pursuant to Kansas Law)

68.    UUIC realleges and incorporates Paragraphs 1 through 67 as though fully set forth herein.

69.    Tsikouris has misappropriated UUIC's confidential and proprietary information and other property.

70.    Furthermore, as detailed above, Tsikouris has disclosed and/or threatened to use or disclose UUIC's confidential and proprietary information and/or other property for his own benefit.

71.    Such conduct constitutes a breach of Tsikouris' obligations and representations under his employment agreement.

72.    UUIC has fully performed all of its obligations under the employment agreement.

73.    Moreover, UUIC has not consented to Tsikouris' retention, use or disclosure of any of its confidential and proprietary information or other property.

74.    As a direct, proximate, and foreseeable result of Tsikouris' wrongful conduct alleged herein, UUIC has suffered and, unless Tsikouris is immediately enjoined, will continue to suffer irreparable injury, including but not limited to wrongful retention, use and/or disclosure, and/or threatened retention, use and/or disclosure, of its confidential and proprietary information, loss of goodwill, loss of future business, and loss of customer relationships, for which UUIC's remedy at law is inadequate.  At the time of such conduct, Tsikouris knew or reasonably should have known by virtue of his position with UUIC and other information available to him that his conduct would inflict such injury on UUIC.

75.    UUIC has a substantial likelihood of success on the merits of this claim due to Tsikouris' clear breach of his contractual obligations.

76.    The threat of harm to UUIC in the absence of injunctive relief far outweighs the threat of harm to Tsikouris if an injunction is granted.  UUIC faces substantial but difficult to calculate financial loss and loss of goodwill, whereas the only "hardship" imposed on Tsikouris is to prevent him from reaping any illicit gain or benefit from his breach of contract.

77.    The public interest would be served by granting the relief sought in that the public interest clearly favors preventing persons such as Tsikouris from profiting from his improper and unlawful conduct.

**COUNT III**
**(Breach of Duty of Loyalty)**
**(Pursuant to Illinois Law)**

78.    UUIC realleges and incorporates by reference each of the allegations in paragraphs 1 through 77.

79.    By virtue of his employment agreement and the positions he held with UUIC, Tsikouris owed a fiduciary duty of loyalty to UUIC, both during his employment with UUIC and after said employment terminated.

80.    Tsikouris' duty of loyalty required, among other things, that he deal fairly with UUIC and protect its business interests.  Tsikouris' conduct as described herein constitutes a breach of his duty of loyalty.

81.    As a direct, proximate, and foreseeable result of the many breaches of fiduciary duty by Tsikouris, UUIC has suffered and, unless Tsikouris is enjoined, will continue to suffer irreparable injury, including without limitation loss of business and economic opportunities, customer relationships, future business, goodwill, and commercial reputation, for which UUIC's remedy at law is inadequate.  At the time of such conduct, Tsikouris knew or reasonably should have known by virtue of his positions with UUIC and other information available to him that his conduct would inflict such injury on UUIC.

82.    UUIC has a substantial likelihood of success on the merits of this claim due to Tsikouris' clear breaches of his fiduciary duties to UUIC.

83.    The threat of additional harm to UUIC in the absence of injunctive relief far outweighs the threat of any harm to Tsikouris if an injunction is granted.  UUIC faces substantial but difficult to calculate financial loss and loss of goodwill, whereas the only "hardship" imposed on Tsikouris is to prevent him from reaping any illicit gain or benefit from his breaches of fiduciary duties to UUIC.

84.    The public interest would be served by granting the relief sought in that the public interest clearly favors preventing Tsikouris from profiting from his improper conduct.

85.    Tsikouris' breaches of fiduciary duty were and are knowing and intentional and of such an aggravated character as to warrant the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Universal Underwriters Insurance Company respectfully requests that the Court grant the following relief to it and against defendant Bryan Tsikouris:

(a)    enter judgment in favor of UUIC and against defendant Tsikouris;

(b)    enter an Order compelling defendant Tsikouris to immediately withdraw from consideration the pending proposal/bid for insurance that he recently submitted to Chicago Parts and Sound;

(c)    enter an Order compelling defendant Tsikouris to immediately withdraw from consideration any pending proposal/bid for insurance which violates paragraph 7(a) of his employment agreement with UUIC;

(d)    enter Orders temporarily, preliminarily and permanently enjoining defendant Tsikouris, and any and all persons acting by or under his authority or in privity or concert with him, from directly or indirectly using, transferring, copying or disclosing to any individual or entity, any confidential and/or proprietary information belonging to UUIC as outlined in Paragraph 5 of his employment agreement with UUIC;

(e)    enter Orders temporarily, preliminarily and permanently requiring defendant Tsikouris, and any and all persons acting by or under his authority or in privity or concert with him, to immediately turn over and deliver to UUIC all confidential and/or proprietary information and all other property of UUIC (whether or not confidential or proprietary), however stored or maintained, and all copies thereof;

(f)    enter Orders temporarily, preliminarily and permanently requiring the defendant Tsikouris, and any and all persons acting by or under his authority or in privity or concert with him, from procuring, soliciting, accepting, referring, or aiding another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by UUIC or any of its affiliated companies consistent with Paragraph 7 of Tsikouris' employment agreement with UUIC;

(g)    enter Orders temporarily, preliminarily and permanently requiring defendant Tsikouris to otherwise abide by the post-employment restrictions contained in his employment agreement with UUIC;

(h)    enter an Order requiring defendant Tsikouris to file with the Court and serve on UUIC reports in writing and under oath setting forth in detail the manner and form in which he has complied with each injunction issued by the Court;

(i)    enter an Order holding defendant Tsikouris liable for the payment to UUIC of:

    1.    an amount of money damages to be proven at trial; and

    2.    an additional amount in punitive damages as deemed appropriate by the Court;

(j)    enter an Order awarding an amount equal to UUIC's costs and attorneys' fees incurred in enforcing its rights with respect to defendant Tsikouris; and

(k)    enter an Order granting UUIC such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

UNIVERSAL UNDERWRITERS INSURANCE COMPANY

By:    /s/Sarah M. Konsky
    One of its Attorneys

Nigel F. Telman
Sarah M. Konsky
Sidley Austin, LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

## **VERIFICATION**

I, Nicholas DiCarlo, hereby verify under penalty of perjury that the foregoing Verified

Complaint for Injunctive and Other Relief is true and correct to the best of my knowledge and

belief.

_____
Nicholas DiCarlo

Dated: _5 - 1 6 - 08_

18



# EMPLOYMENT AGREEMENT

This Agreement is made and entered into this _____ day of 3/12 , 19 98 , by and between the undersigned Employer, and *Bryan Tsikouris* hereinafter called Employee.

In consideration of the mutual covenants contained herein, each and all of which the parties hereto acknowledge constitute full and adequate consideration, the parties agree as follows:

1. **EMPLOYMENT AND LICENSING**

   (a) Subject to the terms and conditions hereinafter set forth, Employer does hereby employ the Employee and may license Employee as an insurance agent of Employer, or company represented by Employer, and Employer hereby accepts employment, and his license (if any) as an insurance agent as aforesaid.

   (b) During his employment the Employee shall not be licensed as an agent, solicitor, representative or broker for any insurance company or organization other than Employer, or a company represented by, or affiliated with, Employer, without the written consent of Employer. Employee, during his employment, shall not place or aid in placing insurance in or through any company other than Employer or a company represented by, or affiliated with, Employer except (1) with written permission of the Employer or (2) insurance on his own property, his own life or the property and lives of his immediate family.

2. **ASSISTANCE BY EMPLOYER** — Employer agrees to provide Employee with policy and related forms, revisions thereof, equipment, manuals, underwriting services and such supervision and training to assist Employee in carrying out his duties as Employer deems necessary.

3. **COMPENSATION** — Employer shall pay Employee as his full compensation a monthly salary, fixed by Employer from time to time, and Employer shall not be liable for any sum in excess of such monthly salary. Additional incentive compensation may be paid by Employer from time to time.

4. **EXCLUSIVE SERVICES** — Employee shall devote his entire business activity to the business of Employer. Any and all insurance business at any time or times procured by Employee while employed by Employer is and shall be the permanent and exclusive property of Employer for Employer's exclusive benefit. Without the written consent of Employer, Employee shall not, during the term of this Agreement, (a) engage in any other business activity, whether or not such business activity is pursued for a gain, profit or other advantage or (b) act as employee, officer, director or consultant for any other insurance company, agency, or brokerage firm.

   Provided, however, that Employee may invest in business enterprises not requiring any services on the part of the Employee in the operation of the affairs of the companies in which such investments are made. Provided, further such investments shall not be in any insurance company, agency, or brokerage firm unless the capital stock thereof be publicly held and traded, whether as owner, shareholder, partner or creditor, without the written consent of Employer, which shall not be unreasonably withheld.

5. **PROPERTY OF EMPLOYER AND TRADE SECRETS** — Employee recognizes, acknowledges and agrees that:

   (a) With the exception of insurance written on Employee's own property or his life, or on the property or lives of his immediate family, all contract rights with Employer's policyholders, agents, subagents, brokers and employees, and all expirations and the use and control of records, copies of policies in force, pending applications for policies of insurance on hand, Employer's policies received by Employee, inspection reports, appraisals, maps, underwriting surveys, financial information of policyholders, rate computations, payroll audits, inventory reports and distributions of values are, and shall at all times remain, the property of Employer;

   (b) The list of the Employer's customers, the premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, Employer's prospect list with expiration dates as they may exist from time to time, inspection reports, appraisals, maps, underwriting surveys, financial information of subscribers, rate computations, payroll audits, inventory reports and distributions of values and all its manuals, descriptions of procedures and techniques, and electronic data processing programs are confidential, constitute trade secrets, and are and shall remain the property of Employer. Employee will not, during or after the term of his employment, without Employer's written consent, disclose any of the foregoing items or any part or parts thereof, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, except fellow employees of Employer or companies affiliated with Employer, in the normal course of carrying out his duties. After termination of employment, Employee will not retain, or deliver to any other person, any of the items hereinabove mentioned, or copies thereof; and

   (c) In the event of a breach or threatened breach by Employee of the provisions of this paragraph, Employer shall be entitled to an injunction restraining Employee from interfering with Employer's property rights described in subparagraph (a) hereof, and from disclosing, in whole or in part, for a period of two (2) years following termination, the list of Employer's customers or any or all of the foregoing items, and from retaining, delivering and disclosing the contents to any other person, firm, corporation, association or other entity, directly or indirectly in competition with Employer, of such list or items, or from rendering, for a period of two (2) years from the date of termination hereof, any services to any person, firm, corporation, association, or other entity to whom such list or items, in whole or in part, have been delivered or disclosed or are threatened to be delivered or disclosed. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available to Employer for such breach or threatened breach, including the recovery of damages from Employee.

6. **TERM OF EMPLOYMENT AND TERMINATION** — This Agreement shall continue until terminated by either party. Either party hereto may terminate this Agreement at any time. Notice of termination (regardless of the effective date thereof) by either party shall authorize Employer to terminate at any time all duties and services of Employee and to cancel his license (if any) as insurance agent of Employer.

**EXHIBIT**

A

7. ACTIVITY AFTER TERMINATION

    (a) For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

    (b) Employee, after termination of this Agreement, shall not be prohibited from engaging in any phase of the insurance business provided that such activity shall not be in conflict with the provisions of this Agreement.

    (c) For a period of two (2) years following termination of this Agreement or retirement, Employee shall not directly or indirectly solicit, encourage or attempt to induce any person, firm, corporation or association within the territory or territories in which Employee was assigned at any time within two years of such termination or retirement, and which was insured at such time by Employer, or any of its affiliated companies, to discontinue, cancel, terminate or decline renewal of such insurance with Employer.

8. NONINTERFERENCE WITH EMPLOYMENT AGREEMENTS — For a period of two (2) years following his termination or retirement, Employee shall not, directly or indirectly, employ any other employee of Employer, or appoint any agent of, or insurance producer for Employer, as agent of, or producer for, any other insurance company or insurance agency, or insurance brokerage firm.

9. ENFORCEMENT — In addition to all other remedies which Employer may have, Employer may enforce this Agreement at equity by a suit for injunction, specific performance, or otherwise.

10. SERVICES TO AFFILIATED COMPANIES — Employee recognizes that Employer, in making and entering into this Agreement, is acting on its own behalf and also on behalf of the member companies of Universal Underwriters Group, consisting of Universal Underwriters Insurance Company, Universal Underwriters Life Insurance Company, Universal Underwriters of Texas, Universal Underwriters Service Corporation and Universal Underwriters Service Corporation of Texas, and any other company which may become affiliated with Employer. Employee agrees he may be loaned to, or perform duties for, one or more of said companies, as may be directed by Employer, and that all the terms and provisions of this Agreement shall be applicable and enforceable between such Company, or, Companies, and Employee.

11. SURVIVAL OF TERMS — All obligations of Employee set forth in Paragraph 5 through 10 inclusive, shall survive termination of employment and this Agreement.

12. SEPARABILITY OF PROVISIONS — Provisions of this Agreement are separable and in the event of the invalidity of any provision, the remaining provisions shall nevertheless remain in full force and effect. If any of the restrictions contained herein should be considered by any court of competent jurisdiction to be unenforceable, in whole or in part, because unreasonable in length of time or area to which said restriction applies, the said court may, and is requested to, reduce and reform the provisions hereof so as to apply limits as to time or area, or both, considered enforceable by said court.

13. NOTICES — All notices hereunder may be oral or in writing and, if to the Employee, may be communicated to him personally or by certified mail at his last known address. Notices served by certified mail shall be deemed served when deposited in the United States mail, postage prepaid.

14. PLACE OF AGREEMENT — This Agreement is subject to approval by Employer at its principal office in Overland Park, Kansas and shall be construed according to the laws of the State of Kansas.

15. PRONOUNS — The use of male gender pronouns herein shall include the female and the singular pronouns shall include the plural, and vice versa.

16. ENTIRE AGREEMENT — This Agreement contains the entire agreement between the parties, replaces and supersedes all prior agreements in conflict herewith, and cannot be modified or waived except in writing signed by the parties hereto. Paragraph headings are for convenience only and do not constitute part of this Agreement.


IN WITNESS WHEREOF, the parties have executed this agreement.


UNIVERSAL UNDERWRITERS INSURANCE CO.
                   EMPLOYER

By _____
       VICE PRESIDENT

_____
                 EMPLOYEE

Form 4726 (8/94)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNIVERSAL UNDERWRITERS INSURANCE COMPANY, a Kansas corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. _____ |
| BRYAN TSIKOURIS, an individual, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF JOE POTTALA

I, Joe Pottala, under penalties of perjury, state to the best of my knowledge and belief as follows:

1.    I am employed as an Account Executive in the Direct Underwriters business of Zurich American Insurance Company ("ZAIC"), the parent company of Universal Underwriters Insurance Company ("UUIC").

2.    In that role, I am responsible for accounts in portions of Chicago and certain Chicago suburbs.

3.    In March of 2008, the owner of UUIC client Glenview Auto Body ("Glenview") told me that Bryan Tsikouris ("Tsikouris") had solicited Glenview for its insurance business.  The owner also confirmed to me that Tsikouris had submitted a quote to Glenview. Tsikouris had been the account representative responsible for managing the Glenview account on behalf of UUIC.

**EXHIBIT**

tabbies

B    _____

4.      Earlier this month, the owner of UUIC client Chicago Parts and Sound ("CPS") told me that Tsikouris had solicited CPS for its insurance business. Tsikouris had been the account representative responsible for managing the CPS account on behalf of UUIC. CPS's insurance policies with UUIC are set to expire on May 22, 2008. CPS has not yet renewed the policies with UUIC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on May 19, 2008.

_____
Joe Pottala

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNIVERSAL UNDERWRITERS      )
INSURANCE COMPANY,           )
a Kansas corporation,           )
                                    )
        Plaintiff,           )
                                    )
      v.                   )   Case No. _____
                                    )
BRYAN TSIKOURIS, an individual,   )
                                    )
        Defendant.         )
                                    )

## DECLARATION OF NICHOLAS DICARLO

I, Nicholas DiCarlo, under penalties of perjury, state to the best of my knowledge and belief as follows:

1.      I am employed as a Regional Sales Manager in the Direct Underwriters business of Zurich American Insurance Company ("ZAIC"), the parent company of Universal Underwriters Insurance Company ("UUIC").

2.      In that role, I am responsible for supervising account executives and underwriting in parts of Chicago and certain Chicago suburbs.

3.      In or around September of 2007, I learned that Bryan Tsikouris ("Tsikouris") had recently solicited Gerber Collision ("Gerber") for its insurance business. Tsikouris had been the account representative responsible for managing the Gerber account on behalf of UUIC.

4.      Gerber subsequently moved its workers' compensation insurance business from UUIC to Tsikouris. Gerber had been UUIC's largest account in the region.



EXHIBIT

tabbies®

C

5.    In March of 2008, the owner of UUIC client Glenview Auto Body ("Glenview") told me that Tsikouris had solicited Glenview for its insurance business. Tsikouris had been the account representative responsible for managing the Glenview account on behalf of UUIC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on May ___, 2008.

_____
Nicholas DiCarlo

CHI 4271190v.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNIVERSAL UNDERWRITERS )
INSURANCE COMPANY, )
a Kansas corporation, )
  )
         Plaintiff, )
  )
   v. )    Case No. _____
  )
BRYAN TSIKOURIS, an individual, )
  )
         Defendant. )
  )

## DECLARATION OF BRENT WOLOSYN

I, Brent Wolosyn, under penalties of perjury, state to the best of my knowledge and belief as follows:

1.    I am employed as a Regional Sales Manager in the Direct Underwriters business of Zurich American Insurance Company ("ZAIC"), the parent company of Universal Underwriters Insurance Company ("UUIC").

2.    I formerly was responsible for supervising account executives and underwriting in portions of Chicago and certain Chicago suburbs. I recently changed territories, and I am now responsible for supervising account executives and underwriting in other states.

3.    In late August of 2007, the owner of UUIC client Gerber Collision ("Gerber") told me that Bryan Tsikouris ("Tsikouris") was soliciting Gerber for its insurance business, including by submitting a quote to Gerber. While I was a at a meeting at Gerber, I saw Tsikouris waiting in the lobby of Gerber's office.



EXHIBIT

D

4.    On August 31, 2007, I received an email from Tim O'Day, the owner of Gerber.  A true and correct copy of that email is attached as Exhibit 1 hereto.  The email confirms Gerber had moved its workers' compensation insurance business from UUIC to Tsikouris.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on May ___, 2008.

Brent Wolosyn

CH1 4275348v.1

```
"Tim O'Day"
<TOday@gerbercoll
ision.com>                                                    To
                                   "Steve Blosch"
08/31/2007 03:49                   <steve.blosch@zurichna.com>,
PM                                 <brent.wolosyn@zurichna.com>
                                                              cc
                                   "Frank Alessia"
                                   <Falessia@gerbercollision.com>,
                                   "David Streeter"
                                   <DStreeter@gerbercollision.com>
                                                         Subject
                                   FW: Work Comp
```

Steve/Brent,

The information on our workers comp policy appears below. Please let me know if you have any questions.

Tim O'Day
Chief Operating Officer
Gerber Collision & Glass
(847) 344-3212

-----Original Message-----
From: Bryan Tsikouris [mailto:btsikouris@lamblittle.com]
Sent: Friday, August 31, 2007 3:34 PM
To: Tim O'Day
Subject: RE: Work Comp

Tim, the carrier is Safeco, and the policy # is  01WC17956510, and the limits are 500,000/500,000/500,000.

Also, I need to come out there with George Canavan and meet with you and Dave, hopefully next week some time.  I'd also like to discuss which services, if any, from Bill Crimmins you want to utilize.  He can still help with loss control an all lines even if only the workers comp is with our agency.  The workers comp is where he needs to focus most of his efforts at this point anyway, though.  I don't have any financial stake in you using Bill, but I do think it would be money well spent.

EXHIBIT

!

Hope you have a great weekend with the family, Tim!
-----Original Message-----
From: Tim O'Day [mailto:TOday@gerbercollision.com]
Sent: Friday, August 31, 2007 2:21 PM
To: Bryan Tsikouris
Cc: Frank Alessia; David Streeter
Subject: FW: Work Comp

Bryan,

Can you provide the information required by Universal so that our
umbrella covers our workers compensation policy?

Tim O'Day
Chief Operating Officer
Gerber Collision & Glass
(847) 344-3212


-----Original Message-----
From: Steve Blosch [mailto:steve.blosch@zurichna.com]
Sent: Friday, August 31, 2007 2:17 PM
To: Tim O'Day
Subject: Work Comp


Tim--To add the Worker's Compensation policy under our Umbrella I will
need
the following information:

1.  Name of Work Comp carrier
2.  Limits of Work Comp insurance
3.  Policy number

If you could get this to me ASAP I would appreciate it.

Thanks,

Steve

*Janet M. Hedrick*
*Assistant General Counsel*
*Employment Law*

**CONFIDENTIAL**

August 29, 2007

**VIA DHL**
Mr. Bryan Tsikouris
Lamb Little & Co.
1101 Perimeter Drive, Suite 500
Schaumburg, IL 60173

Re:  Employment Agreement with Universal Underwriters

**Zurich North America**
Corporate Law
Zurich Towers
13th Floor
1400 American Lane
Schaumburg, Illinois
60196-1056

Direct Dial 847/330-8715
Direct Fax 847/240-4486
E-mail janet.hedrick@zurichna.com

Dear Mr. Tsikouris:

I represent Universal Underwriters Insurance Company, d/b/a/ Zurich Direct Underwriters (hereinafter "UUIC"). We have been informed that you are doing business on behalf of your current employer, Lamb Little & Co. ("LLC"), with customers of UUIC and its affiliated companies. This conduct violates the Employment Agreement that you signed upon your hire at UUIC, a copy of which I have attached.

In particular, paragraph 7 of the Employment Agreement states:

> (a)      For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.



**EXHIBIT**

E

Mr. Brian Tsikouris
August 29, 2007
Page 2 of 2

It is our policy to enforce Employment Agreements strictly, and we intend to take all necessary actions to ensure compliance and pursue compensation for damages caused by any breach. Any further violations of your Agreement will result in appropriate legal action by UUIC to protect its interests. I have also informed LLC of your Agreement and asked that they direct you to comply with its terms.

Please call me if you wish to discuss this matter further

Very truly yours,

Janet M. Hedrick

JMH:kd

Enclosure

## EMPLOYMENT AGREEMENT

This Agreement is made and entered into this _____ day of  3/12 ____, 19 98 , by and between the undersigned Employer, and  Bryan Tsikouris _____, hereinafter called Employee.

In consideration of the mutual covenants contained herein, each and all of which the parties hereto acknowledge constitute full and adequate consideration, the parties agree as follows:

1. **EMPLOYMENT AND LICENSING**

   (a) Subject to the terms and conditions hereinafter set forth, Employer does hereby employ the Employee and may license Employee as an insurance agent of Employer, or company represented by Employer, and Employer hereby accepts employment, and his license (if any) as an insurance agent as aforesaid.

   (b) During his employment the Employee shall not be licensed as an agent, solicitor, representative or broker for any insurance company or organization other than Employer, or a company represented by, or affiliated with, Employer, without the written consent of Employer. Employee, during his employment, shall not place or aid in placing insurance in or through any company other than Employer or a company represented by, or affiliated with, Employer except (1) with written permission of the Employer or (2) insurance on his own property, his own life or the property and lives of his immediate family.

2. **ASSISTANCE BY EMPLOYER** — Employer agrees to provide Employee with policy and related forms, revisions thereof, equipment, manuals, underwriting services and such supervision and training to assist Employee in carrying out his duties as Employer deems necessary.

3. **COMPENSATION** — Employer shall pay Employee as his full compensation a monthly salary, fixed by Employer from time to time, and Employer shall not be liable for any sum in excess of such monthly salary. Additional incentive compensation may be paid by Employer from time to time.

4. **EXCLUSIVE SERVICES** — Employee shall devote his entire business activity to the business of Employer. Any and all insurance business at any time or times procured by Employee while employed by Employer is and shall be the permanent and exclusive property of Employer for Employer's exclusive benefit. Without the written consent of Employer, Employee shall not, during the term of this Agreement, (a) engage in any other business activity, whether or not such business activity is pursued for a gain, profit or other advantage or (b) act as employee, officer, director or consultant for any other insurance company, agency, or brokerage firm.

   Provided, however, that Employee may invest in business enterprises not requiring any services on the part of the Employee in the operation of the affairs of the companies in which such investments are made. Provided, further such investments shall not be in any insurance company, agency, or brokerage firm unless the capital stock thereof be publicly held and traded, whether as owner, shareholder, partner or creditor, without the written consent of Employer, which shall not be unreasonably withheld.

5. **PROPERTY OF EMPLOYER AND TRADE SECRETS** — Employee recognizes, acknowledges and agrees that:

   (a) With the exception of insurance written on Employee's own property or his life, or on the property or lives of his immediate family, all contract rights with Employer's policyholders, agents, subagents, brokers and employees, and all expirations and the use and control of records, copies of policies in force, pending applications for policies of insurance on hand, Employer's policies received by Employee, inspection reports, appraisals, maps, underwriting surveys, financial information of policyholders, rate computations, payroll audits, inventory reports and distributions of values are, and shall at all times remain, the property of Employer;

   (b) The list of the Employer's customers, the premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, Employer's prospect list with expiration dates as they may exist from time to time, inspection reports, appraisals, maps, underwriting surveys, financial information of subscribers, rate computations, payroll audits, inventory reports and distributions of values and all its manuals, descriptions of techniques, and electronic data processing programs are confidential, constitute trade secrets, and are and shall remain the property of Employer. Employee will not, during or after the term of his employment, without Employer's written consent, disclose any of the foregoing items or any part or parts thereof, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, except fellow employees of Employer or companies affiliated with Employer, in the normal course of carrying out his duties. After termination of employment, Employee will not retain, or deliver to any other person, any of the items hereinabove mentioned, or copies thereof; and

   (c) In the event of a breach or threatened breach by Employee of the provisions of this paragraph, Employer shall be entitled to an injunction restraining Employee from interfering with Employer's property rights described in subparagraph (a) hereof, and from disclosing, in whole or in part, for a period of two (2) years following termination, the list of Employer's customers or any or all of the foregoing items, and from retaining, delivering and disclosing the contents to any other person, firm, corporation, association or other entity, directly or indirectly in competition with Employer, of such list or items, or from rendering, for a period of two (2) years from the date of termination hereof, any services to any person, firm, corporation, association, or other entity to whom such list or items, in whole or in part, have been delivered or disclosed or are threatened to be delivered or disclosed. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available to Employer for such breach or threatened breach, including the recovery of damages from Employee.

6. **TERM OF EMPLOYMENT AND TERMINATION** — This Agreement shall continue until terminated by either party. Either party hereto may terminate this Agreement at any time. Notice of termination (regardless of the effective date thereof) by either party shall authorize Employer to terminate at any time all duties and services of Employee and to cancel his license (if any) as insurance agent of Employer.

7.    ACTIVITY AFTER TERMINATION

    (a)    For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association than insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

    (b)    Employee, after termination of this Agreement, shall not be prohibited from engaging in any phase of the insurance business provided that such activity shall not be in conflict with the provisions of this Agreement.

    (c)    For a period of two (2) years following termination of this Agreement or retirement, Employee shall not directly or indirectly solicit, encourage or attempt to induce any person, firm, corporation or association within the territory or territories to which Employee was assigned at any time within two years of such termination or retirement, and which was insured at such time by Employer, or any of its affiliated companies, to discontinue, cancel, terminate or decline renewal of such insurance with Employer.

8.    NONINTERFERENCE WITH EMPLOYMENT AGREEMENTS — For a period of two (2) years following his termination or retirement, Employee shall not, directly or indirectly, employ any other employee of Employer, or appoint any agent of, or insurance producer for Employer, as agent of, or producer for, any other insurance company or insurance agency, or insurance brokerage firm.

9.    ENFORCEMENT — In addition to all other remedies which Employer may have, Employer may enforce this Agreement at equity by a suit for injunction, specific performance, or otherwise.

10.   SERVICES TO AFFILIATED COMPANIES — Employee recognizes that Employer, in making and entering into this Agreement, is acting on its own behalf and also on behalf of the member companies of Universal Underwriters Group, consisting of Universal Underwriters Insurance Company, Universal Underwriters Life Insurance Company, Universal Underwriters of Texas, Universal Underwriters Service Corporation and Universal Underwriters Service Corporation of Texas, and any other company which may become affiliated with Employer. Employee agrees he may be loaned to, or perform duties for, one or more of said companies, as may be directed by Employer, and that all the terms and provisions of this Agreement shall be applicable and enforceable between such Company, or, Companies, and Employee.

11.   SURVIVAL OF TERMS — All obligations of Employee set forth in Paragraph 5 through 10 inclusive, shall survive termination of employment and this Agreement.

12.   SEPARABILITY OF PROVISIONS — Provisions of this Agreement are separable and in the event of the invalidity of any provision, the remaining provisions shall nevertheless remain in full force and effect. If any of the restrictions contained herein should be considered by any court of competent jurisdiction to be unenforceable, in whole or in part, because unreasonable in length of time or area to which said restriction applies, the said court may, and is requested to, reduce and reform the provisions hereof so as to apply limits as to time or area, or both, considered enforceable by said court.

13.   NOTICES — All notices hereunder may be oral or in writing and, if to the Employee, may be communicated to him personally or by certified mail at his last known address. Notices served by certified mail shall be deemed served when deposited in the United States mail, postage prepaid.

14.   PLACE OF AGREEMENT — This Agreement is subject to approval by Employer at its principal office in Overland Park, Kansas and shall be construed according to the laws of the State of Kansas.

15.   PRONOUNS — The use of male gender pronouns herein shall include the female and the singular pronouns shall include the plural, and vice versa.

16.   ENTIRE AGREEMENT — This Agreement contains the entire agreement between the parties, replaces and supersedes all prior agreements in conflict herewith, and cannot be modified or waived except in writing signed by the parties hereto. Paragraph headings are for convenience only and do not constitute part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this agreement.

UNIVERSAL UNDERWRITERS INSURANCE CO.

EMPLOYER

EMPLOYEE

By

VICE PRESIDENT

Form 4725 (8/94)



08 cv 2890
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE NOLAN

ZURICH

**Janet M. Hedrick**
*Assistant General Counsel*

August 29, 2007

<u>VIA FAX AND US MAIL</u>

Mr. Scott Bennett
**Chief Operating Officer**
Lamb Little & Co.
1101 Perimeter Drive, Suite 500
Schaumburg, IL 60173

Re:  Bryan Tsikouris
     Employment Agreement with Zurich/Universal Underwriters Insurance
     Company

Dear Mr. Bennett:

Zurich North America Commercial
Corporate Law
Zurich Towers
20th Floor
1400 American Lane
Schaumburg, Illinois
60196-1056

Direct Dial 847/330-8715
Direct Fax 847/240-4486
E-mail janet.hedrick@zurichna.com

I represent Universal Underwriters Insurance Company, d/b/a/ Zurich Direct Underwriters (hereinafter "UUIC").  I am writing to notify Lamb Little & Co. ("LLC") that Bryan Tsikouris, who began his employment with LLC in May 2007, signed an employment agreement with UUIC upon his hire in March 1998.  A copy of that Agreement is enclosed. Paragraph 7 of that agreement provides:

(a)     For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

On May 17, 2007, Mr. Tsikouris resigned from his position as Account Executive to accept employment with LLC.  Recently, at least one large

**EXHIBIT**

A

Mr. Scott Bennett
August 29, 2007
Page 2 of 2

UUIC customer, Gerber Collision & Glass, reported that Mr. Tsikouris
quoted its worker's compensation business on behalf of LLC and that Gerber
is moving its account to LLC effective September 1, 2007 as a result. Gerber
is a customer that Mr. Tsikouris secured while employed by UUIC, using its
resources, giving UUIC a protectible interest in that customer relationship.

Such actions by Mr. Tsikouris on behalf of LLC violate his employment
agreement for LLC's benefit. Consequently, UUIC has sent a letter to Mr.
Tsikouris demanding that he comply with the Agreement. UUIC further
asks that LLC immediately direct Mr. Tsikouris to abide by the Agreement's
terms and refrain from direct or indirect contact with UUIC customers with
whom he had dealings on UUIC's behalf, in order to avoid unfair
competition and tortious interference with UUIC's contractual rights and
business relationships.

Thank you for your anticipated cooperation. Please call me if you wish to
discuss this matter further.

Very truly yours,

Janet M. Hedrick

Janet M. Hedrick

JMH:kd

Enclosure



# EMPLOYMENT AGREEMENT

This Agreement is made and entered into this _____ day of _3/12_ , 19 _98_ , by and between the undersigned Employer, and _Bryan Tsikouris_ , hereinafter called Employee.

In consideration of the mutual covenants contained herein, each and all of which the parties hereto acknowledge constitute full and adequate consideration, the parties agree as follows:

1. EMPLOYMENT AND LICENSING

   (a) Subject to the terms and conditions hereinafter set forth, Employer does hereby employ the Employee and may license Employee as an insurance agent of Employer, or company represented by Employer, and Employer hereby accepts employment, and his license (if any) as an insurance agent as aforesaid.

   (b) During his employment the Employee shall not be licensed as an agent, solicitor, representative or broker for any insurance company or organization other than Employer, or a company represented by, or affiliated with, Employer, without the written consent of Employer. Employee, during his employment, shall not place or aid in placing insurance in or through any company other than Employer or a company represented by, or affiliated with, Employer except (1) with written permission of the Employer or (2) insurance on his own property, his own life or the property and lives of his immediate family.

2. ASSISTANCE BY EMPLOYER — Employer agrees to provide Employee with policy and related forms, revisions thereof, equipment, manuals, underwriting services and such supervision and training to assist Employee in carrying out his duties as Employer deems necessary.

3. COMPENSATION — Employer shall pay Employee as his full compensation a monthly salary, fixed by Employer from time to time, and Employer shall not be liable for any sum in excess of such monthly salary. Additional incentive compensation may be paid by Employer from time to time.

4. EXCLUSIVE SERVICES — Employee shall devote his entire business activity to the business of Employer. Any and all insurance business at any time or times procured by Employee while employed by Employer is and shall be the permanent and exclusive property of Employer for Employer's exclusive benefit. Without the written consent of Employer, Employee shall not, during the term of this Agreement, (a) engage in any other business activity, whether or not such business activity is pursued for a gain, profit or other advantage or (b) act as employee, officer, director or consultant for any other insurance company, agency, or brokerage firm.

   Provided, however, that Employee may invest in business enterprises not requiring any services on the part of the Employee in the operation of the affairs of the companies in which such investments are made. Provided, further such investments shall not be in any insurance company, agency, or brokerage firm unless the capital stock thereof be publicly held and traded, whether as owner, shareholder, partner or creditor, without the written consent of Employer, which shall not be unreasonably withheld.

5. PROPERTY OF EMPLOYER AND TRADE SECRETS — Employee recognizes, acknowledges and agrees that:

   (a) With the exception of insurance written on Employee's own property or his life, or on the property or lives of his immediate family, all contract rights with Employer's policyholders, agents, subagents, brokers and employees, and all expirations and the use and control of records, copies of policies in force, pending applications for policies of insurance on hand, Employer's policies received by Employee, inspection reports, appraisals, maps, underwriting surveys, financial information of policyholders, rate computations, payroll audits, inventory reports and distributions of values are, and shall at all times remain, the property of Employer;

   (b) The list of the Employer's customers, the premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, Employer's prospect list with expiration dates as they may exist from time to time, inspection reports, appraisals, maps, underwriting surveys, financial information of subscribers, rate computations, payroll audits, inventory reports and distributions of values and all its manuals, descriptions of procedures and techniques, and electronic data processing programs are confidential, constitute trade secrets, and are and shall remain the property of Employer. Employee will not, during or after the term of his employment, without Employer's written consent, disclose any of the foregoing items or any part or parts thereof, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, except fellow employees of Employer or companies affiliated with Employer, in the normal course of carrying out his duties. After termination of employment, Employee will not retain, or deliver to any other person, any of the items hereinabove mentioned, or copies thereof; and

   (c) In the event of a breach or threatened breach by Employee of the provisions of this paragraph, Employer shall be entitled to an injunction restraining Employee from interfering with Employer's property rights described in subparagraph (a) hereof, and from disclosing, in whole or in part, for a period of two (2) years following termination, the list of Employer's customers or any or all of the foregoing items, and from retaining, delivering and disclosing the contents to any other person, firm, corporation, association or other entity, directly or indirectly in competition with Employer, of such list or items, or from rendering, for a period of two (2) years from the date of termination hereof, any services to any person, firm, corporation, association, or other entity to whom such list or items, in whole or in part, have been delivered or disclosed or are threatened to be delivered or disclosed. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available to Employer for such breach or threatened breach, including the recovery of damages from Employee.

6. TERM OF EMPLOYMENT AND TERMINATION — This Agreement shall continue until terminated by either party. Either party hereto may terminate this Agreement at any time. Notice of termination (regardless of the effective date thereof) by either party shall authorize Employer to terminate at any time all duties and services of Employee and to cancel his license (if any) as insurance agent of Employer.

7. ACTIVITY AFTER TERMINATION

   (a) For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

   (b) Employee, after termination of this Agreement, shall not be prohibited from engaging in any phase of the insurance business provided that such activity shall not be in conflict with the provisions of this Agreement.

   (c) For a period of two (2) years following termination of this Agreement or retirement, Employee shall not directly or indirectly solicit, encourage or attempt to induce any person, firm, corporation or association within the territory or territories to which Employee was assigned at any time within two years of such termination or retirement, and which was insured at such time by Employer, or any of its affiliated companies, to discontinue, cancel, terminate or decline renewal of such insurance with Employer.

8. NONINTERFERENCE WITH EMPLOYMENT AGREEMENTS — For a period of two (2) years following his termination or retirement, Employee shall not, directly or indirectly, employ any other employee of Employer, or appoint any agent of, or insurance producer for Employer, as agent of, or producer for, any other insurance company or insurance agency, or insurance brokerage firm.

9. ENFORCEMENT — In addition to all other remedies which Employer may have, Employer may enforce this Agreement at equity by a suit for injunction, specific performance, or otherwise.

10. SERVICES TO AFFILIATED COMPANIES — Employee recognizes that Employer, in making and entering into this Agreement, is acting on its own behalf and also on behalf of the member companies of Universal Underwriters Group, consisting of Universal Underwriters Insurance Company, Universal Underwriters Life Insurance Company, Universal Underwriters of Texas, Universal Underwriters Service Corporation and Universal Underwriters Service Corporation of Texas, and any other company which may become affiliated with Employer. Employee agrees he may be loaned to, or perform duties for, one or more of said companies, as may be directed by Employer, and that all the terms and provisions of this Agreement shall be applicable and enforceable between such Company, or, Companies, and Employee.

11. SURVIVAL OF TERMS — All obligations of Employee set forth in Paragraph 5 through 10 inclusive, shall survive termination of employment and this Agreement.

12. SEPARABILITY OF PROVISIONS — Provisions of this Agreement are separable and in the event of the invalidity of any provision, the remaining provisions shall nevertheless remain in full force and effect. If any of the restrictions contained herein should be considered by any court of competent jurisdiction to be unenforceable, in whole or in part, because unreasonable in length of time or area to which said restriction applies, the said court may, and is requested to, reduce and reform the provisions hereof so as to apply limits as to time or area, or both, considered enforceable by said court.

13. NOTICES — All notices hereunder may be oral or in writing and, if to the Employee, may be communicated to him personally or by certified mail at his last known address. Notices served by certified mail shall be deemed served when deposited in the United States mail, postage prepaid.

14. PLACE OF AGREEMENT — This Agreement is subject to approval by Employer at its principal office in Overland Park, Kansas and shall be construed according to the laws of the State of Kansas.

15. PRONOUNS — The use of male gender pronouns herein shall include the female and the singular pronouns shall include the plural, and vice versa.

16. ENTIRE AGREEMENT — This Agreement contains the entire agreement between the parties, replaces and supersedes all prior agreements in conflict herewith, and cannot be modified or waived except in writing signed by the parties hereto. Paragraph headings are for convenience only and do not constitute part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this agreement.

_____
UNIVERSAL UNDERWRITERS INSURANCE CO.
                     EMPLOYER

_____
                          EMPLOYEE

By _____
          VICE PRESIDENT

Form 4726 (8/94)

*Janet M. Hedrick*
*Assistant General Counsel*
*Employment Law*

**CONFIDENTIAL**

August 29, 2007

**VIA DHL**
Mr. Bryan Tsikouris
Lamb Little & Co.
1101 Perimeter Drive, Suite 500
Schaumburg, IL 60173

Re:   Employment Agreement with Universal Underwriters

Dear Mr. Tsikouris:

**Zurich North America**
Corporate Law
Zurich Towers
13th Floor
1400 American Lane
Schaumburg, Illinois
60196-1056

Direct Dial 847/330-8715
Direct Fax 847/240-4486
E-mail janet.hedrick@zurichna.com

I represent Universal Underwriters Insurance Company, d/b/a/ Zurich Direct Underwriters (hereinafter "UUIC"). We have been informed that you are doing business on behalf of your current employer, Lamb Little & Co. ("LLC"), with customers of UUIC and its affiliated companies. This conduct violates the Employment Agreement that you signed upon your hire at UUIC, a copy of which I have attached.

In particular, paragraph 7 of the Employment Agreement states:

(a)      For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

Mr. Brian Tsikouris
August 29, 2007
Page 2 of 2

It is our policy to enforce Employment Agreements strictly, and we intend to
take all necessary actions to ensure compliance and pursue compensation for
damages caused by any breach. Any further violations of your Agreement
will result in appropriate legal action by UUIC to protect its interests. I have
also informed LLC of your Agreement and asked that they direct you to
comply with its terms.

Please call me if you wish to discuss this matter further

Very truly yours,

Janet M. Hedrick

JMH:kd

Enclosure

# EMPLOYMENT AGREEMENT

This Agreement is made and entered into this _____ day of **3/12** , 19 **98** , by and between the undersigned Employer, and ~~Bryan Tsikouris~~ , hereinafter called Employee.

In consideration of the mutual covenants contained herein, each and all of which the parties hereto acknowledge constitute full and adequate consideration, the parties agree as follows:

1. **EMPLOYMENT AND LICENSING**

   (a) Subject to the terms and conditions hereinafter set forth, Employer does hereby employ the Employee and may license Employee as an insurance agent of Employer, or company represented by Employer, and Employer hereby accepts employment, and his license (if any) as an insurance agent as aforesaid.

   (b) During his employment the Employee shall not be licensed as an agent, solicitor, representative or broker for any insurance company or organization other than Employer, or a company represented by, or affiliated with, Employer, without the written consent of Employer. Employee, during his employment, shall not place or aid in placing insurance in or through any company other than Employer or a company represented by, or affiliated with, Employer except (1) with written permission of the Employer or (2) insurance on his own property, his own life or the property and lives of his immediate family.

2. **ASSISTANCE BY EMPLOYER** — Employer agrees to provide Employee with policy and related forms, revisions thereof, equipment, manuals, underwriting services and such supervision and training to assist Employee in carrying out his duties as Employer deems necessary.

3. **COMPENSATION** — Employer shall pay Employee as his full compensation a monthly salary, fixed by Employer from time to time, and Employer shall not be liable for any sum in excess of such monthly salary. Additional incentive compensation may be paid by Employer from time to time.

4. **EXCLUSIVE SERVICES** — Employee shall devote his entire business activity to the business of Employer. Any and all insurance business at any time or times procured by Employee while employed by Employer is and shall be the permanent and exclusive property of Employer for Employer's exclusive benefit. Without the written consent of Employer, Employee shall not, during the term of this Agreement, (a) engage in any other business activity, whether or not such business activity is pursued for a gain, profit or other advantage or (b) act as employee, officer, director or consultant for any other insurance company, agency, or brokerage firm.

   Provided, however, that Employee may invest in business enterprises not requiring any services on the part of the Employee in the operation of the affairs of the companies in which such investments are made. Provided, further such investments shall not be in any insurance company, agency, or brokerage firm unless the capital stock thereof be publicly held and traded, whether as owner, shareholder, partner or creditor, without the written consent of Employer, which shall not be unreasonably withheld.

5. **PROPERTY OF EMPLOYER AND TRADE SECRETS** — Employee recognizes, acknowledges and agrees that:

   (a) With the exception of insurance written on Employee's own property or his life, or on the property or lives of his immediate family, all contract rights with Employer's policyholders, agents, subagents, brokers and employees, and all expirations and the use and control of records, copies of policies in force, pending applications for policies of insurance on hand, Employer's policies received by Employee, inspection reports, appraisals, maps, underwriting surveys, financial information of policyholders, rate computations, payroll audits, inventory reports and distributions of values are, and shall at all times remain, the property of Employer;

   (b) The list of the Employer's customers, the premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, Employer's prospect list with expiration dates as they exist from time to time, inspection reports, appraisals, maps, underwriting surveys, financial information of subscribers, rate computations, payroll audits, inventory reports and distributions of values and all its manuals, descriptions of procedures and techniques, and electronic data processing programs are confidential, constitute trade secrets, and are and shall remain the property of Employer. Employee will not, during or after the term of his employment, without Employer's written consent, disclose any of the foregoing items or any part or parts thereof, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, except fellow employees of Employer or companies affiliated with Employer, in the normal course of carrying out his duties. After termination of employment, Employee will not retain, or deliver to any other person, any of the items hereinabove mentioned, or copies thereof; and

   (c) In the event of a breach or threatened breach by Employee of the provisions of this paragraph, Employer shall be entitled to an injunction restraining Employee from interfering with Employer's property rights described in subparagraph (a) hereof, and from disclosing, in whole or in part, for a period of two (2) years following termination, the list of Employer's customers or any or all of the foregoing items, and from retaining, delivering and disclosing the contents to any other person, firm, corporation, association or other entity, directly or indirectly in competition with Employer, of such list or items, or from rendering, for a period of two (2) years from the date of termination hereof, any services to any person, firm, corporation, association, or other entity to whom such list or items, in whole or in part, have been delivered or disclosed or are threatened to be delivered or disclosed. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available to Employer for such breach or threatened breach, including the recovery of damages from Employee.

6. **TERM OF EMPLOYMENT AND TERMINATION** — This Agreement shall continue until terminated by either party. Either party hereto may terminate this Agreement at any time. Notice of termination (regardless of the effective date thereof) by either party shall authorize Employer to terminate at any time all duties and services of Employee and to cancel his license (if any) as insurance agent of Employer.

7.  ACTIVITY AFTER TERMINATION

(a) For a period of two (2) years, following termination of this Agreement, or following Employee's retirement, Employee shall not, except with written consent of Employer, directly or indirectly, for himself or others, in any manner whatsoever, within the territory or territories to which he was assigned at any time within two years of such termination or retirement, procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications or inquiries about insurance from any person, firm, corporation or association then insured or which was insured by a policy, or policies, of insurance issued by Employer or any of its affiliated companies within one (1) year prior to such termination or retirement, or any insurance agency or broker with whom company regularly carried on business.

(b) Employee, after termination of this Agreement, shall not be prohibited from engaging in any phase of the insurance business provided that such activity shall not be in conflict with the provisions of this Agreement.

(c) For a period of two (2) years following termination of this Agreement or retirement, Employee shall not directly or indirectly solicit, encourage or attempt to induce any person, firm, corporation or association within the territory or territories to which Employee was assigned at any time within two years of such termination or retirement, and which was insured at such time by Employer, or any of its affiliated companies, to discontinue, cancel, terminate or decline renewal of such insurance with Employer.

8.  NONINTERFERENCE WITH EMPLOYMENT AGREEMENTS — For a period of two (2) years following his termination or retirement, Employee shall not, directly or indirectly, employ any other employee of Employer, or appoint any agent of, or insurance producer for Employer, as agent of, or producer for, any other insurance company or insurance agency, or insurance brokerage firm.

9.  ENFORCEMENT — In addition to all other remedies which Employer may have, Employer may enforce this Agreement at equity by a suit for injunction, specific performance, or otherwise.

10. SERVICES TO AFFILIATED COMPANIES — Employee recognizes that Employer, in making and entering into this Agreement, is acting on its own behalf and also on behalf of the member companies of Universal Underwriters Group, consisting of Universal Underwriters Insurance Company, Universal Underwriters Life Insurance Company, Universal Underwriters of Texas, Universal Underwriters Service Corporation and Universal Underwriters Service Corporation of Texas, and any other company which may become affiliated with Employer. Employee agrees he may be loaned to, or perform duties for, one or more of said companies, as may be directed by Employer, and that all the terms and provisions of this Agreement shall be applicable and enforceable between such Company, or, Companies, and Employee.

11. SURVIVAL OF TERMS — All obligations of Employee set forth in Paragraph 5 through 10 inclusive, shall survive termination of employment and this Agreement.

12. SEPARABILITY OF PROVISIONS — Provisions of this Agreement are separable and in the event of the invalidity of any provision, the remaining provisions shall nevertheless remain in full force and effect. If any of the restrictions contained herein should be considered by any court of competent jurisdiction to be unenforceable, in whole or in part, because unreasonable in length of time or area to which said restriction applies, the said court may, and is requested to, reduce and reform the provisions hereof so as to apply limits as to time or area, or both, considered enforceable by said court.

13. NOTICES — All notices hereunder may be oral or in writing and, if to the Employee, may be communicated to him personally or by certified mail at his last known address. Notices served by certified mail shall be deemed served when deposited in the United States mail, postage prepaid.

14. PLACE OF AGREEMENT — This Agreement is subject to approval by Employer at its principal office in Overland Park, Kansas and shall be construed according to the laws of the State of Kansas.

15. PRONOUNS — The use of male gender pronouns herein shall include the female and the singular pronouns shall include the plural, and vice versa.

16. ENTIRE AGREEMENT — This Agreement contains the entire agreement between the parties, replaces and supersedes all prior agreements in conflict herewith, and cannot be modified or waived except in writing signed by the parties hereto. Paragraph headings are for convenience only and do not constitute part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this agreement.

UNIVERSAL UNDERWRITERS INSURANCE CO.
EMPLOYER

_Bryan Trohn_
EMPLOYEE

By _____
VICE PRESIDENT

Form 4726 (8/94)

08 CV 2890

JUDGE DER-YEGHIAYAN          Page 1

MAGISTRATE JUDGE NOLAN

LEXSEE 1992 US APP LEXIS 16557

**EQUIFAX SERVICES, INC., doing business as Equifax Commercial Specialists, formerly known as White & White Inspection & Audit Service, Inc., Plaintiff-Appellee, v. STEVEN A. HITZ, Defendant-Appellant.**

No. 91-3109

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

*1992 U.S. App. LEXIS 16557*

**July 9, 1992, Filed**

**NOTICE:** [*1] THIS ORDER AND JUDGMENT HAS NO PRECEDENTIAL VALUE AND SHALL NOT BE CITED, OR USED BY ANY COURT WITHIN THE TENTH CIRCUIT, EXCEPT FOR PURPOSES OF ESTABLISHING THE DOCTRINES OF THE CASE, RES JUDICATA, OR COLLATERAL ESTOPPEL. 10TH CIR. R. 36.3.

**SUBSEQUENT HISTORY:** Reported as Table case at *1992 U.S. App. LEXIS 23857*

**PRIOR HISTORY:** (D.C. No. 89-CV-2047). (Dist. of Kansas). D.C. Judge DALE E. SAFFELS

**DISPOSITION:** AFFIRMED

**JUDGES:** Before BALDOCK and BARRETT, Circuit Judges, and PARKER**, District Judge.

UNKNOWN        **The Honorable James A. Parker, United States District Judge for the District of New Mexico, sitting by designation.

**OPINION BY:** JAMES E. BARRETT

**OPINION**

ORDER AND JUDGMENT

Steven A. Hitz (Hitz), appeals from the order and judgment of $ 605,000 entered in favor of Equifax Services, Inc., d/b/a Equifax Commercial Specialists f/k/a White & White Inspection and Audit Service, Inc. (Equifax) [1] after trial to the district court.

1 In early 1988, Equifax merged with White & White. While the parties dispute whether Equifax purchased White & White or whether the two merged, the district court determined that it was a corporate merger. See *Equifax Services, Inc. v. Hitz*, 1991 WL 17651, at *2 (Appellant's Appendix Tab 62, p. 3).

[*2] Hitz was employed as a branch manager for White & White Inspection and Audit Service, Inc., a Missouri corporation. (White & White). As branch manager, Hitz was involved with White & White's customers in such a manner as to allow him access to the clients and to confidential information about the different client accounts. During this employment, Hitz signed two employment agreements, one in 1982 and one in 1986. The 1986 employment agreement contained the following covenant not to compete clause:

9. *Covenant Not To Compete.*

(a) The Branch Manager agrees that for a period of two (2) years following the termination of his employment with White & White for any reason whatsoever, whether such termination is with or without cause, he will not engage, directly or indirectly, in competition with White & White in furnishing Investigations to the Customers on a fee basis in any State(s) in which he as operated as a branch manager within the past two (2) years, either as a principal, agent, partner, officer, director, stockholder, advisor, consultant, employee, contractor, or in any other form, method or capacity. For the same period, the Branch Manager further agrees that he [*3] will not in any manner persuade or attempt to persuade any employee or field representative of White & White to discontinue his relationship with White & White or engage in concert with any em-

**EXHIBIT**

tabbies*

B

ployee or field representative of White & White in competition with White & White. It is agreed that any breach of this Agreement by the Branch Manager shall entitle White & White, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin any violation of this Agreement.

(Appellee's Appendix, Vol. 2, Tab 119, pp. 3-4). The agreement also contained a paragraph which stated that the agreement would be governed by the laws of the State of Kansas. *Id.* at 4.

On February 24, 1988, prior to the merger, [2] Hitz informed White & White that he intended to resign his position, which he did vacate on March 31, 1988. On April 1, 1988, Hitz went to work for a competing company, Golden Coast Survey and Audit Services, Inc. (Golden Coast).

> 2  The date of the merger is disputed. Hitz states that the "purchase of White & White was consummated" on April 27, 1988 (Appellant's Brief p. 1), and Equifax states that the merger occurred on February 29, 1988. (Appellee's Brief p. 11). The Agreement and Plan of Merger is dated February 29, 1988 (See, Appellee's Appendix Tab 133).

[*4] On April 28, 1988, White & White, through its attorney, notified Hitz that it believed he was in violation of his employment agreement. Specifically, White & White alleged that Hitz was violating the covenant not to compete clause of the agreement. White & White also notified Hitz that it intended to enforce the restrictive covenant. (Appellant's Appendix, Vol. III, Tab 45).

Equifax brought suit in Kansas state court against Hitz on December 19, 1988, for both damages and injunctive relief. Hitz removed the case to the United States District Court for the District of Kansas on diversity grounds. On February 21, 1989, the district court entered a temporary restraining order (TRO) against Hitz. (Appellant's Appendix, Vol. I, Tab 1). The TRO enjoined him from violating the covenants contained in the employment agreement he had with White & White. Thereafter, Hitz moved to dismiss the complaint alleging lack of personal jurisdiction. Alternatively, he sought a change of venue to the United States District Court for the Central District of California. (Appellant's Appendix, Vol. I, Tab 2).

On March 8, 1989, the district court entered a preliminary injunction against Hitz, [*5] and denied his motion for a change of venue. (Appellant's Appendix,

Vol. I, Tab 3). We affirmed the district court's preliminary injunction and determined that the motion for a change of venue was an interlocutory order and not immediately appealable. See, *Equifax Services, Inc., v. Hitz, 905 F.2d 1355 (10th Cir. 1990)*.

While Hitz's first appeal to our court was pending, Equifax filed an amended complaint against Hitz, which alleged: breach of agreement; interference with prospective business or economic advantage; breach of the fiduciary duty of good faith and fair dealing; unfair competition; and misrepresentation. (Appellant's Appendix, Vol. I, Tab 5).

On August 20, 1990, the district court commenced a two day bench trial. At the trial, Equifax alleged that Hitz and his wife formed Golden Coast during March, 1989, prior to his resignation from White & White; that Hitz actively participated in the formation of Golden Coast; that Hitz's wife owned 95% of the shares of stock in Golden Coast [3]; that before and after Hitz's resignation from White & White, he solicited business on behalf of Golden Coast from clients of White & White; and that Hitz contacted [*6] other employees of White & White regarding possible employment with Golden Coast.

> 3  Equifax contended that prior to the formation of Golden Coast, Hitz's wife had no experience or training in the survey and audit business.

On January 24, 1991, the district court entered judgment in favor of Equifax, awarding Equifax $ 605,000 in damages. In its detailed judgment, the district court found, *inter alia*, that: it had personal jurisdiction over Hitz; pursuant to Kansas choice of law principles, Kansas law governed the dispute; the restrictive covenant should be reformed to cover only the Los Angeles branch area, rather than all of California; Hitz had entered an employment agreement with White & White, in which he agreed to the covenant not to compete clause; Hitz had violated the covenant; the transaction between White & White and Equifax was a merger and not a sale; and, Equifax suffered damages as a result of Hitz's breach of the employment agreement. The court determined that the damages suffered by Equifax [*7] included lost profits, costs incurred to replace and train employees hired away by Hitz, and the loss of goodwill among many of White & White's former clients. (Appellant's Appendix, Vol. IV, Tab 62). Following the judgment, Hitz filed a motion for a new trial, which was denied by the district court. (Appellant's Appendix, Vol. IV, Tabs 68 and 70).

On appeal, in a lengthy listing of issues, Hitz contends that the district court erred in what basically amounts to all of its findings of facts and conclusions of law. Questions of law are reviewed de novo, while fac-

tual findings of the district court are reviewed under the clearly erroneous standard. *American Council for the Blind of Colorado, Inc. v. Romer*, 1992 WL 90490 * 1 (10th Cir., May 5, 1992).

I.

Hitz here argues many of the same legal issues we dealt with in *Equifax Servs., Inc. v. Hitz, 905 F.2d 1355 (10th Cir. 1990)*. We there held in favor of Equifax on the issues regarding personal jurisdiction, standing, and choice of law in the preliminary injunctive stage of the lawsuit. We hold in favor of Equifax on the same issues here.

a.

Regarding the issue of personal jurisdiction, we have held that, [*8]

> "'A federal court sitting in diversity "may exercise personal jurisdiction over a nonresident defendant only so long as there exist "'minimum contacts'" between the defendant and the forum state." "The defendant's contacts with the forum state must be such that maintenance of the suit 'does not offend "traditional notions of fair play and substantial justice."'"'"

*Kennedy v. Freeman, 919 F.2d 126, 128 (10th Cir. 1990)* (citations omitted). We further held that to establish specific jurisdiction, a party must do some act that represents an effort by him to "purposefully avail [] [himself] of the privilege of conducting activities within the forum State." *Id.* (citations omitted).

In *Equifax*, we held that "the nature of defendant's relationship with his Kansas employer supports the district court's exercise of personal jurisdiction over defendant in Kansas in this dispute arising out of that relationship." *Equifax at 1357*. Hitz purposefully availed himself of the privilege of conducting activities within Kansas when he agreed to employment with a corporation whose home office and all administrative activities relating to the employment were [*9] in Kansas. [4] Furthermore, Hitz agreed to an employment agreement which contained a clause providing that the agreement would be governed by the law of the State of Kansas. (Appellee's Appendix, Vol. 2, Tab 119, p. 4).

4    Although Hitz's physical presence in Kansas was not significant, and he worked solely in southern California,

. . . as a branch manager in charge of White & White offices there, his only direct supervision came from White & White employees in Kansas. [Hitz] had regular contact with White & White employees in Kansas, both by telephone, mail, and through electronic data communications. [Hitz's] customers were invoiced from and made payment directly to White & White in Kansas. [Hitz] and his personnel were paid directly by White & White from Kansas, and that company's Kansas office reimbursed expenses for [Hitz's] offices and provided those offices with necessary materials and supplies. [Hitz] also negotiated the terms of his employment contract directly with White & White's president, a contract which paid him $ 120,000 to $ 140,000 per year over his last two years of employment.

*Equifax at 1358*.

[*10]    Hitz argued in *Equifax*, as he does here, that the district court erred in finding that he was not fraudulently induced to sign the 1986 agreement with White & White. In *Equifax*, we found nothing in the record to support the claim, nor do we find anything in the present record which would support such a claim. Thus, we hold that the district court properly exercised personal jurisdiction over Hitz.

b.

The 1986 employment agreement signed by Hitz, contained a paragraph which read as follows:

10. *Miscellaneous.*

* * *

(f) *Inurement and Modification.* The duties and obligations of the Branch Manager under this agreement shall inure the benefit of the successors and assigns of White & White. . . .

* * *

(Appellee's Appendix, Vol. 2, Tab 119, p. 4).

We held in *Equifax*, that, "in the case of a merger, as here, the surviving corporation automatically succeeds to the rights of the merged corporations to enforce employees' covenants not to compete." *Equifax at 1361* (citations omitted). Our holding that the surviving corporation automatically succeeds to the rights of the merged corporation and the clause stated in the employment agreement that Hitz [*11] signed, clearly indicates that Equifax had standing to enforce the agreement and the covenants contained therein.

c.

The federal district court for the District of Kansas has held that "when [a] court exercises diversity jurisdiction, it must apply the substantive law of the forum state," *Commercial Union Ins. v. John Massman Contracting, 713 F.Supp. 1403, 1404-5 (D.Kan. 1989)* (citation omitted), and that "in contract actions, Kansas courts follow the general rule that the place where the contract is made controls its interpretation . . . . [and that] the contract is 'made' where the last act necessary for its formation is performed." *Id. at 1405* (citation omitted). We agree. See also, *Frasher v. Life Investors Ins. Co., 796 P.2d 1069, 1071 (Kan.App. 1990)* (when the underlying issue involves construction of a contract, the choice of law rule applied by Kansas is lex loci contractus); *State Farm Mut. Auto. Ins. Co. v. Baker, 797 P.2d 168, 171 (Kan.App. 1990)* (which state's substantive law is applicable to construction of contract issues is determined by where the contract is made).

In the instant case, [*12] after Hitz had signed the contract, the last act necessary for the formation of the employment agreement between Equifax and Hitz was the signature of the president of Equifax at the home office of the corporation in Kansas. This was the final step in solidifying the employment agreement between Hitz and Equifax. The contract specifically stated that Kansas law would govern the contract.

In *Equifax*, we held that Kansas law would govern the contract as specifically provided in the employment agreement. We also held that under Kansas law, when there is no contractual choice-of-law provision, the Kansas Supreme Court has chosen to adhere to the lex loci contractus rule. *Equifax at 1360* (citing *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc., 777 P.2d 1259, 1267-70 (Kan. 1989)*). Thus, we hold that based upon our review of the facts and our holdings in *Equifax*, the place of contract is Kansas and Kansas substantive law is applicable.

II.

Hitz contends that the district court erred in concluding that the "customer contacts" covenants in the employment agreement did not seek to prevent ordinary competition and could be enforced against [*13] him under Kansas law.

In *Uarco Inc. v. Eastland, 584 F.Supp. 1259, 1261 (D.Kan. 1984)*, the court determined that a clause not to compete was valid if ancillary to a lawful contract, but that it was subject to reasonableness. The court further found that "only legitimate interests may be protected by such a covenant, and it is unreasonable if its real object is merely to avoid ordinary competition." (citations omitted). See also *Eastern Distributing Co., Inc. v. Flynn, 567 P.2d 1371, 1376-1377 (Kan. 1977)*.

The *Uarco* case involved facts similar to those in the instant case. In *Uarco*, the "plaintiff's business '[was] one in which the employee [was] the sole or primary contact with the customers and in which a close personal relationship with them is fostered, enabling the employee to control such business as a personal asset.'" *Uarco at 1262* (citation omitted). In our case the evidence established that a similar relationship existed between Hitz and the clients he dealt with while employed by White & White.

The nature of Hitz's employment indicates that the covenant not to compete set forth in the employment agreement served [*14] a legitimate purpose in protecting White & White from that which ultimately happened, i.e., Hitz's use of his relationship with the clients to lure them away from White & White to Golden Coast. The covenant was also reasonable once the district court restricted its coverage to the Los Angeles branch area only.

Therefore, based upon the restriction placed upon the covenant by the district court, and the evidence presented regarding the nature of Hitz's employment, we hold that the district court did not err in concluding that the covenant did not seek to prevent ordinary competition and could be enforced against Hitz.

III.

Hitz contends that the district court erred as a matter of law in enforcing the successors and assigns clause in the agreement when there was a lack of consideration to support it.

In order to be enforceable, a contract must be supported by consideration. *Puritan-Bennett Corp. v. Richter, 657 P.2d 589, 591 (Kan.App. 1983)*. The record reflects that Hitz's compensation increased by $ 10,000 from approximately $ 130,000 in 1986 to approximately $ 140,000 in 1987. (Appellant's Appendix, Vol. II, Tab 22, p. 100). The employment agreement was [*15] signed December 24, 1986. (Appellee's Appendix, Vol. 2, Tab 119). Therefore, we hold that the district court correctly determined that Hitz received adequate consid-

eration to support the successors and assigns clause in the employment agreement.

IV.

Hitz contends that the district court erred in awarding damages to Equifax after granting it injunctive relief.

The employment agreement signed by Hitz states in pertinent part, that "it is agreed that any breach of this Agreement by the Branch Manager shall entitle White & White, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin any violation of this Agreement." (Appellee's Appendix, Vol. 2, Tab 119, p. 4). The agreement further stated that in the event of a breach, the duration of the covenant not to compete would be extended beyond the stated two year period for a time period equal to the duration of the breach. *Id.*

The parties have not addressed the standard of review we should pursue regarding the district court's authority to award both damages and injunctive relief. In *E.E.O.C. v. Ackerman, Hood & McQueen, Inc., 956 F.2d 944, 946-47 (10th Cir. 1992),* [*16] we held:

> Our review of the district court's factual findings is limited to determining whether they are clearly erroneous. *See Fed. R. Civ. P. 52(a); Beck v. Quiktrip Corp., 708 F.2d 532, 535 (10th Cir. 1983).* In contrast, we review legal issues de novo. *Northern Natural Gas Co. v. Grounds, 931 F.2d 678, 681 (10th Cir. 1991); Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990).*

Hitz argues that the award of injunctive relief and damages is duplicative. We disagree. The district court did not award both injunctive relief and damages. The court refused to extend the previously imposed injunctive relief, in accordance with the employment agreement, because it did award damages. (Appellant's Appendix, Vol. IV, Tab 62, p. 14-15). The district court ruled that the damages awarded to Equifax were "for the period during which defendant was in breach of contract, . . ." No error was committed. The purpose of injunctive relief is to prevent future violations. *United States v. W.T. Grant Co., 345 U.S. 629 (1953).*

Hitz argues in a footnote to his brief that, "if Equifax [*17] can recover damages it is not entitled to the damages it sustained prior to trial during a period of time the covenants were overly broad and not reasonably restricted geographically." Again, we disagree. There is nothing in the record indicating that any objection was made by Hitz in the district court to the damages based upon the argument that the covenant was overly broad and not geographically reasonably restricted. Absent such objection by Hitz, we defer to the district court's judgment in it's calculation of the damages based upon the evidence presented.

This court will generally not address issues which were not raised, considered and ruled upon by the district court. *Farmers Ins. Co., Inc. v. Hubbard, 869 F.2d 565, 570 (10th Cir. 1989); Burnette v. Dresser Industries, Inc., 849 F.2d 1277 (10th Cir. 1988).* In *Farmers* we observed that the narrow exceptions to the general rule relate to issues of jurisdiction in the "case or controversy" limitation of Article 3, Section 2 of the United States Constitution and questions of sovereign immunity. *869 F.2d at 570.* Those exceptions do not apply here.

V.

In a detailed [*18] Memorandum And Order, the district court set forth its findings of facts and conclusions of law. (See attached Memorandum and Order). The court found, *inter alia,* that: Hitz had breached his employment agreement by hiring White & White employees away from them; such actions directly resulted in damages to Equifax; and the damages amounted to lost profits, the cost of retraining and relocating employees, and loss of reputation and goodwill. We hold that the factual findings of the district court are substantiated by the record, and are not clearly erroneous.

Based upon a careful review of the record, the arguments and legal authority, we hold that the district court did not err in finding that Hitz signed an employment agreement with White & White which contained a binding covenant not to compete clause, that Hitz breached the agreement, and that Equifax suffered damages because of the breach.

We affirm for substantially the reasons set forth in the district court's Memorandum And Order of January 24, 1991, a copy of which is attached hereto and by reference made a part hereof.

AFFIRMED.

Entered for the Court:

James E. Barrett, Senior United States Circuit Judge

EXHIBIT [*19] 1

*MEMORANDUM AND ORDER*

This matter was tried to the court on August 20 and 21, 1990. This is an action for injunctive relief and damages.

Plaintiff Equifax Services, Inc., d/b/a Equifax Commercial Specialists, f/k/a White & White Inspection and Audit Service, Inc. (hereinafter "Equifax" or "plaintiff") brings this action alleging numerous claims against defendant Steven A. Hitz (hereafter "Hitz" or "defendant"). All of plaintiff's claims center around defendant's alleged wrongful conduct whereby he ignored a covenant not to compete which he had entered into with his former employer, White & White. In addition to injunctive relief and damages, plaintiff petitions the court for the award of attorneys' fees. Also before the court is plaintiff's motion for a citation of contempt for defendant's alleged violation of this court's preliminary injunction entered on March 8, 1989.

*Findings of Fact*

Based on the evidence before the court, the court makes the following findings of fact.

1. Defendant Steven Hitz began working for White & White Inspection and Audit Service, Inc. in 1980. White & White was engaged in the business of furnishing insurance inspections, premium audits, [*20] surveys, investigations and related work for insurance companies on a fee basis. Defendant was branch manager of White & White's southern California branch and serviced clients mainly in the Los Angeles area.

2. The defendant executed an employment contract with White & White in 1982. Later, a new employment contract was entered into in 1986. Each contract contained a covenant not to compete clause. The December 24, 1986, contract stated:

> The Branch Manager agrees that for a period of two (2) years following the termination of his employment with White & White for any reason whatsoever, whether such termination is with or without cause, he will not engage, directly or indirectly, in competition with White & White in furnishing Investigations to the Customers on a fee basis in any state(s) in which he has operated as a branch manager within the past two (2) years, either as a principal, agent, partner, officer, director, stockholder, advisor, consultant, employee, contractor, or in other form, method or capacity for the same period, the Branch Manager further agrees that he will not in any manner persuade or attempt to persuade any employee or field representative of White [*21] & White to discontinue his relationship with White & White or engage in competition with White & White. It is agreed that any

breach of this Agreement by the Branch Manager shall entitle White & White, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin any violation of this Agreement.

Plaintiff's exhibit 2, paragraph 9(a).

3. The contract contained a clause providing that the rights and obligations created by the contract would inure to the benefit of White & White's successors. The contract stated:

> The duties and obligations of the Branch Manager under this agreement shall inure to the benefit of the successors and assigns of White & White.

Plaintiff's exhibit 2, paragraph 10(f).

4. Also, the contract provided that the employment agreement would be construed and governed in accordance with the laws of Kansas. Plaintiff's exhibit 2, paragraph 10(d).

5. Defendant was not fraudulently induced to sign his 1986 contract of employment with White & White.

6. In early 1988, White & White entered into a corporate merger with Equifax Services, Inc. White & White Inspection and Audit Service, Inc. merged [*22] into White & White Acquisitions, which later merged into Equifax. Plaintiff's exhibit 24. Equifax Commercial Specialists, a division of Equifax Services, Inc., primarily handles the business developed and previously operated by White & White. Also, Equifax Commercial Specialists maintains its home office in Overland Park, Kansas.

7. Plaintiff's December 24, 1986, contract of employment with White & White Inspection and Audit Service, Inc. (hereafter "White & White") contained a clause which states, "the Agreement shall become effective when signed for White & White at its Home Office [located in Overland Park, Kansas]." Plaintiff's exhibit 2, paragraph 10(g).

8. At the time this lawsuit was commenced, defendant Hitz was the President of Golden Coast Insurance Services,Inc. (hereafter "Golden Coast"). Golden Coast engages in the same type of business as defendant's former employer. Defendant's wife, Ginger Hitz, currently owns 95% of its stock. Defendant is currently employed by Golden Coast as a consultant.

9.  Golden Coast actively solicits business from many former clients of White & White's California branch.  Many of White & White's former clients began and have continued [*23] to utilize Golden Coast instead of Equifax.  Other former clients of White & White have continued to utilize Equifax while also sending work to Golden Coast.

10.  Based upon evidence presented at trial, the insurance investigative industry is a highly competitive industry, with numerous companies offering such services to the insurance industry.  Indeed, many insurance companies employ several investigative companies at the same time.

11.  Defendant Hitz was informed by letter, dated April 28, 1988, that the covenant not to compete contained in Hitz's contract of employment, would be enforced against him.  On July 26, 1988, defendant signed an agreement with plaintiff in which he ratified his 1986 employment agreement containing the covenant not to compete.

12.  On December 19, 1988, plaintiff filed a petition in state court.  This action was later removed to this court.

13.  On March 8, 1989, this court entered a preliminary injunction restraining defendant from competing directly or indirectly with plaintiff in furnishing investigations, on a fee basis in any county in which Hitz has operated as a branch manager within the last two years.  Defendant was further enjoined from [*24] directly or indirectly attempting in any manner to persuade any employee or field representative of plaintiff to discontinue his relationship with plaintiff.

14.  Defendant Hitz was further enjoined from directly or indirectly engaging in concert with any employee or field representative in competition with plaintiff.  Finally, plaintiff was enjoined from directly or indirectly using, disseminating, disclosing, lecturing upon or publishing articles concerning the confidential information disclosed to defendant as a consequence of his employment with plaintiff.

15.  Defendant appealed this court's March 8, 1989, order which enjoined defendant from competing with Equifax.  This court's decision was affirmed by the Tenth Circuit Court of Appeals on June 4, 1990.  *Equifax Serv., Inc. v. Hitz, 905 F.2d 1355, 1362 (10th Cir. 1990).*

16.  Golden Coast was formed during March of 1988, defendant's last month of employment with White & White.  On March 24, 1988, Hitz solicited business on behalf of Golden Coast from plaintiff's former customer, Farmers Insurance Group, through Joan Dinardo.  Specifically, Hitz mailed a letter of solicitation to Ms. Dinardo.  Plaintiff's [*25] Exhibit 7.  Enclosed in this letter

was a Golden Coast business card with Hitz's name.  Defendant followed up this correspondence with a letter dated March 30, 1988, in which he enclosed a brochure detailing the organization, the "players," and the type of services which could be provided by Golden Coast.  Hitz was portrayed as one of the key "players."  Plaintiff's exhibit 8.

17.  Other former clients of plaintiff which Hitz or Golden Coast has solicited from the Los Angeles area or Simi Valley area include more than 40 insurance companies.  Plaintiff's exhibits 3 and 6.

18.  Additionally, defendant Hitz, as President of Golden Coast, sent letters of solicitation directly to:  American Hardware Insurance Group, Fireman's Fund, C & F Surplus, and Crusader Insurance Company.  Plaintiff's exhibits 11, 14, 15 and 16.

19.  After Hitz notified plaintiff of his resignation in March of 1988, Hitz sent a memorandum to all "field staff."  In this memorandum, Hitz invited the field staff to inquire why he had decided to leave.  Also, Hitz suggested that "perhaps [his and members' of the field staff] paths may cross again."  Plaintiff's exhibit 4.

20.  Subsequent to the formation of Golden Coast, [*26] Hitz and Golden Coast employed approximately 17 former employees and field agents of plaintiff.  Plaintiff's exhibits 40 - 53.  One of these employees performed field audits for Golden Coast while still employed with plaintiff.  Deposition of Jon Kovach, at 12, 21 - 27.  Defendant even suggested to one untrained job applicant that he should get trained by Equifax and then apply for a job with Golden Coast at a later date.  Deposition of Bruce Moffit, at 7-8.

21.  Golden Coast requires its employees and management personnel to sign employment contracts which contain covenants not to compete.  Deposition of Ray Rasori, at 66.

22.  The agreement form which Golden Coast used to hire field agents was closely modeled after the agreement form utilized by plaintiff.

23.  Defendant Hitz breached his contract of employment with plaintiff, by directly and indirectly competing with plaintiff in furnishing investigations to customers of plaintiff in southern California within two years after the termination of his employment.

24.  Defendant further breached his contract of employment with plaintiff by persuading former employees and field agents or plaintiff to discontinue their relationship [*27] with Equifax.  Defendant breached his contract of employment by engaging in concert with former employees and field agents of plaintiff in competition with plaintiff.

25.  Plaintiff has suffered damages as a result of defendant Hitz's breach of contract. The damages suffered include lost profits and costs incurred by plaintiff to replace and train employees who were hired by Golden Coast. Additionally, plaintiff's reputation has been damaged and plaintiff has experienced a concomitant loss of goodwill among many of White & White's former clients. This loss of goodwill is primarily the result of defendant's breach and the resulting disruption of plaintiff's ability to provide quality service to its clients.

26.  Based upon the evidence before the court, identifiable loss profits may be calculated by the amount of net profit which Golden Coast has received from customers who formerly dealt with plaintiff f/k/a White & White. The court finds this amount to be $ 300,000.00. Plaintiff's exhibit 28.

27.  Based upon the evidence before the court, the total amount of costs incurred in training and relocating employees as a result of defendant's enticing away plaintiff's employees [*28] is $ 55,000.00. ¹ Plaintiff's exhibits 30-32.

> 1  The court will not award plaintiff the costs of replacing defendant Hitz. The costs incurred in replacing defendant Hitz were not the result of his breach of contract; these costs were the result of his resignation.

28.  Based upon the evidence before the court, plaintiff has suffered $ 250,000.00 in the loss of reputation and goodwill among its customers. ²

> 2  Although the court is able to reasonably calculate the amount of loss profits plaintiff has incurred due to former clients giving their business to Golden Coast, the amount of lost profits suffered as a result of present and former customers taking their business to competitors, other than Golden Coast, must be estimated.

To the extent that any conclusions of law contain findings of fact, they are incorporated by reference herein as findings of fact.

*Conclusions of Law*

To the extent that any findings of fact are deemed to be conclusions of law, they are incorporated by reference herein as conclusions [*29] of law.

1.  This court has jurisdiction over this action pursuant to *28 U.S.C. §§ 1441(a)* and *1332*.

2.  Venue is proper in the District of Kansas pursuant to *28 U.S.C. § 1391(a)*.

3.  This court has personal jurisdiction over the defendant. The court hereby adopts and incorporates by reference its previous findings of facts and conclusions of law contained in its Memorandum and Order filed on March 8, 1989, as they relate to personal jurisdiction over the defendant. *Equifax Serv., Inc. v. Hitz*, No. 89-2047- S (D. Kan. filed Mar. 8, 1989) (1989 WL 3595), *aff'd, 905 F.2d 1355, 1360 (10th Cir. 1990)*.

4.  Kansas choice of law principles control whether Kansas or California law governs the substantive issues in this case. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)*; *Black v. Cabot Petroleum Corp., 877 F.2d 822, 823 (10th Cir. 1989)*.

5.  Because plaintiff is seeking to enforce a covenant not to compete, this action may properly be characterized as a contract action. Accordingly, in contract actions, "Kansas applies the rule of *lex loci contractus* -- the law of the state in which the contract is [*30] made." *Dow Chemical Corp. v. Weevil-cide Co., Inc., 630 F. Supp. 125, 127 (D. Kan. 1986)* (citing *First Nat'l Bank of Beaver, Oklahoma v. Hough, 643 F.2d 705, 706 (10th Cir. 1981)* (Kansas courts hold that "a contract is considered 'made' when and where the last act necessary for its formation is done.").

6.  Pursuant to the very terms of the disputed contract, the place of the making is Kansas. The relevant contractual clause provides:

> The Agreement shall become effective when signed for White & White at its Home Office [located in Overland Park, Kansas].

Plaintiff's exhibit 2, paragraph 10(g). Thus, pursuant to Kansas choice of law principles, Kansas law governs disputes concerning defendant's contract of employment. Moreover, the parties specifically agreed that Kansas law would govern issues involving defendant's contract of employment. Plaintiff's exhibit 2, paragraph 10(d).

7.  Although Kansas has not specifically addressed the validity of choice of law clauses, this court believes, as does the Tenth Circuit Court of Appeals, that such a clause would be upheld by Kansas courts. *See Equifax Serv., Inc. v. Hitz, 905 F.2d at 1360*. [*31]

8.  The transaction whereby White & White was combined with Equifax Services, Inc. was, under Missouri law, a merger and not a sale. Plaintiff's exhibit 24, at 31. ³ There were no material changes in the contractual obligations and duties of the branch managers as a result of the merger. Thus, Equifax, as the surviving corporation, succeeds to the rights of White & White to enforce Hitz's covenant not to compete. *See Alexander & Alexander, Inc. v. Koelz, 722 S.W.2d 311, 313 (Mo. Ct. App. 1986)*. Further, the parties have agreed that the duties and

obligations of the defendant shall inure to the benefit of the successors and assigns of White & White. Plaintiff's exhibit 2, paragraph 10(f). Accordingly, Equifax has standing to enforce the covenant not to compete.

3   The court rejects defendant's argument that because the transaction is treated as a sale for federal taxation purposes, the transaction was not a merger. For purposes of determining the characterization of the transaction, the merger agreement and Missouri law is controlling. The transaction was certified by Missouri law as a merger. Plaintiff's exhibit 24, at 31. Further, in this court's review of the merger agreement, it finds no agreement to be bound by the federal tax code in nontax matters, nor does the defendant point out any such provision in the merger agreement. The court notes that a different result was reached in *Equifax Serv., Inc. v. Chlystek*, No. 89-2068-0 (D. Kan. filed April 3, 1989) (1989 WL 45345). The court further notes that in *Chlystek*, the court concluded that the transaction was a sale after a hearing for a preliminary injunction. Thus, the findings of fact made at that hearing were not conclusive findings of fact.

[*32] 9.   Under Kansas law, the noncompetition and nonsolicitation clause contained in the contract, while overly broad geographically (covering all of California), may be reformed and thereby enforced "to an extent necessary to carry out the protective intent of the agreement. . . ." *Foltz v. Struxness*, 168 Kan. 714, 215 P.2d 133, 138 (1950). Further, the parties have agreed by contract that the restrictive covenant may be reformed "as is reasonably necessary to protect the interests of White & White." Plaintiff's exhibit 2, paragraph 10(1). The court will reform the restrictive covenant to cover the Los Angeles branch area. Specifically, the restrictive covenant shall cover all counties included in the Los Angeles branch area of White & White during the period defendant was employed as White & White's Los Angeles Branch Manager.

10.   The court further finds that the interests which Equifax seeks to protect by enforcement of the covenant not to compete are legitimate business interests which, under Kansas law, may be protected through the enforcement of a covenant not to compete. *See Eastern Distributing Co., Inc. v. Flynn*, 222 Kan. 666, 567 P.2d 1371, 1376-77 (1977)* [*33]* ("'customer contracts' is a legitimate interest to be protected by an employee." The most important factor is "the nature of the functions performed by the employee."). The insurance investigation business is based upon personal contacts and knowledge of the special needs of customers. As testimony by deposition revealed, when customers have complaints with

work which has been done by field agents, their complaints are directed to the branch manager who in turn attempts to redress their complaints. Further, as stated in defendant's contract of employment, defendant's primary function as branch manager was to "develop valuable business relationships with the Customers on behalf of White & White." Plaintiff's exhibit 2, paragraph 5. Thus, customer contacts were central to defendant's employment with White & White, and defendant would be closely identified with the service being sold. This conclusion is further supported by evidence that some clients of White & White decided to give Golden Coast investigative work because of their familiarity with the quality of defendant Hitz's work at White & White.

11.   Defendant has breached the covenant not to compete by engaging in competition [*34] with Equifax in furnishing investigations to customers of White & White in the Los Angeles branch area of southern California. Further, defendant has breached his contract of employment by persuading employees of White & White to terminate their employment with Equifax.

12.   Under Kansas contract law, plaintiff may recover damages which may "fairly be considered as arising, in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach." *Hochman v. American Family Ins. Co.*, 9 Kan. App. 2d 151, 673 P.2d 1200, 1203 (1984). The court finds the damages which plaintiff alleges (*i.e.*, loss profits, cost incurred in replacing employees who were enticed away from Equifax, and damages to plaintiff's reputation and goodwill) to be within the contemplation of the parties at the time of contracting. Indeed, avoidance of these losses were the actual purposes of entering into a covenant not to compete. Thus, these damages are recoverable under plaintiff's breach of contract claim. [4]

4   Although defendant's conduct also satisfies the elements for tortious interference with contract, the court finds that the wrongful conduct of defendant which would amount to tortious interference is also the same conduct which constitutes a breach of contract claim. Accordingly, plaintiff's claim for damages are satisfied by one recovery under its breach of contract claim.

[*35] 13.   Further, under Kansas law, damages resulting from harm to a business' goodwill are recoverable. *See Avery v. City of Lyons*, 183 Kan. 611, 621, 331 P.2d 906, 914 (1958).

12.   The elements of goodwill are: continuity of place and continuity of time. *Id.* "Good will means an established business at a given place with the patronage that attaches to the name and the location. It is the prob-

ability that old customers will resort to the [former business]." *Id.*

13.  In order to recover, plaintiff must make it "reasonably certain by competent proof what the amount of his loss actually was." *Id., 331 P.2d at 913.* However, the "fact that damages cannot be calculated with absolute exactness will not render them so uncertain as to preclude an assessment." *Id., 331 P.2d at 914.* The court finds plaintiff's assessment that it has suffered $ 250,000.00 damages to its goodwill to be a fair assessment. [5]

> 5  The court notes that while plaintiff is recovering for lost profits former clients of White & White who have employed Golden Coast, some former clients of White & White have taken their business to other competing companies so that damages suffered by plaintiff as a result of defendant's wrongful behavior are not simply those net profits which Golden Coast received from former clients of White & White.  Because defendant's breach caused plaintiff to lose numerous employees, plaintiff was unable to satisfactorily perform work for all of its clients until plaintiff had successfully replaced the employees who went to work for Golden Coast.  Thus, plaintiff lost many customers to competitors other than Golden Coast.

[*36]  12.  The court finds that pursuant to the terms of the parties' contract, the two year restriction against competition imposed by contract is to be extended in the event of a breach, for a period equal to the duration of the breach.  Plaintiff's exhibit 2, paragraph 9(b).  However, because plaintiff is recovering damages for the period during which defendant was in breach of contract, the court will decline to exercise its equitable powers to extend the injunction for a period equal to the breach.

13.  The court will not grant plaintiff's request for continuing injunctive relief as the two year restriction contained in the covenant not to compete has run.

14.  Because this is a diversity case, whether to award attorneys' fees to the prevailing party is a matter of Kansas law.  *Alyeska Pipe Line Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n. 31 (1975).*  Under Kansas law, the awarding of attorneys' fees is "not allowed unless authorized by statute or agreement of the parties." *Schuh v. Educational Reading Serv. of Kansas, Inc., 6 Kan. App. 2d 100, 101, 626 P.2d 1219, 1220 (1981).*  No agreement has been entered into regarding [*37] attorneys' fees, nor does plaintiff cite any statutory authority

pursuant to which it could recover attorneys' fees.  Thus, this court will not award attorneys' fees to plaintiff.

*Citation of Contempt*

Plaintiff has moved the court for a citation of contempt.  Plaintiff alleges that defendant has been violating this court's preliminary injunction granted on March 8, 1989.  Specifically, plaintiff contends that defendant has been indirectly competing with plaintiff in the area covered by the preliminary injunction.  Plaintiff argues that while the defendant has resigned as the President of Golden Coast, he has continued to assist Golden Coast in competing with Equifax in the Los Angeles area.  Additionally, plaintiff asserts that defendant has continued to induce employees of Equifax to come to work for Golden Coast.

In a civil contempt case, the party seeking a citation of contempt bears a heavy burden.  Civil contempt must be proven by clear and convincing evidence.  *Heinold Hog Mkt., Inc. v. McCoy, 700 F.2d 611, 614-15 (10th Cir. 1983)* (citations omitted).  The court finds that plaintiff has failed to present clear and convincing evidence that defendant [*38] is in violation of this court's preliminary injunction.  Although defendant continues to maintain an office in the Los Angeles area, he is no longer managing the Los Angeles branch of Golden Coast.  Instead, he is involved in providing services in the Seattle and San Francisco areas which are beyond the geographic area in which defendant is prohibited from working.  Moreover, while two additional employees of Equifax have become employed by Golden Coast, these employees are not working in the restricted area.  Further, the court is not convinced that defendant enticed these two employees from Equifax's employment.  Accordingly, the court will deny plaintiff's motion for a citation of contempt.

IT IS BY THE COURT THEREFORE ORDERED that judgment is entered in favor of the plaintiff and against defendant in the amount of $ 605,000.00.

IT IS FURTHER ORDERED that plaintiff's motion for injunctive relief denied.

IT IS FURTHER ORDERED that plaintiff's motion for a citation of contempt is denied.

DATED: This 24 day of January, 1991, at Topeka, Kansas.

DALE E. SAFFELS

United States District Judge

100MVX

```
********* Print Completed *********

Time of Request: Friday, May 16, 2008  13:10:57 EST

Print Number:    1843:93093175
Number of Lines: 523
Number of Pages:
```

```
Send To:  KONSKY, SARAH
          SIDLEY AUSTIN LLP
          1 S DEARBORN ST FL 31
          CHICAGO, IL 60603-2301
```

LEXSEE 1988 US DIST LEXIS 13645

**HELDOR INDUSTRIES, INC., Plaintiff, v. KIRK JOHNSTON, Defendant**

**Civil Action No. 88-2544-O**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

*1988 U.S. Dist. LEXIS 13645*

**November 17, 1988, Decided and Filed**

**COUNSEL:** [*1] David J. Waxse, Ks #07357, Barbara A. Harmon, Ks #12534, Overland Park, Kansas for Plaintiff

Steven D. Ruse, #11461, Shughart, Thompson. Kilroy, Overland Park, Park; Kirk J. Goza, Shughart, Thompson, Kilroy, Kansas City, Missouri for Defendant

**OPINION BY:** O'CONNOR

**OPINION**

*MEMORANDUM AND ORDER*

*EARL E. O'CONNOR, CHIEF UNITED STATES DISTRICT JUDGE*

This matter is before the court on the motion for a temporary restraining order filed by the plaintiff Heldor Industries, Inc. (Heldor). Heldor filed its motion on November 1, 1988. On November 7, 1988, the court held a hearing on the motion at which evidence was adduced by the parties. Following the hearing, Johnston timely filed a response to the motion, and Heldor timely replied to the response. Given this procedural background, the court is of the opinion that this motion should be treated as a motion for a preliminary injunction, rather than as a motion for a temporary restraining order. See Fed. R. Civ. P. 65. Given the evidence and the briefs submitted by the parties, the court makes the following findings of fact and conclusions of law.

*Findings of Fact*

1. Heldor, a New Jersey corporation, is a manufacturer and wholesale seller of swimming pools, [*2] spas, and related accessories. Heldor has a branch office in Kansas which serves an eight state area.

2. Heldor hired Johnston to work in the customer service department in August 1981. In December 1981, Johnston became a field sales representative, the position he held when he resigned in September 1988. As a field sales representative, Johnston solicited and sold Heldor products to wholesale customers in designated areas. At the time of his resignation, Johnston's territory included the metropolitan Kansas City area; Joplin, Blue Springs, Harrisonville, and Orango, Missouri; Sioux City, Iowa; all of Nebraska, and all of Kansas except Wichita. Additionally, he covered Des Moines, Iowa, until 1984 and St. Joseph, Missouri, until 1985, and between 1981 and 1988 he traveled to North Dakota and South Dakota twice.

3. Upon his hiring in 1981, Johnston was informed that he would be compensated through salary and a bonus program. He participated in the bonus program based on sales during the years 1981, 1982, and 1983. On November 1, 1983, Heldor announced a new bonus program which was based partially on profits rather than merely on sales. The new program became effective in January 1984. [*3] Under this new program, Johnston's bonuses remained relatively unchanged until 1986, when another new program which increased Johnston's bonuses was introduced.

4. In January 1984, Heldor sent a memorandum regarding the new bonus plan to all field employees. The memorandum stated that "[t]his letter represents your personal invitation to participate in our profit sharing program. You can signify your acceptance by signing and returning the attached letter to your zone manager."

5. Heldor asserts that the "attached letter" was a covenant not to compete. The letter read as follows:

In consideration of participating in Heldor's bonus system based upon profits, Employee agrees that for a period of one year after resigning for any reason, not to:

1. Work for a competing swimming pool/spa distributor or manufacturer in the same geographic region, enabling Employee to solicit business from the same cus-

tomers which Employee has served as a Heldor Representative.

*2. Participate in the establishment of a new swimming pool/spa distribution business which would accomplish the same end.*

*The geographic region applicable to the Employee is [Kansas, Missouri, Colorado, Nebraska, North Dakota, [\*4] South Dakota, and Iowa].*

*It is expressly noted that there are no restrictions outside that region, or inside the region for non-competing segments of the swimming pool/spa business. For example, the retail business or a non-competing manufacturer.*

6. On January 16, 1984, Johnston signed the document. He was not told that he could not participate in the bonus plan or that he would be terminated if he did not sign.

7. Johnston did not receive a raise at the time he signed the document. Later, he did receive the following increases in salary: eight percent (8%) in April 1984, five percent (5%) in April 1985, five and one-half percent (5.5%) in March 1986, eight percent (8%) in March 1987, and ten percent (10%) in February 1988. In each of the "personnel action requests" seeking the raises, Emanuel Kiehl (Kiehl), the manager of Heldor's Kansas branch and Johnston's boss, highly praised Johnston and his work.

8. As a Heldor field sales representative, Johnston had access to Heldor customer lists and pricing and cost information. Heldor customer lists, which are confidential, contain customers' names and addresses and the dates and the volume of the customers' purchases. Although the [\*5] lists are confidential, information such as the names of customers (which are swimming pool retailers) is readily available in the marketplace and is known by Heldor's competitors. Similarly, Heldor's price catalogues are routinely distributed to customers, and are likely in the possession of Heldor's competitors (Heldor has copies of its competitors' price catalogues). However, information regarding the cost of Heldor's products is strictly confidential; Johnston reviewed cost information several times a year.

9. In September 1988, Johnston resigned his position at Heldor and began to work for Weatherking Pools of Kansas, Inc. (Weatherking) Weatherking, along with about three other companies, competes with Heldor in the Kansas City area by manufacturing and selling to retailers swimming pools, spas, and related accessories.

At Weatherking, Johnston is the vice president and general manager; he spends about seventy-five percent (75%) of his time performing managerial, administra-

tive, and personnel functions not involving customer contacts, and about twenty-five percent (25%) of his time soliciting sales. His sales territory covers only Springfield, Missouri.

10. At the time Johnston [\*6] left Heldor, he returned all Heldor customer lists, sales manuals, and product and price information.

11. On September 28, 1988, Johnston mailed a letter to customers on Weatherking's customer list announcing his new position. Because the customer lists of Heldor and Weatherking overlap to some extent, some Heldor customers received the letter.

12. Since his arrival at Weatherking, Johnston has not modified the Weatherking customer list. Additionally, he has not solicited any Heldor customers which did not already have some contacts with Weatherking. In fact, Johnston's Springfield, Missouri, territory includes no customers which he solicited while at Heldor.

*Conclusions of Law*

This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The court has personal jurisdiction over Johnston, as he is a Kansas resident.

A preliminary injunction is proper only where four prerequisites are met:

(1) a substantial likelihood that the movant will eventually prevail on the merits;

(2) a showing that the movant will suffer irreparable harm unless the injunction issues;

(3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause [\*7] the opposing parties; and

(4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980), quoted in Uarco, Inc. v. Eastland, 584 F.Supp. 1259, 1261 (D. Kan. 1984).*

I. *Substantial Likelihood of Success on the Merits.*

In determining the plaintiff's prospects on the merits, the court must liberally construe the term "probability of success." *Lundgrin, 619 F.2d at 63.*

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough

that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."

*Id.* (quoting *Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781-82 (10th Cir. 1964)).*

A noncompetition agreement is enforceable under Kansas law if it is reasonable and not inimical to the public welfare. *Eastern* [*8] *Distributing Co. v. Flynn, 222 Kan. 666, 670, 567 P.2d 1371, 1376 (1977).* On the other hand, a noncompetition agreement is unenforceable if it furthers an illegitimate interest or if it is unsupported by consideration. *See Uarco, 584 F.Supp. at 1261.*

In the instant case, the noncompetition agreement seeks to protect a legitimate business interest. Although the names of many of Heldor's customers are known by Heldor's competitors, the level of sales to specific customers is not likely known. Additionally, Heldor's cost information is not known outside the company. Moreover, it is "a well-recognized principle that 'customer contacts' is a legitimate interest to be protected by an employer." *Eastern Distributing, 222 Kan. at 671, 567 P.2d at 1376.* Even when the names of customers are publicly known, information such as the names and habits of customers' ordering clerks is not. *Id. at 674, 567 P.2d at 1378.* Simply put, Johnston developed his relationships with customers on Heldor's time, and Heldor has a legitimate interest in protecting its investment in customer contacts.

It remains to be determined, however, whether the noncompetition agreement was supported by sufficient [*9] consideration. Under Kansas law, a contract is presumed to be supported by valid consideration. *Uarco, 584 F.Supp. at 1262* (citing *Ferraro v. Fink, 191 Kan 53, 379 P.2d 266 (1963)).* Johnston has the burden of presenting evidence to rebut this presumption. *Id.* He argues that the agreement was not supported by consideration because he had participated in Heldor bonus plans from 1981 to 1983, the 1984 bonus plan did not significantly change the bonuses he received, he was given no raise in connection with his signing the noncompetition agreement, he was not told he must sign the agreement to continue working for Heldor, and other Heldor employees refused to sign the agreement and continued to work for and receive bonuses from Heldor. For support, Johnston relies on *Uarco, 584 F.Supp. 1259; Puritan-Bennett Corp. v. Richter, 8 Kan.App.2d 311, 657 P.2d 589, rev. denied, 233 Kan. 1092 (1983);* and *Evco v. Brandau, 6 Kan.App.2d 53, 626 P.2d 1192 (1981).*

In *Uarco,* this court concluded that a noncompete clause was supported by valid consideration where the employee had received an increase in his base salary rate

when the clause was executed. *See Uarco, 584* [*10] *F.Supp. at 1262.* However, we decided nothing more regarding the consideration issue; we did not hold that absent a salary increase, there is insufficient consideration.

In *Puritan-Bennett,* the Kansas Court of Appeals considered whether adequate consideration supported a noncompetition agreement entered into during employment where the employee was terminable at will, was informed that his continued employment was conditioned on his signing the agreement, remained with the company long after signing the agreement, and received consistent promotions following execution of the agreement. The court held that continued employment may constitute sufficient consideration to support a noncompetition agreement. *See Puritan-Bennett, 8 Kan.App.2d at 315, 657 P.2d at 592.* The court stated: "[W]e hold that the trial court erred in holding that [the employee's] continued employment after execution of the agreement was insufficient consideration to support the restrictive covenants and conclude that the contract should have been enforced." *Id.*

In *Evco,* the Kansas Court of Appeals affirmed a trial court ruling that consideration was inadequate where under the terms of the noncompetition [*11] agreement, the employer was obligated to make payments which were already required under the terms of a previous employment contract. *See Evco, 6 Kan.App.2d at 55, 59, 626 P.2d at 1195, 1198.*

After reviewing the cases cited by Johnston and the facts in the instant case, we are persuaded that there is a substantial likelihood that Heldor will prevail on the merits as to the issue of the adequacy of consideration supporting the noncompetition agreement. A number of reasons support our holding. First, the instant facts strongly resemble the facts in *Puritan-Bennett,* where the court found sufficient consideration. Johnston had no employment contract with Heldor; he was an employee-at-will. Thus, Heldor had no obligation to continue to employ Johnston, and his continued employment is evidence of consideration. Additionally, Johnston continued working for Heldor long after the agreement was signed, and he received salary increases during this tenure. As stated in *Puritan-Bennett,* an employee who has been retained, promoted and entrusted with company secrets for a significant time after execution of such a covenant has received a benefit to which he was not automatically entitled." [*12] *Puritan-Bennett, 8 Kan.App.2d at 315, 657 P.2d at 592.*

Second, the bonus program, even though it had formerly been extended to Johnston, was not a benefit which Heldor was obligated to extend to Johnston. Heldor could have terminated the program, or Johnston's

inclusion in the program, at any time. Thus, by signing the agreement, Johnston acquired a benefit from Heldor which Heldor was not legally obligated to provide.

Third, even if Heldor had previously incurred a duty to include Johnston in a bonus program, Johnston signed an agreement that obligated Heldor to include him in a different program. Prior to January 1984, Heldor's bonus program was based only on sales; in January 1984, the program changed so that profit was a factor in determining bonuses. Thus, even if Heldor had a pre-existing duty to include Johnston in a bonus program, at the time the agreement was signed, Heldor acquired a new and different duty to include Johnston in a revised bonus program.

These three rationales support the court's conclusion that Heldor is substantially likely to prevail on the merits as to the issue of consideration supporting the noncompetition agreement. The court also notes that only [*13] hearsay evidence was presented regarding other employees who assertedly did not sign the agreement but who were retained and allowed to participate in the bonus program. Further, Heldor's dealings with other employees are not at issue; our focus is on the agreement signed by Johnston and whether adequate consideration supported this particular agreement.

Having determined that the noncompetition agreement seeks to protect a legitimate business interest and that it is supported by adequate consideration, we must determine whether the scope of the agreement is reasonable. The agreement, which extends for one year, is not objectionably lengthy in time. The agreement precludes Johnston from working for a Heldor competitor in a seven state area because such employment would "enabl[e Johnston] to solicit business from the same customers which [he] served as a Heldor Representative." We find that the primary intent of the agreement is to prevent Johnston from contacting his old customers while working for a Heldor competitor; it does not seek to preclude Johnston's working as a manager for a competitor in the seven state region. At the hearing, Heldor indicated that it sought enforcement [*14] only as to six states: Kansas, Missouri, Nebraska, North Dakota, South Dakota, and Iowa. We find this geographical restriction overly broad, and we will therefore modify the agreement. *See Eastern Distributing, 222 Kan. at 674-75, 567 P.2d at 1378* (recognizing a court's power to modify a territorial restriction). While at Heldor, Johnston had little contact with customers in North Dakota and South Dakota, and the court will strike these states from the agreement. Additionally, Johnston's only contact with customers in Iowa since 1984 was in Sioux City; the court will therefore modify the agreement so that Johnston is precluded from contacting only those Iowa retailers located within seventy-five (75) miles of Sioux City. Johnston's Missouri territory while at Heldor consisted of

the Kansas City area, Joplin, Blue Springs, Harrisonville, and Orango; we will therefore limit the agreement so that Johnston may not contact retailers located within seventy-five (75) miles of those cities. We note that at present, Johnston solicits retailers in Springfield for Weatherking; because of Springfield's proximity to Joplin (it is within seventy-five (75) miles of Joplin) Johnston is prohibited [*15] from further solicitation of customers in Springfield. Finally, as to Kansas and Nebraska, we find the agreement reasonable, and we therefore will not modify it.

II. *Irreparable Injury.*

The evidence demonstrates that without a preliminary injunction, Heldor might well suffer irreparable injury. Although Kiehl testified that he was unaware of any Heldor customers which had been lured to Weatherking by Johnston, the potential exists. Johnston is a capable and efficient salesperson who developed good relations with many customers during his tenure with Heldor. Further, although Johnston currently is soliciting customers only in Springfield, without an injunction, he could begin sales work in any part of his former territory. The amount of damages which Heldor would suffer as a result of this possible action is impossible to foresee or calculate. Thus, we conclude that Heldor has adequately demonstrated that it will suffer irreparable harm without a preliminary injunction.

III. *Balancing the Harm.*

The evidence suggests that the potential harm to Heldor in the absence of a preliminary injunction outweighs the harm to Johnston resulting from the issuance of an injunction. Without [*16] an injunction, the harm to Heldor could be substantial. In comparison, the harm to Johnston is relatively insubstantial. His duties at Weatherking are primarily managerial; only twenty-five percent (25%) of his time is spent on sales work. Further, the injunction will preclude Johnston from doing sales work in only a limited area. Given this, the balance of harm weighs in favor of issuing an injunction.

IV. *Public Interest.*

The issuance of a preliminary injunction in this case is not adverse to the public interest. In fact, an injunction furthers the public interest. "Clearly, the enforcement of valid contracts is in the public interest." *Uarco, 584 F.Supp. at 1262.* Here, as discussed above, the noncompetition agreement is a valid and enforceable agreement.

V. *Summary.*

In summary, the four *Uarco* requirements are met, and a preliminary injunction is warranted. The noncom-

petition agreement will be enforced by the court, subject to the modification of the agreement's territorial restrictions discussed above. Additionally, the injunction will be effective until September 15, 1989, one year after the date of Johnston's resignation, or until a final judgment is entered [*17] on this cause. Although at the hearing the court directed the parties to address the issue of a reasonable amount for the surety bond to be posted pursuant to *Federal Rule of Civil Procedure 65(c)*, neither party discussed the bond issue in its briefs before the court. We find that a bond of $ 50,000 will adequately protect Johnston's interests should the injunction later be determined improper.

IT IS THEREFORE ORDERED that Johnston is hereby restrained and enjoined, for a period from the date hereof to and including September 15, 1989, or until such time as this cause shall be tried on the merits and a final judgment entered thereon, whichever shall first occur, from soliciting business as a wholesale swimming pool, spa, and accessories salesperson from customers in the following geographic areas:

(1) the state of Kansas;

(2) the state of Nebraska;

(3) Sioux City, Iowa, and all surrounding areas within seventy-five (75) miles; and

(4) metropolitan Kansas City, Joplin, Blue Springs, Harrisonville, and Orango, Missouri, and all surrounding areas within seventy-five (75) miles of those cities (including Springfield, Missouri).

IT IS FURTHER ORDERED that, pursuant to *Rule 65(c)*, [*18] Heldor post, within ten (10) days of the date of this order, a surety bond in the amount of $ 50,000.

IT IS FURTHER ORDERED that this preliminary injunction shall remain in effect until September 15, 1989, or until further order of the court.

Dated this *17th* day of November, 1988, at Kansas City, Kansas.

100MVX

********** Print Completed **********

Time of Request: Friday, May 16, 2008  13:12:20 EST

Print Number:    1843:93093088
Number of Lines: 249
Number of Pages:

Send To:  KONSKY, SARAH
          SIDLEY AUSTIN LLP
          1 S DEARBORN ST FL 31
          CHICAGO, IL 60603-2301

Westlaw.

Not Reported in F.Supp.                                         Page 1
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

▷
PepsiCo, Inc. v. Redmond
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
PEPSICO, INC., Plaintiff,
v.
William E. REDMOND, Jr., et al., Defendants.
**No. 94 C 6838.**

Jan. 2, 1996.

*PERMANENT INJUNCTION AND FINAL JUDG-
MENT*

LINDBERG, District Judge.
*1 This case coming on for trial, and all parties
having elected to rest without offering further evid-
ence; the Court having issued its preliminary in-
junction order and opinion (the "Preliminary In-
junction") on January 26, 1995, *nunc pro tunc* as of
December 15, 1994 based on the evidence adduced
in the course of the preliminary injunction hearing
theretofore conducted by the Court; and the United
States Court of the Appeals for the Seventh Circuit
having affirmed the Preliminary Injunction in its
opinion issued on May 11, 1995 (*PepsiCo, Inc. v.
William E. Redmond, Jr. and The Quaker Oats
Company,* 54 F.3d 1262 (7th Cir. 1995)
(hereinafter, "*PepsiCo*")), including paragraphs
numbered 1 and 2 of the Preliminary Injunction "...
preventing [Redmond] forever from disclosing
PCNA    trade    secrets    and    confidential
information"(54 F.3d at 1272); the remaining in-
junctive paragraphs of the Preliminary Injunction,
numbered 3 through 8, having expired by their
terms; and the Court therefore finding the same
facts and reaching the same conclusions of law as it
made in the Preliminary Injunction, a copy of
which is attached hereto as Exhibit A and is incor-
porated herein as if fully set forth in this order;

IT    THEREFORE    IS    ORDERED,    ADJUDGED

AND DECREED:

A. That a permanent injunction is hereby issued in
favor of plaintiff PepsiCo and against defendants
Redmond and Quaker, enjoining:

1. Defendant Redmond and any of his agents, ser-
vants, employees, attorneys, and all others in active
concert or participation with him, from using or
disclosing any trade secrets or confidential informa-
tion of PepsiCo acquired by Redmond in the course
of, or arising out of his employment by PepsiCo, in-
cluding, without limitation, information relating to
PepsiCo's strategic and annual operating plans,
PepsiCo's pricing of beverage products, PepsiCo's
selling and delivery system (including its Customer
Representative compensation formula), and any in-
formation relating to PepsiCo's customer proposals
to national accounts;

2. Defendant Quaker and its officers, directors,
agents, servants, employees, attorneys, and all oth-
ers in active concert or participation with it, from
seeking or acquiring any trade secrets or confiden-
tial information of PepsiCo acquired by Redmond
in the course of or arising out of his employment by
PepsiCo, including, without limitation, information
relating to PepsiCo's strategic and annual operating
plans, PepsiCo's pricing of beverage products, Pep-
siCo's selling and delivery system (including its
Customer Representative compensation formula),
and any information relating to PepsiCo's customer
proposals to national accounts.

EXHIBIT A

MEMORANDUM AND ORDER

The court has reviewed both parties' proposed find-
ings of fact and conclusions of law. Plaintiff's sub-
mission accurately portrays both the facts and the
law applicable to this case. The court is therefore

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 2
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

adopting as its own the proposed findings of fact with modification where appropriate and conclusions of law submitted by plaintiff, with the addition of a conclusion of law and modification of the relief granted to better reflect the appropriate balance between plaintiff's and defendants' rights required in this case.[FN1]

**\*2** Certain of the evidence presented by plaintiff contains trade secrets or confidential information. That material was protected from disclosure in this proceeding by an Agreed Protective Order. Indeed, the Illinois Trade Secrets Act expressly provides that: "In an action under this Act, the court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include ... holding in-camera hearings [and] sealing the records of the action ...."765 ILCS 1065/6. Accordingly, the court will only indirectly refer to the secret material so as to maintain its secrecy.

Since the preceding paragraph does not affect in any way the meaning or purport of the court's Order of December 15, 1994, this Order is entered *nunc pro tunc.*

FINDINGS OF FACT

I. Subject Matter Jurisdiction

Plaintiff, PepsiCo, Inc. ("PepsiCo"), is a North Carolina corporation with its principal place of business in the state of New York. PepsiCo is a citizen of North Carolina and of New York. Pepsi-Cola North America ("PCNA") is an unincorporated division of PepsiCo through which PepsiCo transacts business.

Defendant, William E. Redmond, Jr. ("Redmond"), at the time of filing of this lawsuit, was a citizen of the state of California. Defendant, The Quaker Oats Company ("Quaker"), is a New Jersey corporation with its principal place of business in Illinois. Quaker is a citizen of New Jersey and of Illinois. Gatorade North America is an unincorporated division of Quaker through which Quaker transacts business.

The matter in controversy among the parties exceeds $50,000, exclusive of interest and costs.

II. The Parties

PepsiCo is a major food and beverage company. PCNA markets carbonated soft drinks, sports drinks, prepackaged tea and fruit drinks, waters, and many other beverages excluding alcohol- and dairy-based drinks. Among PCNA's competitors is Quaker, with its Gatorade and, prospectively, Snapple businesses.

PCNA is divided into eleven business units each having responsibility for a geographic region of the U.S. and Canada. Each of those units is run by a General Manager. Other business units exist for PepsiCo's franchise-owned bottlers and for national accounts.

Quaker is a world-wide grocery products and beverage company. Its sports drink, Gatorade, was Quaker's principal beverage product, and one of its most profitable products as of November 2, 1994. On that date, Quaker announced that it was acquiring Snapple Beverage Corp. ("Snapple"), through an Agreement and Plan of Merger and a Tender Offer for shares of common stock of Snapple.

PCNA launched its "All Sport" isotonic drink on a national basis in March and April, 1994. Prior to that time, All Sport had been available only in a few test markets. All Sport's main competitor is Quaker's Gatorade, which has a dominant market share. Quaker's market share in the isotonic beverage category is approximately ten times that of PCNA.

**\*3** In recent years, PepsiCo has entered into joint ventures with Thomas J. Lipton Company to produce ready-to-drink tea products, and with Ocean Spray Cranberries, Inc. to market certain fruit drinks. In the "new age" category, including ready-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

to-drink teas and fruit drinks, PCNA's share is approximately 1/2 that of Snapple.

William E. Redmond, Jr. was employed by PepsiCo in its PCNA division for approximately ten years prior to his resignation on November 10, 1994. In June, 1993, he was promoted to the position of General Manager of the Northern California Business Unit. In July 1994, Redmond was promoted to the position of General Manager of the newly-created business unit covering all of California and became responsible for the profit and loss of a business having annual revenues of more than 1/2 billion dollars--about 20 percent of the PCNA's profit for the entire U.S. Redmond's position was a very senior level within PepsiCo's organization.

Like other PepsiCo management employees, as a condition of Redmond's employment with PepsiCo, and at the outset of that employment, Redmond signed a Confidentiality Agreement with PepsiCo. The Confidentiality Agreement provides in part that

[Redmond] will not disclose at any time, to anyone other than officers or employees of [PepsiCo] or make use of, confidential information relating to the business of [PepsiCo] ... obtained while in the employ of [PepsiCo], which shall not be generally known or available to the public or recognized as standard practices ....

Redmond admits that he is bound by the terms of the Confidentiality Agreement.

III. Redmond Is Recruited By Quaker And Uzzi

Quaker's initial contact with Redmond, for the purpose of recruiting him for employment at Quaker, was through Donald Uzzi ("Uzzi"). Uzzi himself had been a PCNA employee for seven years, until March, 1994, when he resigned to become President of Gatorade. Uzzi received a written offer of employment from Quaker dated December 1, 1993, which offer recited that Quaker understood that Uzzi wanted to delay acceptance of an offer from Quaker and his departure from PepsiCo for approx-

imately two months. Uzzi claims not to know or remember how Quaker came to have such an understanding. At the time of Uzzi's departure, any PepsiCo confidential information that he had in his possession was less critical, as a consequence of the timing of his departure, than the information that is now in Redmond's possession.

Around the beginning of 1994, Uzzi accepted a promotion by PCNA from the position of General Manager of the Mid-Atlantic Business Unit of PCNA to Senior Vice President and Chief Customer Officer of PCNA, without advising anyone at PCNA that he had already received an offer of employment from Quaker, with whom he had been in serious discussions regarding a position. Uzzi held the position of Senior Vice President and Chief Customer Officer for a very short time during which he was engaged "purely" in transition to the position.

*4 Uzzi accepted the position as the President of Gatorade in January or February, 1994 and resigned from PepsiCo some time in March, 1994.

At the time of Uzzi's departure from PepsiCo, Brenda Barnes (PCNA's Chief Operating Officer) advised all of the business unit General Managers, including Redmond, that they needed to be careful in talking with Uzzi because he now was working for a competitor. Barnes asked Redmond to talk with her if he ever were to consider leaving PepsiCo, and Redmond assured Barnes that he had no intention of leaving PepsiCo.

Uzzi, acting on behalf of Quaker, bought dinner for Redmond in May, 1994, in San Francisco. During dinner, Uzzi raised the question of Redmond coming to work for Gatorade. Shortly after Uzzi's dinner with Redmond in San Francisco, Uzzi gave Redmond's name to Barbara Pickens, an executive recruiter, who started calling Redmond approximately once a week for the next several months. In August, 1994, Redmond met at Quaker headquarters in Chicago with William D. Smithburg, Quaker's Chairman and Chief Executive Officer,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

Philip A. Marineau, Quaker's President and Chief Operating Officer, James F. Doyle, Quaker's Senior Vice President and President of Gatorade World-wide, as well as with Uzzi. On October 20, 1994, Quaker offered Redmond the position of Vice President - On Premise Sales for Gatorade. Redmond did not accept that offer, but rather, continued to negotiate for more money.

When, in July, 1994, Redmond was promoted by his boss, Barnes, to the position of Business Unit General Manager of all of California, he did not tell anyone at PepsiCo that he was then being actively recruited by a competitor, Quaker.

Quaker had interviewed three candidates for the position of Vice President - On Premise Sales. All three, including Redmond, were employed by PCNA. The court finds that it is not unreasonable to infer that Quaker's interest in exclusively PCNA employees resulted from an interest that went beyond PCNA employees' general business experience.

On November 8, 1994 at a breakfast meeting, Uzzi, on behalf of Quaker, delivered to Redmond a written offer for the position of Vice President-Field Operations for Gatorade. Redmond accepted that offer unequivocally, unconditionally and without qualification, in the course of the breakfast meet- ing.

IV. Redmond's Resignation

After accepting a position with Quaker at breakfast on November 8, 1994, Redmond called PCNA and spoke with William Bensyl, the Senior Vice President of Human Resources for PCNA.

In the course of that call, Redmond told Bensyl that he had an offer from Quaker and gave Bensyl the financial details of the offer. Redmond:

(a) falsely told Bensyl that he had *not* accepted the offer

(b) told Bensyl that his job would be Chief Operat-

ing Officer of the combined Gatorade and Snapple company; and

(c) asked Bensyl if he should carry out his plans to make calls upon certain PCNA customers without telling Bensyl of his previous acceptance of the Quaker job.

**\*5** Not knowing that Redmond had already accepted the Quaker position, Bensyl told Redmond to make the customer visits. Redmond did so.

On November 9, 1994, Redmond falsely told Craig Weatherup ("Weatherup"), the President and Chief Executive Officer of PCNA, that he had not accepted the Quaker offer, and that he was uncertain whether he would accept or reject that offer.

On November 10, 1994, Redmond went to PCNA headquarters in Somers, New York for a previously scheduled meeting with his immediate superior, Barnes. Barnes' primary responsibility as PCNA's Chief Operating Officer is to run the field operations for the Pepsi Cola business in the U.S. and in Canada that produce, sell and distribute beverages in those countries.

Redmond met in the morning with Barnes and told her, again falsely, that he was considering, but had not yet decided to accept the Quaker offer. In speaking with Barnes, Redmond also sought to determine if a more senior position such as Barnes' job might be available for him.

In the three days immediately preceding his resignation, Redmond told at least six PCNA employees, including Weatherup, Barnes and Bensyl, that the job he had been offered by Quaker was Chief Operating Officer of Gatorade.

V. Redmond's Position at Quaker

A. As It Was Known Before This Litigation

Whatever Redmond's duties may be in his new position at Quaker, it is conceded by defendants that he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

"could be faced with a decision that could be influenced by certain confidential information that [he] obtained while employed at Pepsico."Redmond himself concedes that he possesses confidential information of PCNA that he would not feel free to disclose to Quaker.

Although the written offer from Quaker that Redmond accepted on November 8, 1994 denominated his new job as "Vice President, Field Operations," Redmond did not, in his own mind, distinguish that job from the job of "Chief Operating Officer." Redmond purports to describe his new job in his declaration, but he testified that he is unclear on his job and can only speculate on what it will be. In other testimony, Redmond describes his new job as managing the entire sales effort of Gatorade at the field level, possibly including strategic planning.

B. As Defendants Have Described It In This Litigation

Uzzi says that Redmond's job will be to execute marketing, promotion and sales plans in the marketplace. That job will include consulting with regional directors about their spending of discretionary marketing funds. Uzzi agrees that Quaker will be going to market differently with Gatorade and Snapple after the two distribution systems are integrated than before.

In his declaration Redmond asserts that his primary task for the next few months will be to execute an existing "business plan" to integrate the Gatorade and Snapple distribution systems. That "business plan" however, consists only of a formal contract among a single Snapple distributor, Select Beverages, Inc., Snapple and Stokely Van Camp, and/or a two-page "contract terms summary" that sets forth the changes in the renegotiated Select agreement.

**\*6** Regardless of what Quaker says constitutes the business plan, in fact Redmond himself has no knowledge of any such business plan. Although Redmond swears that his new boss--Uzzi--told him

of this plan, Uzzi himself knows of no one who transmitted such hearsay to Redmond.

Uzzi has publicly stated that the plan for integrating the Gatorade and Snapple distribution systems is something that will happen in the future. In so doing, Uzzi is consistent with another Quaker executive, Mr. Robb, who also has told the public that the integration plan for the two distribution systems has yet to be designed. The integration aspect of Redmond's job is neither mentioned nor even hinted at in personnel files, executive search files, or any other piece of paper relating to Redmond's job in the possession of Quaker, Redmond or Uzzi other than the declarations fashioned by Quaker after this case was filed.

If Redmond were to take on the task of integrating Quaker's and Snapple's distribution systems, he could not reasonably expect to force distributors to accept a renegotiated distributor agreement in the form of the business plan that is the Select agreement because:

(a) The Select agreement was negotiated not at arm's length, but rather with a distributor (Select) that is controlled by Thomas H. Lee & Co., one of the major selling shareholders of Snapple

(b) A group of Snapple distributors has openly expressed concern about the "plan" represented by the Select distributor agreement, particularly about "changes caused by competition"

(c) The distribution plan itself, as distinguished from the integration plan, contemplates taking away from existing Snapple distributors certain Snapple packages that they have heretofore distributed.

Quaker has no plan whatever for renegotiating the Snapple distributor agreements if Snapple distributors do not accept the terms sought by Snapple. Thus, while Quaker claims to have a plan or "vision" for the integrated distribution system after all Snapple distributor agreements have been renegotiated, Quaker has no plan to achieve the renego-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 6
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

tiation with 350 distributors.

If Redmond were to take on the integration task, he could be "influenced by certain confidential information [he] obtained while employed at PepsiCo," as he contemplates in his declaration, because:

(a) The integration plan itself requires renegotiation of actual merchandising co-operative programs, advertising co-operative programs and pricing increase formulae, distribution targets and equipment placement programs;

(b) Quaker makes available to distributors marketing funds that are discretionary at the regional level to be used to meet in-market competitive responses "on a regional meeting competitive basis" by regional directors who report to Redmond, and who consult with Redmond on decisions regarding the use of such funds; and

(c) The current Quaker/Gatorade distribution system has very little experience with store-door delivery systems such as the Snapple system. Redmond, on the other hand, has PepsiCo confidential information regarding its contemplated and tested new selling and delivery system, that PCNA recently has developed with Redmond's involvement.

*7 Uzzi has testified that Redmond has never seen the Snapple strategic marketing plan that he is supposed to execute. Quaker has not yet embraced this plan, because Uzzi has only skimmed it and disagrees strongly with certain premises of it. Additionally, Uzzi cannot confirm that this plan was created prior to Redmond's employment by Quaker, as he swore in his declaration Likewise, there is no Snapple 1995 National Sales and Marketing Plan, which will include an allocation of Snapple's resources, its 1995 marketing tactics, its budget allocation for promotions, and its product mix, among other things.

Redmond's use of PepsiCo's confidential information and trade secrets in his new job does not de-

pend upon its title. He will use that information because he is a senior executive with Gatorade who will have responsibility for packaging, pricing, costs, margins, distribution systems, products, channels, and marketing, and therefore will necessarily suffer the influence of PepsiCo's trade secrets.

The court finds that Defendants' credibility regarding Redmond's duties at Quaker has been undermined by:

(a) Redmond's false statements to three PCNA executives regarding his acceptance of the Quaker offer;

(b) Redmond's unconditional acceptance of the offer from Uzzi when he apparently intended to negotiate for a higher position with his present employ- er;

(c) Redmond's sworn declaration describing a business plan of which he knew nothing and his false testimony that he got that information from Uzzi;

(d) The widely varying descriptions of Redmond's job title and duties, starting with his assertion to six PCNA employees that Quaker hired him to be the Chief Operating Officer of Gatorade; and

(e) Redmond's admission in his declaration and Uzzi's denial in the hearing that Redmond's job performance could be influenced by confidential PepsiCo information.

VI. PepsiCo's Trade Secrets

A. Strategic Plan and Marketing Initiatives

PCNA uses a planning process for its business that begins with a Strategic Plan for a three-year time frame, and is revisited annually. The Strategic Plan identifies the areas of the beverage business in which PCNA plans to compete, product strategies, operational strategies relating to manufacturing, selling and distribution, marketing strategies, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 7
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

financial goals and strategies. The strategic plan-
ning process is confidential, because its purpose is
to create a competitive advantage by anticipating
competitor's moves in the marketplace and pree-
mpting those moves.

PCNA's Strategic Plan is developed by Weatherup
and his staff. Because the General Managers of
PCNA's business units are involved in the process
of developing and directing PCNA's plans, the Gen-
eral Managers understand the nature of the informa-
tion presented to them and treat the information in
those plans as confidential. Although the General
Managers are responsible for individual geographic
regions, their interest in the strategic plans is not
limited to their own region. PepsiCo primarily goes
to market on a national basis.

**8** PCNA's Strategic Plan was presented to senior
PCNA managers, including Redmond, at a meeting
at the Sagamore hotel in upstate New York in July,
1994. Those managers are responsible for the for-
mulation of the plans, as well as for the execution
of the Strategic Plan. At that meeting, Weatherup
and others presented specific information regarding
products, package sizes, financial targets, key oper-
ational changes, and timing, among other things.
Weatherup and others explained at this meeting that
the information being presented was confidential.

Among other times and places where the General
Managers, including Redmond, were involved in
and exposed to PCNA's strategic planning pro-
cesses was the July, 1994 meeting. At that meeting,
PCNA presented its confidential strategic market-
ing information to the General Managers, includ-
ing, for example, marketing plans relating to the
sales of Lipton Original and Lipton Brisk ready-
to-drink teas. PCNA's marketing plans, as presented
at Sagamore, are not publicly known. If they be-
came known to a competitor, they could be used by
that competitor to create a product or plan designed
to challenge PCNA's marketing strategy.

Also presented at the Sagamore meeting was, for
example, another strategic initiative related to

PCNA's juice drinks, and specifically to new fla-
vors being introduced by PCNA in 1995 and the ex-
pansion of flavors in specified package sizes.
Knowledge of such confidential information would
enable a competitor to block the success of PCNA's
planned product introductions.

Still another example of the strategic initiatives
presented at the Sagamore meeting related to
PCNA's All Sport. That initiative related to the size
of the All Sport package and was designed to shift
the focus of All Sport's marketing.

PCNA's Strategic Plan has economic value as a res-
ult of its not being generally known in the beverage
business. That is because the Strategic Plan shows
PCNA's direction, which competitors could use to
try to preempt or block PCNA's moves and thereby
reap economic benefits. If a competitor obtained
PCNA's confidential strategic plans, that competitor
would know where PCNA was and was not going
to place its competitive and financial resources,
what accounts PCNA did and did not plan to focus
upon, what size packages PCNA was and was not
planning to use, and what PCNA's new innovations
are. That information represents the difference
between winning (by taking sales and customers
away from competitors, and by being profitable)
and losing in the marketplace.

B. Annual Operating Plan

PCNA's strategic plan is focused for a single calen-
dar year in an Annual Operating Plan ("AOP"), in a
process beginning in June. That AOP is a nation-
wide plan developed by reviewing proposals with
the field operations, including the business man-
agers of each of the geographic business units.
Once finalized, the AOP is delivered to the geo-
graphic business units for implementation within
each specific region. Business Unit General Man-
agers use their own judgment to implement the na-
tional plan on a regional level.

**9** As a result of the confluence of several events,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

calendar year 1995 will be a pivotal year for PCNA's success or failure in the non-carbonated soft drink categories that are new areas for PCNA: isotonic beverages, teas and juices. 1995 will be the first full year in which PCNA and the Coca-Cola Company will have products that compete with Quaker's Gatorade product that has for so long dominated the isotonic beverage market.

1995 also is pivotal because the combined Gatorade and Snapple businesses form a greater competitive threat than those entities standing alone. The combined entity will be able to present a more powerful sales effort across sales channels. PepsiCo has formed a task force to address the competitive effects of the combined Gatorade/Snapple entity.

Competition in the tea market also will be remarkably fierce in 1995. A partnership between Coke and Nestea already has been disbanded in that market as a result of the fierce competition. Fierce competition for the sale of juice products is also anticipated in 1995.

PCNA concludes its AOP at the national level in mid- to late summer. That AOP becomes the guideline for all of PCNA's field operations in the U.S. and Canada to execute all the activities that PepsiCo participates in during the calendar year 1995. Although the specific implementation of the AOP varies among the regional business units, the AOP provides the direction for that implementation. The AOP includes PCNA's financial goals and expectations, marketing plans for each product and package size, promotional event calendars, growth expectations, and operational changes. These plans represent the "strategic bets" that PCNA makes about its business, that will allow PCNA to win or lose in the market.

PCNA's AOP is developed by many people at PCNA over many months. The development group is the same as that for PCNA's strategic plan (including Redmond), and also includes brand managers, PCNA's new product Vice President, joint venture managers and others whose input is neces-

sary to the plan.

PCNA's 1995 AOP was distributed to Barnes' direct reports--the Business Unit General Managers, and senior personnel working at PepsiCo's headquarters in Somers, NY. Barnes has discussed the AOP with Redmond over the last several weeks as Redmond (along with other Business Unit General Managers) prepared the action plan for his business unit for 1995. Redmond knows of every initiative contained in the AOP.

The AOP bears a legend that reads "Private and Confidential-Do Not Reproduce," and generally is understood by PCNA managers to contain confidential information. Different information contained within the AOP is competitively sensitive for different periods of time, some of it through December, 1995.

PCNA's competitors could not develop the information contained in PCNA's AOP even if they looked at historical market data. If the information contained in the AOP were to be placed in the hands of one of PCNA's competitors, competitors could take steps to preempt or destroy PCNA's competitive moves.

**\*10** Among the major PCNA initiatives outlined in the AOP are confidential advertising, campaigns, marketing strategies, including a determination of the timing for specific activities, and packaging tactics. The plans are not generally known and have been kept confidential by PCNA.

Included in the AOP is confidential information about a new piece of merchandising equipment. Although that piece of equipment has been introduced to the public, PCNA's plans with respect to that equipment--targets for placement, capital expenditures, and the like--are not known to the public. PCNA's AOP also includes an initiative to place other cold merchandising equipment into stores, detailing the type of equipment that PCNA will purchase, and the number of pieces of equipment. Pepsi is in competition with other beverage vendors to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 9
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

place such equipment into stores.

PCNA's plans to expand its business in certain markets that are new to PCNA, using a specific PCNA product, are not publicly known. PCNA's AOP includes details of funding available to PCNA's distributors to spend on an initiative behind PCNA's Lipton Brisk tea product, and other plans (including timing) relating to that product. PCNA's AOP also includes information regarding new product flavors and packages that is not publicly known and that is competitively sensitive.

Although trade press reports may contain information regarding new flavors, that information frequently is incorrect. Readers of the press reports would be unable to discern which of the information contained within such reports is accurate, and which is inaccurate. Gatorade's president, Uzzi, testified that he did not believe everything that he read in Brand News, Brand Marketing and other trade publications, and that those publications are not always accurate. Thus, the fact that some of the new flavors and packaging plans identified in PCNA's AOP are mentioned in the press does not preclude trade secret status for PCNA's plans regarding those flavors, because the press statements could not be relied upon by competitors in formulating their own business plans.

D. Pricing Architecture

"Pricing Architecture" is a key component of PCNA's AOP, relating to how PCNA prices its products in the marketplace. Pricing Architecture goes to great length and detail to determine and establish what prices PCNA will be charging for its products, including All Sport, Lipton and Ocean Spray products, to deliver certain retail prices in the market, on a nationwide basis. Documents reflecting PCNA's Pricing Architecture are labeled as "Private and Confidential."

Pricing Architecture includes PCNA's national pricing approach, specific price points, directions for

Customer Development Agreements ("CDAs"), objectives for All Sport, Lipton teas, Ocean Spray juices and lemonade, and PCNA's new (and still under test) water product, Aquafina, by trade channel, package size and other characteristics of PCNA's products and customers. The pricing alternatives identified in the Pricing Architecture were selected by PCNA from many alternatives. PCNA's Pricing Architecture is not publicly known and is confidential. Because the beverage market is extremely price sensitive, if competitors had access to PCNA's confidential information, they could use that information to calculate their own price points to beat PCNA in the marketplace.

*11 Pricing Architecture also includes information on the guidance that PCNA gives to its sales personnel entering into CDAs with retailers. CDAs are agreements between PCNA and retailers by which the retailer agrees to engage in certain merchandising activities for PCNA products in exchange for the payment of money by PCNA for a one calendar year period. PCNA's CDA information for 1995 is confidential, is not publicly available, and includes using the CDA approach for new products (which has not been a common practice for the types of products that PCNA sells). PCNA's Pricing Architecture includes CDA goals for specific products in specific channels. Redmond was responsible for developing specific CDAs for California and for working on CDAs for national accounts that are headquartered in California.

At the time of Redmond's departure on November 10, 1994, PCNA was negotiating CDAs with its customers. One CDA in process at the time of Redmond's departure was a contract with K-Mart, which included specific recommendations regarding merchandising equipment. That information is not publicly known, but competitors could use that information to outbid PCNA in order to obtain a merchandising advantage with the retailer. Similar information was in process regarding a CDA with PCNA's customer, "7-11," and Redmond had access to that information shortly before he left

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PCNA to work for Quaker.

PCNA developed its Pricing Architecture with the work of five full time staff members and consultant resources over an eighteen-month period. Redmond was a member of PCNA's steering committee for Pricing Architecture, which met with the headquarters group to review work in progress on Pricing Architecture and to give the headquarters group guidance as they developed the Pricing Architecture plan. Redmond concedes that he participated in one Pricing Architecture steering committee meeting; the steering committee also engaged in conference and other telephone calls to provide input.

Pricing Architecture was presented to PCNA's general managers, including Redmond, in an August 23-24 meeting. The Pricing Architecture document was delivered only to those PCNA personnel having a need to know the contents of the document in order to carry out their jobs: the vice presidents of customer development and financial officers of each of the PCNA business units. At a later date, copies of the Pricing Architecture document would have been provided to the market unit managers who report directly to the business unit general managers. Those persons were involved in the development of Pricing Architecture. Pricing Architecture was not distributed in its entirety to PCNA's franchise bottlers. The information that was received by the bottlers, however, was reasonably expected by PCNA to be kept in confidence by them as a result of their own business and legal incentives to retain that information in confidence, and because PCNA senior employees tell the bottlers to keep the information confidential.

*12 PCNA's Pricing Architecture has major economic value precisely because it is not generally known. That is because there is no variable that has a greater effect on profitability than pricing. Indeed, there is nothing more important that will influence the success of a business unit, such as the California business unit of which Redmond was in charge, in terms of achieving profit goals than pricing. PCNA's competitors could use PCNA's confidential

Pricing Architecture information to preempt PCNA's pricing moves, undercut PCNA's prices, and planning to fight competition from PCNA. PCNA's Pricing Architecture retains its competitive sensitivity through the end of 1995.

The mere fact that a product is priced in the market at a specific dollar amount does not mean that PCNA's 1995 Pricing Architecture is publicly known. Because of the complexity of pricing, which varies by geography, retailer, channel, and time, pricing across the country, PCNA's Pricing Architecture could not be developed with any degree of accuracy by a competitor looking at public data. The best that a competitor could do with public data is speculate as to PCNA's approach to pricing. PCNA's Pricing Architecture deals with ranges of prices, and not the specific prices that PCNA charges to individual customers. Likewise, PCNA's customers do not obtain the entire pricing plan outlined in Pricing Architecture when they receive information specific to them from PCNA.

Business Unit General Managers (including Redmond) worked on Pricing Architecture, and planned to implement within each regional business unit's market. PCNA's Pricing Architecture must be and could be remembered by management employees such as Barnes and by business unit general managers such as Redmond.

Indeed, Redmond was responsible for implementing the guidelines of Pricing Architecture within the California business unit that he ran until November 10, 1994, to assess price points for the markets within that business unit, to prepare proposals for customers, and to forecast profits. Redmond was required to report to Barnes how he was going to use Pricing Architecture to develop specific plans for California, how he was going to approach customers, and what he was going to achieve with those customers.

Examples of PCNA's Pricing Architecture are found in its pricing approach and objectives to All Sport, Lipton Original and Brisk tea and Ocean

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 11

Spray products in various channels. That information is competitively sensitive until December, 1995, because competitors do not know what PCNA is going to do with its prices until after PCNA has priced its products in the marketplace. Even then, competitors would be required to assemble prices from different geographic markets and channels, over the entire year, to obtain the information contained in PCNA's Pricing Architecture. The specifics of PCNA's approach to the marketplace is not generally known. A competitor of PCNA could use this information to block PCNA's efforts in the marketplace by locking up retailer shelf space sooner, by obtaining it for a lower price than PCNA, or by any of several other competitive methods. Redmond was made aware of all of this information.

*13 Pricing Architecture also includes specific targets for All Sport relating to shelf space, which a competitor could use to try to block PCNA's plans by itself obtaining more shelf space in retailers' stores. Likewise, Pricing Architecture includes a new PCNA pricing structure for All Sport. Redmond is attuned to PCNA's pricing strategies against Gatorade.

The manner in which competitive information, of the type included in Pricing Architecture, is used can be shown by what PCNA has done with information that it obtained from the marketplace relating to Quaker's Gatorade product. Parts of PCNA's plans to take All Sport to market are contained in an October 5, 1994 memorandum.

E. Selling and Delivery System

In PCNA's system, products are manufactured and then sold to stores by delivering the product directly from the manufacturing plant to the store shelves for the retailer. Because there are many alternate ways to perform that function, PCNA has, in the last two years, studied those approaches to find the most cost-effective approach to meet its customers' needs. Providing such service will give

PCNA an advantage with its retailers as the retailers make decisions regarding shelf space and merchandising activity.

PCNA has initiated a pilot market test of a new and unique beverage selling and delivery system in Laguna, California. The elements of that system are indicated in the record. PCNA's knowledge, gained through the pilot test, is known only by the team studying it. That team included a group of PCNA employees at its headquarters, the management team in Laguna, California, along with Redmond and his operations staff.

Whether, and if so, when PCNA will begin implementing its now tested selling and delivery system nationwide is not publicly known. Quaker considers its "vision" of a new distribution system to be very confidential information. PCNA considers its new system to be no less so. CNA developed its new selling and delivery system with the assistance of a consultant, spending more than a million dollars over the past two years.

V. Redmond Knows PepsiCo's Confidential Information and Trade Secrets.

As noted above, Redmond participated in the development of PCNA's trade secrets, and received documents and attended presentations relating to those trade secrets. Redmond has acknowledged his possession of PCNA's confidential information, and illustrated his knowledge of PCNA's confidential information by preparing a chart relating to Pricing Architecture during his testimony, and by providing details regarding PCNA's plans during his testimony.

In mid-September, 1994, Weatherup spent a day with Redmond in California reviewing Redmond's California AOP as well as the company's national direction. The AOP is the core of Redmond's job: he "lives and breathes this every single day of every single week."Redmond has not denied having such knowledge, or put on any evidence to suggest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

Page 12

that he does not have such knowledge; in fact, Redmond demonstrated to Weatherup that he could articulate PCNA's strategic plan and Annual Operating plan in 20-30 key respects during Weatherup's visit with Redmond in September, 1994.

VI. Redmond's And Quaker's Use Of PCNA's Confidential Information And Trade Secrets Will Irreparably Harm PCNA.

**\*14** The specific effects of the use of certain of PCNA's trade secrets and confidential information is set forth above. If Redmond's knowledge of PCNA's plans were placed into the hands of a competitor like Quaker, the effects on PCNA would be "catastrophic."

VII. Redmond And Quaker Will Suffer Little Harm From The Entry Of An Injunction.

Uzzi had not begun to think about hiring anyone for the positions that Redmond now holds at any time prior to October 20, 1994. By October 21, 1994 there had not been any discussions at Quaker about any potential candidates to lead the effort to integrate the distribution systems. Redmond's name had not been raised in connection with that job at that time. Quaker and Uzzi did not interview anyone for Redmond's position. If Redmond had not accepted that position, Uzzi would have been required to solicit someone else for the position. Uzzi acknowledges that he would have carried more of the burden of putting the system together himself, had Redmond not accepted. Thus, the court may infer that any injunction precluding Redmond from participating in such efforts will cause little burden to Quaker that Quaker had not already contemplated before Redmond accepted his job, and would have suffered if Redmond had not, in fact, accepted. Uzzi was not surprised that Redmond negotiated with Pepsi following his acceptance of Quaker's job offer, and contemplated the possibility of Redmond's not accepting the job. Uzzi would have hired someone else in that circumstance, and can do

so now.

Quaker is still in the process of defining Redmond's role and responsibilities, and does not expect to have his responsibilities defined until later in December, or early next year. Redmond and Uzzi have themselves agreed not to talk about Redmond's job until the end of the proceedings in this matter or were advised by someone not to do so. This tempers Quaker's claim that an injunction would be "devastating" to Quaker.

*CONCLUSIONS OF LAW*

This court has subject matter jurisdiction to hear this dispute based upon the diversity of citizenship between plaintiff and defendants and the amount in controversy exceeding fifty thousand dollars. 28 U.S.C. § 1332(a) (1994).

I. PRELIMINARY INJUNCTION STANDARDS IN THE SEVENTH CIRCUIT

In determining whether a preliminary injunction should be granted in favor of PepsiCo, this court must consider four factors:

(1) whether PepsiCo has some likelihood of succeeding on the merits of any of its claims at trial;

(2) whether PepsiCo will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(3) whether the threatened injury to PepsiCo outweighs the threatened harm the injunction may inflict on the defendants; and

(4) whether the granting of the preliminary injunction will disserve the public interest.

*Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n. of St. Louis,* 35 F.3d 1134, 1137 (7th Cir. 1994); *Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir. 1994); *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067, (7th Cir. 1994); *Abbott Labs. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 13

*Mead Johnson & Co.,* 971 F.2d 6, 11-12 (7th Cir. 1992); *Roland v. Air Line Employees Ass'n. Int'l,* 753 F.2d 1385, 1392 (7th Cir. 1985). The court concludes that PepsiCo has met its burden with respect to these factors demonstrating that injunctive relief is warranted.

**\*15** Under the Seventh Circuit's "sliding scale" approach, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side."*Abbott Labs.,* 971 F.2d at 12;*Gateway Eastern Ry. Co.,* 35 F.3d at 1137;*Duct-O-Wire,* 31 F.3d at 509. In *Abbott Labs.,* the court further clarified its analysis: "While we have at times framed the sliding scale approach in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to 'weigh the competing considerations and mold appropriate relief.'"*Abbott Labs.,* 971 F.2d at 12 (citation omitted) In this case, both the likelihood of success on the merits and the balance of harms that might be suffered if no injunction were to issue weigh heavily in PepsiCo's favor.

## II. PEPSICO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

It is frequently true in trade secret cases that "[m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs [like PepsiCo] must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything."*Si Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1261 (3d Cir. 1985) (quoting *Greenberg v. Croydon Plastics Co.,* 378 F. Supp. 806, 814 (E.D. Pa. 1974), *vacated,*184 U.S.P.Q. 27 (E.D. Pa. 1974) (vacating earlier order

and substituting more definite injunctive relief)).

A. PepsiCo is Likely to Prevail on its Illinois Trade Secret Act Claim.

To safeguard intellectual property and confidential business information, Illinois has adopted a version of the Uniform Trade Secrets Act. 765 ILCS 1065/1 *et seq.* (1994) (the Illinois Trade Secrets Act, hereinafter "the ITSA"); 14 Uniform L. Ann. 437 *et seq.* (Master ed. 1990). The ITSA was intended to codify existing Illinois common law relating to trade secrets, and to eliminate any inconsistencies within that body of law. *See Napoli v. Sears, Roebuck & Co.,* 835 F. Supp. 1053, 1058 (N.D. Ill. 1993) (Aspen, J.); *Elmer Miller, Inc. v. Landis,* 253 Ill. App. 3d 129, 133, 625 N.E.2d 338, 341 (1st Dist. 1993); *Gillis Assoc. Indus., Inc. v. Cari-All, Inc.,* 206 Ill. App. 3d 184, 189, 564 N.E.2d 881, 884 (1st Dist. 1990); Jager, *Trade Secrets Law* § IL.01 (the ITSA corrects some "recent aberrations in the Illinois case law [and resolves] some confusion that existed in the case law"). Although there are very few Illinois cases construing the provisions of the ITSA applicable here, it is appropriate for this court to look to the application of statutory trade secret act claims in other jurisdictions. *Le Gout v. Decker,* 146 Ill. 2d 389, 397, 586 N.E.2d 1257, 1260-61 (1992) ("To further the goal of uniformity in [uniform] laws, courts generally 'defer to decisions of other states and will construe the statute in accordance with the construction given to the same statute in other jurisdictions'") (citation omitted); *Urban v. Lohman,* 227 Ill. App. 3d 772, 776, 592 N.E.2d 292, 295 (1st Dist. 1992) ("In construing an Illinois statute, decisions of other states construing similar laws are entitled to respect and consideration") (citation omitted).

### 1. PepsiCo's Confidential Information Constitutes Protectible Trade Secrets.

**\*16** The ITSA defines a "Trade Secret" as:

information, including but not limited to, technical

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d) (1993). PepsiCo's confidential business information constitutes protectible trade secrets within the ITSA's definition, because they are data, processes, methods, plans and strategies (including pricing, marketing, strategic and related business information) that derive economic value from not being generally known within the beverage industry.

Further, in this case, defendant Redmond admitted that the PCNA business information at issue is confidential, that he views confidential business information and trade secrets as one and the same, and that he is not free to disclose PepsiCo's confidential information. These admissions alone establish the fact of PepsiCo's trade secrets, for trade secret status may be found when the defendant admits that the information constitutes a trade secret. *Churchill Communications Corp. v. Demyanovich,* 668 F. Supp. 207, 213 (S.D.N.Y. 1987) (admission by a former employee concerning the confidential nature of certain information was relevant in determining whether that information was entitled to trade secret status).

PepsiCo's efforts to maintain the secrecy of its trade secret and confidential information were reasonable and more than required under the ITSA. PepsiCo provided confidential and trade secret information to those employees with an actual need to know it; it regularly marked information "private and confidential;" it required all of its personnel with ac-

cess to this information to execute agreements with PepsiCo whereby they agreed not to use or disclose PepsiCo's confidential information; the bottlers with whom some of this information was shared knew the secret and sensitive nature of the material and had strong business and legal incentives to maintain the secrecy of the information; at meetings where strategic and other business plans were discussed, PCNA executives emphasized to the attendees that the information they were to receive at the meeting was confidential. These steps were more than the "reasonable efforts" required by the ITSA.

The case law illustrates the sufficiency of PCNA's effort to safeguard its confidential information. For example, in *Televation Telecommunication Sys., Inc. v. Saindon,* 169 Ill. App. 3d 8, 15-17, 522 N.E.2d 1359, 1364-66 (2d Dist. 1988), *appeal denied,* 122 Ill. 2d 595, 530 N.E.2d 266 (1988), the court held that the plaintiff took reasonable steps to ensure the secrecy of its proprietary drawings though the drawings were kept in an unlocked file cabinet, portions of those drawings were freely distributed to lower level employees who were not bound by confidentiality agreements and drawings were given to non-employee third parties. The court reasoned that the plaintiff's policy of disclosing complete drawings to employees only on a need-to-know basis, after orally informing its employees that the drawings were confidential and stamping the drawings proprietary, were reasonable measures to protect the information under the circumstances. *See also Service Ctrs. of Chicago, Inc. v. Minogue,* 180 Ill App. 3d 447, 454, 535 N.E.2d 1132, 1136 (1st Dist. 1989) (disclosure to those who have a need to know the content of the trade secret is adequate protection under the ITSA); *Surgidev Corp. v. Eye Technology, Inc.,* 828 F.2d 452, 455 (8th Cir. 1987) (applying Minnesota and California versions of the Uniform Trade Secrets Act, and holding that employee nondisclosure agreements were sufficient protection of secrecy).

**\*17** Likewise, that a limited amount of PepsiCo's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 15
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

trade secrets and confidential information was distributed to PCNA's franchise-owned bottlers (FOBOs) does not mean that PepsiCo has used less than reasonable efforts to maintain the secrecy of such information. FOBOs have the same incentives as PepsiCo to keep that information confidential, and PepsiCo reasonably could expect them to do so. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475 (1974) ("This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secrets to another in confidence, and under an implied obligation not to use or disclose it."). PepsiCo's witnesses also correctly observe that disclosure of confidential information to competitors and others by FOBOs can in certain circumstances run afoul of the law. *See, e.g., U.S. v. U.S. Gypsum Corp.,* 438 U.S. 422, 433 n.16 (1978) (exchanges of current price information by competitors represents the "greatest potential for generating anticompetitive effects" and consistently have been held to violate the Sherman Act).

2. Redmond's Use And Inevitable Disclosure Of PepsiCo's Trade Secrets Constitute Actionable Misappropriate Under The ITSA.

"Misappropriation" is defined under the ITSA in pertinent part as:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized

improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

765 ILCS 1065/2(b) (1993). Both actual and threatened misappropriation also may by enjoined under the ITSA. 765 ILCS 1065/3(a) (1993); *George S. May Int'l Co. v. International Profit Assoc.,* 256 Ill. App. 3d 779, 788, 628 N.E.2d 647, 653 (1st Dist. 1993), *appeal denied,* 156 Ill. 2d 557, 638 N.E.2d 1115 (1994).

"Improper Means" under the ITSA:

includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

765 ILCS 1065/2(a) (1993).

In this case, Redmond's performance of his job at Quaker results in actual misappropriation because he will use PepsiCo's trade secrets and other confidences in order to perform his duties. Thus, under the ITSA, Redmond has misappropriated PepsiCo's trade secrets by "use of a trade secret of [PepsiCo] without express or implied consent" and because Redmond "used improper means [[[by breaching his duty to maintain the confidentiality of PepsiCo's trade secrets and other confidential information] to acquire knowledge of the trade secret." Quaker has misappropriated PepsiCo's trade secrets by placing Redmond into a job in which it "knew or had reason to know that knowledge of the [[[PepsiCo] trade secret was derived from or through a person who *utilized improper means to acquire it;* [and that the trade secrets were] acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; [[[and that the trade secrets were] derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 16

its use."765 ILCS 1065/2(b)(1), (2)(A)(I), (II) and (III) (1993).

**\*18** Further, Redmond and Quaker have "threatened misappropriation" of PepsiCo's trade secrets within the meaning of the ITSA. Threatened misappropriation can occur when an employee who knows of his employer's trade secrets is hired by a competitor to perform a job with similar duties. In such circumstances, the inevitable disclosure or use of the trade secrets by the employee in his new job constitutes misappropriation or threatened misappropriation under the Uniform Trade Secrets Act and under the common law. *See, e.g., IBM Corp. v. Seagate Technology, Inc.,* 1991 U.S. Dist. LEXIS 20406, at \*7-12 (D. Minn. 1991), *remanded for more specific statement of relief,*962 F.2d 12 (8th Cir. 1992) ("*IBM*") (court issued an injunction under the Minnesota Trade Secrets Act (the relevant provisions of which are identical to the ITSA) barring a former employee from working for a competitor in a new job with the same responsibilities because the new job would inevitably lead to the disclosure or use of trade secrets); *American Totalisator Co. v. Autotote Ltd.,* 1983 WL 21374, at \*5 (Del. Ch. 1983) (court noted that Delaware's adoption of the Uniform Trade Secrets Act authorized an injunction against threatened misappropriation where it was impossible for an employee not to use his former employer's trade secrets in his job with the plaintiff's competitor); *Emery Indus., Inc. v. Cottier,* 202 U.S.P.Q. 829, 834 (S.D. Ohio 1978) ("There can be no doubt of the present threat of disclosure in any case in which the transfer of employment is to a head-to-head competitor and the responsibilities in the employment are comparable."); *FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 504-05 (5th Cir. 1982) (court enjoined an employee from working in a new job that posed "an inherent *threat* of disclosure or use of [plaintiff's] trade secrets" because the new job had duties identical to those at his former employer); *Den-Tal-Ez, Inc. v. Siemens Capital Corp.,* 566 A.2d 1214, 1232-33 (Pa. Super. Ct. 1989) (noting that the trial court may have overstated the situation when it said that

trade secret disclosure would be "inevitable," but that there was still ample evidence showing at least a substantial threat of disclosure); *Air Prods & Chems., Inc. v. Johnson,* 442 A.2d 1114, 1122-25 (Pa. Super. Ct. 1982) (finding the inevitability of trade secret disclosure to a new employer to be a sufficient threat to enjoin the employee from holding certain positions where disclosure was likely to occur); *Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 902 (Tex. Civ. App. 1978) (finding inevitable disclosure notwithstanding former employee's good faith, and enjoining employee from working for competitor in any capacity in which trade secrets of previous employer were likely to be used); *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.,* 255 F. Supp. 645, 654 (E.D. Mich. 1966) (enjoining former employee from engaging in the same line of work for a competitor because the nature and type of work created "an inference that there is an inevitable and immediate danger of disclosure" of former employer's trade secrets); *Fountain v. Hudson Cush-N-Foam Corp.,* 122 So. 2d 232, 234 (Fla. Dist. Ct. App. 1960) (enjoining former employee from working for a competitor because employee's "knowledge of the trade secrets would be so entwined with his employment as to render ineffective an injunction directed only toward a prevention of disclosure.").

**\*19** The only court to consider whether "inevitable disclosure" constitutes a threatened misappropriation under the ITSA concluded that it does.*Teradyne, Inc. v. Clear Communications Corp.,* 707 F. Supp. 353, 355 (N.D. Ill. 1989) (Zagel, J.). In that case, the court considered the adequacy of allegations sufficient to state a claim under the ITSA and observed that "[a]n employer seeking injunctive protection for his trade secrets prior to their disclosure generally alleges either that the ex-employee actually intends to divulge the secrets or that he will inevitably do so, whether consciously or not, because of the type of work in which he will be involved, or that there is a substantial probability of disclosure."*Id.* at 356 (quoting *Standard Brands v. Zumpe,* 264 F. Supp. 254, 269 (E.D. La. 1967)). In

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

Page 17

*Teradyne* the claim failed only because there were no allegations of inevitable disclosure.*Teradyne,* 707 F. Supp at 356-57. PepsiCo's complaint here makes such allegations.

Inevitable disclosure is not a concept limited to the law of trade secrets and misappropriation. Thus, for example, the courts have recognized that "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so."*FTC v. Exxon Corp.,* 636 F.2d 1336, 1350 (D.C. Cir. 1980); *see also Sullivan Marketing, Inc. v. Valassis Comm., Inc.,* 1994 WL 177795 at *3 (S.D.N.Y. 1994). Those cases recognize that, once a person has knowledge of a competitors business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge of his competitor's been is "nigh impossible." *Sullivan,* 1994 WL at *3 . The court cannot find that any less is true of Redmond's ability (or inability) to compartmentalize his knowledge of PepsiCo's trade secrets and confidential information and to refrain from using that information in his job at Quaker.

Defendants' reliance upon *AMP Inc. v. Fleischhacker,* 823 F.2d 1199 (7th Cir. 1987), is misplaced. *Fleischhacker* was decided before the ITSA was enacted, and the ITSA provides expressly for injunctive relief upon a showing of threatened misappropriation. 765 ILCS 1065/3(a). The court in *Fleischhacker* also indicated that injunctive relief would have been warranted if the plaintiff had shown that any of its protectible trade secrets were misappropriated or "at risk of misappropriation." *Fleischhacker,* 823 F.2d at 1207. Thus, unlike the plaintiff in *Fleischhacker,* who could not prove that it had specific trade secrets, or that those trade secrets (if possessed) would have been of value to the defendant's new employer, PepsiCo here has shown that it has protectible trade secrets and confidences, that Redmond was integrally involved in their development and implementation, and that Quaker will obtain a great and unfair advantage as a result of Redmond's possession and use of PepsiCo's trade secrets and confidences.

**\*20** In order to determine whether disclosure of trade secrets in such circumstances is inevitable, this court examines (i) the level of competition between the former employer and the new employer; (ii) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (iii) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *IBM,* 1991 U.S. Dist. LEXIS 20406, at *7 (citing *Surgidev Corp. v. Eye Technology, Inc.,* 648 F. Supp. 661, 695 (D. Minn. 1986), *aff'd,*828 F.2d 452 (8th Cir. 1987)). In this case, there is no dispute that PepsiCo and Quaker are direct competitors in the fiercely competitive soft drink business.

The court also concludes that PepsiCo has shown that Redmond's new position is sufficiently comparable to his former position at PepsiCo to make disclosure of PepsiCo's trade secrets and confidential information inevitable at his new position. Redmond himself characterized his new position at Quaker as Chief Operating Officer of Gatorade. The duties of his new position as Vice President-Field Operations for Gatorade North America will overlap the duties he had while at PepsiCo, and thereby will result in his use or disclosure of PepsiCo's confidential information. *See, e.g., National Starch & Chem. Corp. v. Parker Chem. Corp.,* 530 A.2d 31, 32-33 (N.J. Super. Ct. App. Div. 1987) (former employee enjoined from any employment responsibilities related to his previous employment, despite the fact that 95 percent of his work for the defendant consisted of non-related responsibilities; court found that the circumstances gave "rise to an inference that a substantial threat of disclosure exists" even though only 5 percent of his current employment was related to his previous work). The testimony of Redmond and Uzzi (in their respective declarations, Uzzi's deposition and testimony of each at the preliminary injunction hearing) establish

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 18

that the scope of Redmond's job responsibilities at Quaker will be both broad and pertain to the same areas for which Redmond possesses PepsiCo's confidential information, namely sales, distribution, marketing, pricing, customer agreements and promotions. According to both Redmond and Uzzi, Redmond will manage the integration of the distribution systems of Gatorade and Snapple. Redmond also will be responsible for "executing sales and marketing plans, pricing strategies, including Customer Merchandising Agreements, and other types of promotional programs."Redmond's testimony reveals that he will be managing from the top Gatorade's entire North American sales operation at the field level. Although Quaker claims that Redmond will only take charge of previously developed plans and strategies, an executive of his level will implement, improve, and modify existing systems, and Uzzi concedes that Redmond's job will empower him to direct the spending of discretionary marketing funds. Therefore, regardless of whether Redmond is responsible for developing pricing strategies, his knowledge of PepsiCo's trade secrets will either intentionally or inadvertently be used in improving and implementing Quaker's existing sales and distribution systems. Redmond's position with Quaker presents a substantial threat of disclosure.

**\*21** Defendants contend that no risk of disclosure exists because Redmond has signed a contract with Quaker that requires him not to disclose PepsiCo's confidential information while at Quaker, and not to induce Quaker to use PepsiCo's information. The court concludes that this Quaker contract is not adequate to protect PepsiCo's information. First, the Quaker contract does not bar Redmond himself from using PepsiCo's information for Quaker's benefit. Further, such contracts and admonitions do not supplant the trade secrets laws and are routinely rejected as insufficient to prevent inevitable disclosure or use. *IBM,* 1991 U.S. Dist. LEXIS 20406, at \*10 (noting that injunction was appropriate where new employer was unable to explain any specific plan to ensure that employee would not

disclose former employer's trade secrets); *FMC Corp.,* 677 F.2d at 504-05 (finding that a confidentiality agreement and good faith were insufficient to prevent the use or disclosure of a former employer's trade secrets, the court enjoined employee from disclosing former employer's trade secrets and enjoined new employer from placing employee in position that posed inherent threat of use or disclosure of trade secrets); *Autotote,* 1983 WL 21374, at \*5 (noting that promise to not use trade secrets is not possible without an injunction). Moreover, Quaker's effort to preclude such misappropriation--its own confidentiality agreement with Redmond-- noticeably fails to prohibit Redmond's use of PepsiCo's information even as it express prohibits him from using Quaker's confidences. PepsiCo therefore is entitled to injunctive relief under the ITSA. 765 ILCS 1065/3(a) (1993).

PepsiCo has shown that it is likely to prevail on all elements of its claim under the ITSA. Moreover, any shortage in PepsiCo's proof arises from the shifting facts describing Redmond's job that have been provided to PepsiCo and to the court. In such circumstances, it is only fair to shift the burden to defendants, to prove that Redmond will not use or disclose PepsiCo's confidential information. That is because knowledge as to the scope of Redmond's new job duties and Quaker's job plans for Redmond is peculiarly and exclusively within the control of the defendants. It is a "familiar principle" that

"when the true facts relating to [a] disputed issue lie peculiarly within the knowledge of" one party, the burden of proof may properly be assigned to that party "in the interest of fairness."

*ITSI TV Prods., Inc. v. Agricultural Assocs.,* 3 F.3d 1289, 1292 (9th Cir. 1993) (quoting *United States v. Hayes,* 369 F.2d 671, 676 (9th Cir. 1966)). This principle has been recognized by the United States Supreme Court, the Seventh Circuit, other federal courts, and Illinois courts. As the United States Supreme Court has noted,
[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

establishing facts peculiarly within the knowledge of his adversary.

**\*22** *Campbell v. United States,* 365 U.S. 85, 96 (1961); *see also United States v. N.Y., N.H. & Hartford R.R. Co.,* 355 U.S. 253, 256 n.5, 78 S. Ct. 212, 214-15 n.5 (1957) (same); *Old Ben Coal Corp. v. Interior Bd. of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975) (citing 9 Wigmore, Evidence § 2486 (3d ed.)); *Erving Paper Mills v. Hudson-Sharp Mach. Co.,* 332 F.2d 674, 678 (7th Cir.) (en banc) (also citing Wigmore), *cert. denied,*379 U.S. 946 (1964); *Wohl v. Yelen,* 22 Ill. App. 2d 455, 459, 161 N.E.2d 339, 341 (1st Dist. 1959) (recognizing "that if the evidence with respect to an issue is within the control of an adverse party, it is he who has the burden of proof ..."); *Snyder v. Ambrose,* 639 N.E.2d 639, 640-41, 1994 Ill. App. LEXIS 1210, \*6-7 (2d Dist., Aug. 30, 1994); *Southwest Fed. S. & L. Ass'n v. Cosmopolitan Nat'l Bank,* 23 Ill. App. 2d 174, 180-81, 161 N.E.2d 697, 701 (1st Dist. 1959).

In light of PepsiCo's showing of the considerable similarities between Redmond's former and present jobs, it is only through such proof by defendants that the court could be assured that PepsiCo's trade secrets would not inevitably be disclosed or used by Redmond. Defendants completely control the evidence as to what duties Redmond will be assigned. Defendants have failed to prove that Redmond's former position is not comparable to his new position, and that it will not involve the use of PepsiCo's confidential information.

**B. PepsiCo Is Also Likely To Prevail On Its Trade Secrets Misappropriation Claim Under Illinois Common Law.**

PepsiCo is likely to prevail on its claim of trade secret misappropriation under the common law. In order to succeed on the merits of a trade secret claim, PepsiCo must demonstrate that (1) it possessed legally cognizable trade secrets, (2) defendants misappropriated those trade secrets in breach

of an agreement, confidence, duty, or as a result of discovery by improper means, and (3) the information will be used in the defendants' business. *See Cohn and RLC Enter., Inc. v. Taco Bell Corp.,* No. 92 C 5852, 1994 WL 13769 at \*10 (N.D. Ill., Jan. 14, 1994) (Nordberg, J.); *Syntex Ophthalmics, Inc. v. Novicky,* 745 F.2d 1423, 1433 (Fed. Cir. 1984), *vacated and remanded on other grounds,*470 U.S. 1047 (1985) (applying Illinois law) (citing *Schulenburg v. Signatrol, Inc.,* 50 Ill. App. 2d 402, 200 N.E.2d 615 (1964), *aff'd in part and rev'd in part,*33 Ill. 2d 379, 212 N.E.2d 865 (1965), *cert. denied,*383 U.S. 959 (1966)).

Under the common law, a trade secret includes "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it."*ILG Indus., Inc. v. Scott,* 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395 (1971); *Schulenburg,* 33 Ill. 2d at 385, 212 N.E.2d at 868;*Victor Chem. Works v. Iliff,* 299 Ill. 532, 545-46, 132 N.E. 806, 811 (1921); *Televation Telecommunication Sys., Inc. v. Saindon,* 169 Ill. App. 3d 8, 13, 522 N.E.2d 1359, 1363 (2d Dist. 1988); *Junkunc v. S.J. Advanced Technology & Mfg. Corp.,* 149 Ill. App. 3d 114, 118-19, 498 N.E.2d 1179, 1183 (1st Dist. 1986).

**\*23** To determine whether a trade secret is entitled to the protection of the common law, the court is required to examine six factors: (1) the extent to which the information is known outside PepsiCo's business; (2) the extent to which it is known by employees and other individuals involved in PepsiCo's business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to PepsiCo and its competitors; (5) the amount of effort or money expended by PepsiCo in developing the information; and (6) the ease or difficulty with which the information could properly be duplicated or acquired by others. *ILG,* 49 Ill. 2d at 93, 273 N.E.2d at 396 (1971); *Tie Systems, Inc. v. Telcom Midwest, Inc.,* 203 Ill. App. 3d 142, 148, 560 N.E.2d 1080, 1085 (1st Dist. 1990); *Service*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 20

*Ctrs.,* 180 Ill. App. 3d at 453, 535 N.E.2d at 1136;*Junkunc,* 149 Ill. App. 3d at 118-19, 498 N.E.2d at 1183;*Television,* 169 Ill. App. 3d at 13, 522 N.E.2d at 1363;*American Wheel & Eng'g Co. v. Dana Molded Prods., Inc.,* 132 Ill. App. 3d 205, 209, 476 N.E.2d 1291, 1294 (1st Dist. 1985).

PepsiCo seeks injunctive relief for the period of time that the confidentiality of the business information to which Redmond was exposed remains valuable. PepsiCo has established that, during this period of time, the information for which it seeks protection from this court is protectible as a trade secret because it is not known outside of the PepsiCo business family, which includes only select PepsiCo managers and executives, and PepsiCo's business partners (for example, its franchise operators), on a need-to-know basis. Further, PepsiCo has established that it has taken extensive protective measures to guard the information's secrecy, including confidentiality agreements and frequent indications, orally and in writing, that the information is confidential. PepsiCo's information was developed at great expense and effort by PepsiCo, is of great value to PepsiCo while it is secret, and would be valuable to its competitors if it is revealed to them before the information becomes known in the marketplace in the next several months. And, while Defendants have claimed that discrete elements of this information already are known, the court concludes that the breadth of information and the plans of PepsiCo could not be duplicated by others from publicly available sources during the time period that is critical to the value of the information.

The court concludes that the business information for which PepsiCo seeks this court's protection constitutes protectible trade secrets under Illinois common law because, by not being known to others, they give PepsiCo a significant competitive advantage over other firms in the beverage industry. *Novicky,* 745 F.2d at 1434 (applying Illinois law); *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir. 1983) (applying Illinois law). This

court concludes that PepsiCo's strategic and annual operating plans for 1995, pricing architecture, new selling and delivery plans (including its new customer representative compensation system) and customer proposal information are protectible trade secrets. *See, e.g., Elmer Miller,* 253 Ill. App. 3d at 133-35, 625 N.E.2d at 342-43 (customer list containing sales and marketing information was a protectible trade secret); *Lyle R. Jager Agency, Inc. v. Steward,* 253 Ill. App. 3d 631, 639-41, 625 N.E.2d 397, 402 (3d Dist. 1993) (customer files containing information relating to pricing were protectible trade secrets); *Brostron v. Warmann,* 190 Ill. App. 3d 87, 90, 546 N.E.2d 3, 5 (3d Dist. 1989) (gross profit information was a protectible trade secret); *Brunswick Corp. v. Jones,* 784 F.2d 271 (7th Cir. 1986) (finding that access to confidential marketing strategies, financial performance and projections, gave a competitor the unfair advantage to cut the time and costs required to develop a new product, preempt the plaintiff's new products before they reached the market, and enabled the competitor to determine how aggressively to price its products); *American Totalisator Co. v. Autotote Ltd.,* 1983 WL 21374 at *4 (Del. Ch. 1983) (finding plaintiff's bidding information constituted a trade secret because it "necessarily encompasses a philosophy for future operation and, as such, possesses some proprietary value to Amtote and a devastating advantage if it becomes available to its competitors....To know the plan would affect the bidding which would determine profit and loss which would affect everything about this Plaintiff doing business"); *National Starch and Chem. Corp. v. Parker Chem. Corp.,* 530 A.2d 31, 32 (N.J. Super. 1987) (information relating to marketing and sales strategies, manufacturing processes, pricing, research and development, and specialized product specification was protectible as trade secrets); *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1201 (5th Cir. 1986).

*24 PepsiCo acted prudently and reasonably to keep its confidential information secret. *See Lincoln Towers Ins. Agency v. Farrell,* 99 Ill. App. 3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

Page 21

353, 358, 425 N.E.2d 1034, 1037 (1st Dist. 1981). PepsiCo protected its confidentiality interests by requiring its employees to sign confidentiality and non-disclosure agreements, and to promise not to divulge confidential or proprietary information relating to PepsiCo's trade secrets to others during and after employment. *Novicky,* 591 F. Supp. 28, 37 (N.D. Ill. 1983) (Decker, J.), *aff'd,*745 F.2d 1423 (Fed. Cir. 1984); *Television,* 169 Ill. App. 3d at 15-17, 522 N.E.2d at 1364-66 (disclosure of complete documents on a need-to-know basis was sufficient to ensure the secrecy of proprietary documents and to maintain trade secret status); *Affiliated Hosp. Prods., Inc. v. Baldwin,* 57 Ill. App. 3d 800, 802, 806, 373 N.E.2d 1000, 1002, 1005 (1st Dist. 1978) (disclosure of information to employees under agreement not to disclose or use information constituted sufficient protection to qualify the information as trade secrets at common law); *Greenberg v. Croydon Plastics Co.,* 378 F. Supp. 806, 812 (E.D. Pa. 1974) ("The secrecy in which a purported trade secret is shrouded need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosure to unauthorized parties"); *Q-CO Indus., Inc. v. Hoffman,* 625 F. Supp. 608, 617 (S.D.N.Y. 1985) ("absolute secrecy is not required"); *Tie Systems,* 203 Ill. App. 3d at 148, 560 N.E.2d at 1085 (absence of precautions restricting access to the information did not establish that the information was not confidential).

The court concludes, based upon the law and the evidence presented at the hearing, that PepsiCo is entitled to legal protection for its trade secrets in the business information described above. The underlying principle at work here is simple: "A business which may invest substantial time, money and manpower to develop secret advantages over its competitors, must be afforded protection against the wrongful appropriation of confidential information by a prior employee, who was in a position of confidence and trust."*ILG Indus.,* 49 Ill. 2d at 93, 273 N.E.2d at 396. The defendants are not entitled to use for their own benefit information developed by PepsiCo over substantial time and at great cost. The court concludes that PepsiCo is entitled to preliminary injunctive relief on its trade secrets claim under the Illinois common law.

C. PepsiCo Is Likely To Prevail On Its Breach Of Confidentiality Agreement Claim Against Defendant Redmond.

Defendant Redmond entered a confidentiality agreement with PepsiCo which provided, in pertinent part, as follows:

I will not disclose at any time, to any one other than officers or employees of the Company [PepsiCo] or make use of, confidential information relating to the business of the Company, manufacturing methods, processes, techniques, products, research or customers lists obtained while in the employ of the Company, which shall not be generally known or available to the public or recognized as standard practices, and on leaving the employ of the Company will not take without the consent of the Company, any drawing, blueprint, or other reproduction, customers list or confidential data.

**\*25** Actions for breach of confidentiality agreements are properly made under the common law of Illinois. The ITSA provides that "contractual remedies, whether or not based upon misappropriation of a trade secret" are not affected by the ITSA. 765 ILCS 1065/8(b)(1).

PepsiCo's confidentiality agreement with Redmond is valid and enforceable. Redmond entered the agreement prior to his employment with PepsiCo, and the agreement was supported by adequate consideration. *See, e.g., Corroon & Black of Illinois, Inc. v. Magner,* 145 Ill. App. 3d 151, 163, 494 N.E.2d 785, 791 (1st Dist. 1986) (continued employment for a substantial period of time is adequate consideration for an employment agreement). The parties have both cited to Illinois law in memorandum submitted to the court. The court is convinced that no different result would be reached under New York law, however, because similar

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

agreements have been held valid and enforceable under New York law. *See, e.g., Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 172, 173 (2d Cir. 1990) (finding valid and enforceable a confidentiality agreement where employees simply agreed "not to disclose or use any confidential or proprietary information of [the employer] upon leaving the company's employ."); *Anacomp., Inc. v. Shell Knob Servs. Inc.,* 1994 WL 9681 at *4, 12 (S.D.N.Y. 1994) (confidentiality agreement that prohibited disclosure or use of the employer's private and proprietary business information, trade secrets and other confidential data" held valid and enforceable).

Redmond admitted that he was not free to disclose PepsiCo's confidential information. Redmond's counsel also admitted during closing argument that the Confidentiality Agreement was valid and bound Redmond "to protect the confidential information of the Pepsi Cola Company that he was made privy to while employed by Pepsi Cola.""[S]tatements made by an attorney in closing argument may be the basis from which a trial court finds a judicial admission."*Lowe v. Kang,* 167 Ill. App. 3d 772, 777, 521 N.E.2d 1245, 1248 (2d Dist. 1988); *accord Williams v. Cahill,* 258 Ill. App. 3d 822, 826, 629 N.E.2d 1175, 1179 (3d Dist. 1994)."Judicial admissions are formal acts of a party or his attorney in court, dispensing with proof of a fact claimed to be true, and are used a substitute for legal evidence at trial."*Lowe,* 167 Ill. App. 3d at 776, 521 N.E.2d at 1248;*accord Dremco, Inc. v. Hartz Constr. Co.,* 261 Ill. App. 3d 531, 535-36, 633 N.E.2d 884, 888 (1st Dist. 1994). Redmond's counsel affirmatively admitted during his closing argument that Redmond entered into a valid and enforceable Confidentiality Agreement with PepsiCo:

The Pepsi Cola agreement I think is absolutely clear that Mr. Redmond is contractually bound to protect the confidential information of the Pepsi Cola Company that he was made privy to while employed by Pepsi Cola.

Thus, this judicial admission binds Redmond and

dictates a conclusion that Redmond's confidentiality agreement with PepsiCo is valid and enforceable.

**\*26** The fact that the confidentiality agreement here has no time limitation does not invalidate the agreement. Rather, the ITSA explicitly provides that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographic limitation on the duty."765 ILCS 1065/8(b)(1).

Prior to the enactment of the ITSA, a few cases held that confidentiality agreements would not be enforced unless they contained reasonable temporal or geographic limitations. *E.g., Cincinnati Tool Steel Co. v. Breed,* 136 Ill. App. 3d 267, 482 N.E.2d 170 (2d Dist. 1985). Section 8(b)(1) of the ITSA superseded and overruled those holdings to the extent they required durational or geographic limits on contractual duties to maintain secrecy or limit the use of trade secrets. *Abbott Interfast Corp. v. Harkabus,* 250 Ill. App. 3d 13, 22, 619 N.E.2d 1337, 1344 (2d Dist. 1993) (contractual prohibition against trade secret disclosure not invalid because it did not contain time limitation; citing Section 8(b)(1) of ITSA); *see also* Jager at § IL.01[1], p. IL-3; § IL.07, p. IL-19-20.

It is true that, at the termination of employment, an employee is free to take with him "general skills and knowledge acquired during his tenure with his former employer."That employee may not, however, take with him "confidential, particularized plans or processes developed by his employer and disclosed to [[[the employee] while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors."*AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1202 (7th Cir. 1987); *accord Schulenburg,* 33 Ill. 2d at 387, 212 N.E.2d at 869.

Redmond expressly and contractually agreed to protect PepsiCo's confidential business information

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 23

and to utilize PepsiCo's trade secrets exclusively for the benefit of PepsiCo. The confidentiality agreement is evidence that Redmond was informed from the outset that he would not be permitted to use PepsiCo's confidences except in PepsiCo's business.

Redmond's performance of his new job with Quaker, PepsiCo's direct competitor in the soft drink market, will require him to use and to disclose PepsiCo's confidential business information in violation of the confidentiality agreement. The court further concludes that Redmond has thereby breached his contractual non-disclosure obligations to PepsiCo as to valuable confidential business information in which PepsiCo has a protectible business interests. *See, e.g., Lawter Int'l., Inc. v. Carroll,* 116 Ill. App. 3d 717, 720-23, 451 N.E.2d 1338, 1346-48 (1st Dist. 1983).

The court concludes that a preliminary injunction should issue here against Redmond to protect PepsiCo from any breach of the Confidentiality Agreement and further disclosure or use of its confidential business information. Illinois courts routinely hold confidential customer information, confidential pricing procedures, and other confidential methods, formulas, procedures and equipment capabilities learned and used in the course of confidential employer-employee relationships as protectible. *See, e.g., Gorman Publ. Co. v. Stillman,* 516 F. Supp. 98, 105 (N.D. Ill. 1980) (Decker, J.) (protectible information found in plaintiff's finances, staffing problems, salary structure, public relations problems, customer lists and distribution methods); *Crocan,* 385 F. Supp. at 253 ("knowledge of what constitutes the best way to manufacture, package, distribute and sell a product may in itself constitute a trade secret of confidential information"); *Millard Maint. Svc. Co. v. Bernard,* 207 Ill. App. 3d 736, 746, 566 N.E.2d 379, 385 (1st Dist. 1990) (pricing formula and customer information protected); *Torrence v. Hewitt Assoc.,* 143 Ill. App. 3d 520, 526, 493 N.E.2d 74, 77-78 (1st Dist. 1986) (protectible confidential information found in financial data, future business plans, client lists and

confidential reports); *Tower Oil & Technology Co. v. Buckley,* 99 Ill. App. 3d 637, 643, 425 N.E.2d 1060, 1066 (1st Dist. 1981) (particular customer needs, product applications, suppliers were confidential and valuable information); *Donald McElroy, Inc. v. Delaney,* 72 Ill. App. 3d 285, 292-93, 389 N.E.2d 1300, 1306-07 (1st Dist. 1979) (confidential supplier sources and requirements, company procedures, equipment capabilities and other confidential company data); *Wessel Co. v. Busa,* 28 Ill. App. 3d 686, 692, 329 N.E.2d 414, 419 (1st Dist. 1975) (sensitive customer information, confidential pricing procedures and the years of accumulated data upon which it was based); *Smithereen Co. v. Renfroe,* 325 Ill. App. 229, 242-43, 59 N.E.2d 545, 550 (confidential methods, processes and formulae used in plaintiff's business); *see also* Restatement of Torts § 759, cmt. b ("Examples of [such] information ... include ... the state of one's accounts, the amount of his bid for a contract, his sources of supply, his plans for expansion or retrenchment, and the like. There are no limitations as to the type of information included except that it relate to [secret or confidential] matters in the business."); Restatement (Second) Agency § 395, cmt. b (the rule against nondisclosure of a former employer's confidential information "applies not only to those communications which are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him. It applies to unique business methods of the employer, trade secrets, lists of names, and all other matters which are peculiarly known in the employer's business.")

**\*27** The justification for enjoining Redmond from further disclosing PepsiCo's confidential information was stated eloquently by Justice Holmes in *E. I. DuPont de Nemours Powder Co. v. Masland,* 244 U.S. 100, 102 (1917)

Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good.

D. PepsiCo Is Not Estopped From Obtaining Injunctive Relief.

The court concludes that the fact that PepsiCo did not enter a covenant not to compete with Redmond does not estop PepsiCo from obtaining injunctive relief against the disclosure of its trade secrets and confidential information. Illinois law is well-settled that where an employer seeks to enjoin a former employee from using the employer's trade secrets, as in this case, a covenant not to compete is not required:

Under Illinois law, an employer has a legitimate business interest in insuring trade secrets not be disclosed for the benefit of third parties or for the employee's use after his employment. (citations omitted). This is true even when there is no non-competition contract between the parties.

*Pivot Point Int'l, Inc. v. Charlene Prods., Inc.,* 1994 U.S. Dist. LEXIS 8993, at *25 (N.D. Ill., July 1, 1994) (Nordberg, J.); *see also Televation Telecommunication Sys., Inc. v. Saindon,* 169 Ill. App. 3d 8, 12, 522 N.E.2d 1359, 1362 (2d Dist. 1988).[FN2]

The court further concludes that Redmond owed PepsiCo common law duties of confidentiality. "The duty to protect an employer's trade secret exists apart from a contract embodying the obligation."*Crocan Corp. v. Sheller--Globe Corp.,* 385 F. Supp. 251, 253 (N.D. Ill. 1974) (Bauer, J.); *see also Televation,* 169 Ill. App. 3d at 12, 522 N.E.2d at 1362 ("An employer has a recognized business in-

terest in protecting trade secrets disclosed in confidence to the employee during the course of his employment even where ... there is no enforceable restrictive covenant between the parties.") (citations omitted). For this reason as well, it was not necessary for PepsiCo to enter a non-compete agreement with Redmond to bind him to his non-disclosure obligations.

Further, Defendants have failed to cite any authority, or set forth the applicable legal standard, for estoppel. The Illinois Supreme Court has identified six elements necessary for equitable estoppel, including the basic elements of (1) a representation made by the party against whom the estoppel is alleged, and (2) the good faith and reasonable reliance on this representation by the party seeking the benefit of the estoppel. *Vaughn v. Speaker,* 126 Ill. 2d 150, 161-63, 533 N.E.2d 885, 890 (1988). Defendants failed to assert or establish any of the necessary elements of estoppel; thus, the court rejects their argument that PepsiCo is estopped from obtaining injunctive relief.

III. PEPSICO WILL BE IRREPARABLY HARMED IF THE PRELIMINARY INJUNCTION DOES NOT ISSUE, AND THAT INJURY FAR OUTWEIGHS ANY HARM THE INJUNCTION MAY CAUSE THE DEFENDANTS.

**\*28** The court concludes that the threatened injury to PepsiCo far outweighs any harm the injunction may cause defendants, and PepsiCo will be irreparably harmed if the injunction sought by PepsiCo is not issued.

A. Because The ITSA Provides For Injunctive Relief, No Showing Of Lack Of Adequate Remedy At Law Or Irreparable Injury Is Required.

Under Illinois law, "where a statute expressly authorizes injunctive relief to enforce the provisions of the statute, the general rules of equity requiring a showing of a lack of an adequate remedy at law and irreparable injury need not be shown."*People v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 25

*Fiorini,* 143 Ill. 2d 318, 574 N.E.2d 612, 623 (1991) (other citations omitted). This general principle has been recognized widely by federal and state courts alike. *See, e.g., Illinois Bell Telephone Co. v. Illinois Commerce Commission,* 740 F.2d 566, 571 (7th Cir. 1984) ("where the plaintiff seeks [a preliminary] injunction to prevent the violation of a ... statute that specifically provides for injunctive relief, it need not show irreparable harm"); *Trailer Train Co. v. State Bd. of Equalization,* 697 F.2d 860, 869 (9th Cir.) ("The standard requirements for equitable relief need not be satisfied when [a preliminary] injunction is sought to prevent the violation of a ... statute which specifically provides for injunctive relief") (other citations omitted), *cert. denied,*464 U.S. 846 (1983); *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 338 (4th Cir. 1983) ("[w]here a statute authorizes injunctive relief for its enforcement, plaintiffs need not plead and prove irreparable injury") (other citations omitted); *Virginia Beach S.P.C.A., Inc. v. South Hampton Roads Veterinary Ass'n,* 229 Va. 349, 329 S.E.2d 10, 13 (1985) ("When a statute empowers a court to grant injunctive relief, the party seeking an injunction is not required to establish the traditional prerequisites, *i.e.,* irreparable harm and lack of an adequate remedy at law, before the injunction can issue, [and a]ll that is required is proof that the statute or regulation has been violated") (citation omitted).

Although no Illinois case has yet been decided under the Illinois Trade Secrets Act squarely addressing this specific issue, federal and state courts in other states adopting the Uniform Trade Secrets Act (like Illinois) have repeatedly invoked this principle in dispensing with the irreparable harm requirement for injunctive relief where a violation of the trade secret statute has been demonstrated. *See, e.g., Capital Tool and Mfg. Co. v. Maschinenfabrik Herkules,* 837 F.2d 171, 172 (4th Cir. 1988) (where a statutory violation is demonstrated, "a complainant need not allege or prove irreparable harm when it invokes a statute that authorizes in injunctive relief"); *National League Rsch. Group v. Lathan,*

1993 WL 169789 (W.D.Va. 1993) ("A complainant need not prove irreparable harm when invoking a statute [like the Virginia--and Illinois--Trade Secrets Act] that authorizes injunctive relief, but must only prove that the defendant violated the statute"); *Boeing Co. v. Sierracin Corp.,* 108 Wash. 2d 38, 738 P.2d 665, 681 (1987) (no finding of irreparable harm required under Uniform Trade Secrets Act, as adopted by Washington, in order for injunctive relief properly to issue).

**\*29** Accordingly, the Illinois Trade Secrets Act expressly authorizes injunctive relief to enforce its provisions (765 ILCS 1065/8), and PepsiCo has demonstrated a violation of the Illinois Trade Secrets Act. Injunctive relief is appropriate in the instant case without any additional findings of irreparable harm or lack of an adequate remedy at law.

B. PepsiCo Has Amply Demonstrated Irreparable Injury.

In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperiled by a defendant's conduct. *See, e.g., AMP,* 823 F.2d at 1206 (trade secrets and confidential information); *Refractory Technology, Inc. v. Koski,* No. 90 C 4350, 1990 WL 119560, at \*3 (N.D. Ill., Aug. 13, 1990) (Duff, J.) (dissemination of trade secrets would cause plaintiff immediate, irreparable harm); *ISC-Bunker Ramo Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1334-35, 1339 (N.D. Ill. 1990) (Marovich, J.) (irreparable harm adequately demonstrated because defendant had misappropriated plaintiff's trade secret and was likely to continue doing so; "irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement ...."); *CPG Products Corp. v. Mego Corp.,* 214 U.S.P.Q. 206, 214 (S.D. Ohio 1981) (threat of disclosure, destruction or dilution of plaintiff's trade secrets constitutes irreparable injury justifying injunctive relief.); *Donald McElroy, Inc. v. Delany,* 72 Ill. App. 3d 285, 294-95, 389 N.E.2d 1300, 1308

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

Page 26

(1st Dist. 1979) ("Once a protectible interest has been established, injury to plaintiff will presumably follow if that interest is not protected"; threat of irreparable harm sufficient where former employee violated the terms of a non-disclosure agreement); *Lawter Int'l,* 116 Ill. App. 3d at 731, 451 N.E.2d at 1348 (where former employee signed a non-disclosure agreement and was about to use plaintiff's confidential information against the plaintiff, irreparable injury was shown and preliminary injunction was properly granted). An injury is "irreparable" in these cases because it cannot be remedied through the payment of money damages and, indeed, it is often difficult (if not impossible) to calculate the true extent of the loss. *See, e.g., Vogel v. American Soc. of Appraisers,* 744 F.2d 598, 599 (7th Cir. 1984) ("irreparable harm ... means ... plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial"); *Cross Wood Products, Inc. v. Suter,* 97 Ill. App. 3d 282, 286, 422 N.E.2d 953, 957 (1st Dist. 1981) (holding that loss of competitive position was not readily subject to measurement by any certain pecuniary standard and this no legal remedy would be adequate to compensate for that loss); *Prentice Medical Corp. v. Todd,* 145 Ill. App. 3d 692, 701, 495 N.E.2d 1044, 1051 (1st Dist. 1986) (finding that irreparable injury denotes transgressions of a continuous nature resulting in a loss of competition position).

**\*30** The disclosure of even a single trade secret is sufficient to cause irreparable harm. *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1191-92 (5th Cir. 1984) ("It is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a trade secret may be disclosed is enough.") (citation omitted). Moreover, just as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever and, "[s]ince the confidentiality of this information can never be regained, the [threatened] injuries would indeed be irreparable."*Metropolitan Life Ins. Co. v. Usery,* 426 F. Supp. 150, 172 (D.D.C. 1976); *see also FMC Corp.*

*v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret once lost is, of course, lost forever").

Here, PepsiCo faces the certain prospect of irreparable harm unless Redmond and Quaker are enjoined. Quaker's access to, and use of, PepsiCo's competitive information in Redmond's possession will result in injury to PepsiCo. That injury is irreparable because there is no way to measure what impact on PepsiCo's sales the defendant's misappropriation will have. It will be difficult, if not impossible, for PepsiCo to prove that it would have made certain sales of its products had the misappropriation not occurred; and its difficulty will be exacerbated by the fact that its All Sport, Lipton and Ocean Spray brands are products attempting to establish themselves against the market leaders in the isotonic, ready-to-drink tea and fruit drink market niches. PepsiCo also stands to lose its ability to develop market recognition and goodwill that result from an active presence in the marketplace. That loss, too, is irreparable, because PepsiCo cannot place a value on the market share that it is now trying to develop by using its trade secrets to establish a market presence. Because competitive position in an industry defies calculation, the court concludes that it would have no way of calculating a reasonably precise level of pecuniary damage to PepsiCo for its loss of potential competitive position sustained by the disclosure of its trade secrets and confidential information.

Consequently, the court concludes that where trade secrets and confidential information are at issue, as they are here, irreparable harm flows necessarily from the actual or threatened loss of the important protectible business interests at stake. Therefore, a preliminary injunction is the only remedy adequate to curtail the irreparable harm that would otherwise inevitably follow. *See, e.g., Taiwan Tainan,* 730 F.2d at 63-64;*Franke v. Wiltschek,* 209 F.2d 493, 498 (2d Cir. 1953); *Penetone Corp. v. Palchem, Inc.,* 627 F. Supp. 997, 1005-07 (N.D. Ohio 1985). As Judge Posner stated in *American Hosp. Supply,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

Page 27

a "district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken."780 F.2d at 593. Given the choice between either requiring defendants to compete fairly and legitimately by not using PepsiCo's information, even if that means denying Redmond particular head-to-head competitive employment for a period of a few months, or requiring PepsiCo to suffer the inestimable consequences of losing its secret business information to its principal competitor who is the dominant player in the field, the court concludes that the only course of action that would minimize the costs of being mistaken consists of granting PepsiCo's request for a preliminary injunction.

**\*31** Under the standards for granting a preliminary injunction, "the degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor."*E.g., Brunswick,* 784 F.2d at 275. Consequently, "[i]f the harm to the plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible...."*Omega Satellite Prods. v. Indianapolis,* 694 F.2d 119, 123 (7th Cir. 1982); *see also Brunswick,* 784 F.2d at 275;*IDS Financial Services, Inc. v. Smithson,* 843 F. Supp. 415, 419 (N.D. Ill. 1994) (Norgle, J.); *Samuel Bingham Co. v. Maron,* 651 F. Supp. 102, 106 (N.D. Ill. 1986) (Moran, J.). Moreover, a successful showing of a likelihood of success on the merits alone is strong evidence an injunction should issue. *Adams v. Attorney Registration & Disciplinary Com'n,* 801 F.2d 968, 971 (7th Cir. 1986). Where the plaintiff is likely to win on the merits and is also likely to sustain greater injury if the injunction is denied than the defendants are likely to sustain if it is granted, "the case for the injunction is made," and no other possibilities need even be considered. *American Civil Liberties Union*

*v. City of St. Charles,* 794 F.2d 265, 269 (7th Cir.) (citing *American Hosp. Supply,* 780 F.2d at 598,*cert. denied,*107 S. Ct. 458 (1986)). The court concludes that such is the case at bar: PepsiCo is likely to prevail on its trade secret and confidentiality agreement claims, and PepsiCo is likely to sustain greater injury if the injunction is not granted than defendants would if the injunction were granted because the potential harm to defendants is slight. A preliminary injunction should be entered in PepsiCo's favor.

IV. GRANTING A PRELIMINARY INJUNCTION TO PEPSICO WILL NOT DISSERVE THE PUBLIC INTEREST.

Rather than disserving the public interest, the court concludes that granting PepsiCo a preliminary injunction will further the public interest in a number of ways. A variety of public interests and policies impact on any case involving trade secrets and confidentiality agreements. These interests include:

(a) The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. "The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world....[e]ven though a discovery may not be patentable, that does "not destroy the value of the discovery to one who makes its or advantage to the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price In labor, money, or machines expended by the discoverer....[T]rade secret protection [is important] to the subsidization of research and development and to increased economic efficiency within large companies through the dispersion of responsibilities for creative developments."*Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481-82 (1974) (citations omitted).

**\*32 (b)** "[R]estrictions upon an employee's disclosure of information which was developed as a result

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))

Page 28

of the employer's initiative and investment, and which was entrusted to the employee in confidence, are necessary to the maintenance of decent standards of morality in the business community. Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be demoralized; employers will be compelled to limit communication among employees with a consequent loss in efficiency; and business espionage, deceit, and fraud among employers will be encouraged. *Winston Research Corp. v. Minnesota Mining and Mfg. Co.,* 350 F.2d 134, 138 (9th Cir. 1965).

Illinois courts have found it imperative "to recognize a protectible business interest where a trade secret exists and ... a breach of confidentiality in an employee has occurred in the course of his employment."*Burt Dickens,* 144 Ill. App. 3d at 879, 494 N.E.2d at 819 (1st Dist. 1986). Moreover, "the court should protect the employer's investment of time, money and manpower in developing secret advantages from misappropriation by former employees who occupied a position of trust."*Television,* 169 Ill. App. 3d at 12, 522 N.E.2d at 1362;*see also Service Ctrs.,* 180 Ill. App. 3d at 452, 535 N.E.2d at 1135.

The integrity of these and other important policies is at stake in the present litigation. If a preliminary injunction is not granted in favor of PepsiCo, the public interests in fair competition, business innovation and economic efficiency will suffer. The court concludes that granting PepsiCo a preliminary injunction will serve to further these vital public interests.

Alternatively, the court would find that plaintiff would be entitled to a preliminary injunction even if the court were to find that defendant Redmond's position with defendant Quaker would not result in the inevitable use of plaintiff's secrets. For plaintiff's secrets to be secure with defendant Redmond in his new position with defendant Quaker would require the utmost sensitivity and good faith on defendant Redmond's part in treating with

plaintiff's secrets. A violation by defendant Redmond's using plaintiff's secrets in making decisions for defendant Quaker could be extremely difficult to detect. Defendant Redmond's lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with defendant Quaker and when he informed plaintiff that he had accepted that position leads the court to conclude that defendant Redmond could not be trusted to act with the necessary sensitivity and good faith under circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant Redmond's word to that effect. This constitutes a threatened use of plaintiff's secrets, and would be sufficient of itself to warrant the preliminary injunction being entered.

\*33 ORDERED: The motion of defendants, William E. Redmond, Jr., and the Quaker Oats Company, to supplement the record is granted.

The request of plaintiff, PepsiCo, Inc., for a preliminary injunction is granted on the following terms:

IT THEREFORE IS ORDERED, ADJUDGED AND DECREED that a preliminary injunction is hereby issued in favor of plaintiff PepsiCo and against defendants Redmond and Quaker, enjoin- ing:

1. Defendant Redmond and any of his agents, servants, employees, attorneys, and all others in active concert or participation with him from using or disclosing any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of, or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

2. Defendant Quaker and its officers, directors,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

agents, servants, employees, attorneys, and all others in active concert or participation with it, from seeking or acquiring any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

3. Redmond from assuming or performing any duties for Quaker relating in any way to the pricing of beverages through the end of May 1995;

4. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 3;

5. Redmond from assuming or performing any duties for Quaker relating to the development or implementation of any marketing or sales programs for the sale of beverages through May, 1995;

6. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 5;

7. Redmond from assuming or performing any duties for Quaker relating to the system for delivering or distributing beverages through May, 1995; and

8. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 7.

FN1. In addition, defendants have moved to supplement the record. Defendants' motion to supplement the record after proofs were closed, on the basis of newly discovered evidence, is granted. However, the substance of the Wall Street Journal article of December 2, 1994, having been considered by the court, does not affect the court's ruling on the request for a preliminary injunction for essentially the reasons stated in plaintiff's memorandum in opposition to the motion to supplement the re-

cord. The article is hearsay with respect to the truth of its contents, including whether the FOBOs do or do not maintain the confidentiality of information received from plaintiff. The non-hearsay purpose of the article is a very limited one; to the extent that purportedly secret information of plaintiff's actually appears in the article, it may not in fact be confidential or trade secrets. Because there is very little in the way of accurate information about plaintiff's purported secrets in the article, the additional evidence does not affect this court's ruling on the request for a preliminary injunction.

FN2. In their Memorandum in Opposition to PepsiCo's Motion for a Temporary Restraining Order, Defendants cited *Fleming Sales Co. v. Bailey,* 611 F. Supp. 507 (N.D. Ill. 1985) (Shadur, J.), and *Colson Co. v. Wittel,* 210 Ill. App. 3d 1030, 569 N.E.2d 1082 (4th Dist. 1991) to support its proposition that PepsiCo is estopped from obtaining injunctive relief against Redmond and Quaker because they did not enter into a covenant not to compete with Redmond; both cases are inapposite. The courts in both cases cited by the defendants found that the information possessed by the former employees were *not* trade secrets; therefore, that information could not be protected absent some sort of protective agreement. *See Fleming,* 611 F. Supp. at 511-16; *Colson,* 210 Ill App. 3d at 1040, 589 N.E.2d at 1087-88. The PepsiCo information Redmond possesses, however, constitutes a trade secret (*see supra,* Conclusions, *supra*), and is therefore protected regardless of whether the parties entered into a covenant not to compete. Moreover, the cases cited by the defendants concern employer/employee relationships where the parties did not execute *either* a covenant not to compete *or* a nondisclosure

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 30
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.))**

        agreement. *Fleming,* 611 F. Supp. at
        509;*Colson,* 210 Ill. App. 3d at 1037, 569
        N.E.2d at 1086. In contrast, as discussed
        above, Redmond entered into a valid, en-
        forceable confidentiality agreement with
        PepsiCo that covers both trade secrets and
        confidential information. (PX3) Redmond's
        attorney has even conceded in his closing
        arguments that the agreement restricts
        Redmond from disclosing PepsiCo's con-
        fidential information.

N.D.Ill.,1996.
PepsiCo, Inc. v. Redmond
Not Reported in F.Supp., 1996 WL 3965 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.