**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNIVERSAL UNDERWRITERS INSURANCE COMPANY, a Kansas corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. FILED: MAY 19, 2008<br>08 cv 2890    JH<br>JUDGE DER-YEGHIAYAN |
| BRYAN TSIKOURIS, an individual | ) ) | MAGISTRATE JUDGE NOLAN |
| Defendant. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
<u>TEMPORARY RESTRAINING ORDER</u>**

Plaintiff Universal Underwriters Insurance Company ("UUIC" or the "Company"), by its attorneys, submits the following Memorandum of Law in support of its Motion for a Temporary Restraining Order against defendant Bryan Tsikouris ("Tsikouris" or "Defendant"). In further support of its Motion, UUIC submits contemporaneously herewith the declarations of Nicholas DiCarlo, Joe Pottala, and Brent Wolosyn.

## <u>INTRODUCTION</u>

Tsikouris, a former UUIC account executive, has diverted UUIC's business by stealing at least one UUIC customer and by misappropriating UUIC's confidential information and trade secrets for his competitive advantage. Tsikouris' actions are in blatant violation of the non-competition and confidentiality provisions contained in the employment agreement he executed with UUIC, as well as in violation of other legal duties and obligations. To date, UUIC has uncovered indisputable evidence that Tsikouris has:

    (i)    successfully solicited away from UUIC the business of one of his former UUIC customers, causing that customer to move a portion of its insurance business from UUIC to the agency now represented by Tsikouris (the value of this business lost to Tsikouris equals approximately $500,000);

(ii) previously submitted a proposal to one of his former UUIC customers for business then held by UUIC that was up for renewal; and

(iii) submitted a proposal for the insurance business of another of his former UUIC customers. UUIC has also submitted a proposal for the renewal of that client's insurance business. The client is scheduled to make a decision regarding Tsikouris' and UUIC's proposals in **_less than one week_**.

There is no question that Tsikouris is actively soliciting business from his former UUIC customers in competition with UUIC. Each one of the aforementioned actions on the part of Tsikouris indisputably violates the valid post-employment restrictive covenants contained in Tsikouris' employment agreement. There is no telling how many other customers Tsikouris has solicited and how much good will and market share UUIC has lost as a result of Tsikouris' misconduct.

On more than one occasion, UUIC has asked Tsikouris to abide by the terms of his employment agreement and stop soliciting his former UUIC clients. Tsikouris has repeatedly ignored UUIC's request. By his actions, Tsikouris is threatening UUIC's longstanding relationships with many of the Company's significant customers.

It is clear that, absent a court order, Tsikouris will continue to solicit UUIC customers in violation of his employment agreement. Indeed, unless this Court enters the requested order requiring Tsikouris to immediately withdraw his pending proposal submitted to his former UUIC client, there is a significant chance that UUIC will lose yet another customer to Tsikouris **_by the end of the week_**.

## STATEMENT OF FACTS

UUIC provides commercial insurance products and services to business customers. Defendant Tsikouris started working for UUIC in March 1998 as an Account Executive. He was later promoted to a managerial position, a role in which he was responsible for supervising and managing a number of Account Executives in various territories. Subsequent thereto, Tsikouris voluntarily resumed his role as an Account Executive responsible for a specific territory, which was the position he held at the time he resigned his employment with the Company. Throughout his approximately nine years of employment with UUIC, Tsikouris was

responsible for selling commercial insurance products and services to UUIC business customers in specified territories which included portions of Illinois. Verified Complaint ("Cmpl") at ¶¶ 1-3.

Tsikouris worked directly with UUIC customers, and therefore had access to a significant amount of confidential and proprietary information regarding UUIC's customers. Cmpl at ¶ 8. Tsikouris acknowledged at the commencement of his employment with UUIC that he would become privy to certain confidential and proprietary information and trade secrets belonging to UUIC as a direct result of his employment with UUIC. Cmpl at ¶ 4. As expected, Tsikouris gained knowledge during his employment with UUIC regarding customer identities, specific customer needs and preferences, pricing and policy information, and policy expiration and renewal dates. Cmpl at ¶ 8. All such information is confidential and proprietary to UUIC. Cmpl at ¶¶ 11, 12, 26-29. The information regarding policy expiration dates is extremely valuable in the insurance industry because potential customers typically are interested in purchasing insurance near their policy expiration dates. Cmpl at ¶ 28. An insurance salesperson can maximize the potential for actually selling a policy to a potential customer by attempting to make that sale at or around the customer's policy expiration date. Similarly, the information about a customer's loss experience, premiums charged by UUIC, and rate computations is quite valuable in the insurance industry because it allows a competitor to calculate the profitability of the client's insurance requirements and undercut UUIC's premium prices. UUIC secures such proprietary and confidential information by storing electronic versions of the information on password-protected computer system, and in all cases by ensuring that only employees with a "need to know" are given access to the information. Cmpl at ¶¶ 11, 12, 26-29.

At the commencement of his employment with UUIC, Tsikouris executed an employment agreement (the "Agreement"), which is attached to the Verified Complaint as Exhibit A. Cmpl at ¶ 5. The Agreement states, *inter alia*, that Tsikouris will not disclose – either during or following his employment with UUIC – any UUIC confidential information or trade secrets, defined in relevant part in the Agreements to include the "list of the [UUIC's] customers, the premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, [and UUIC's] prospect lists with expiration dates as they may exist from time to time." *See* Verified Complaint, Ex. A at ¶ 5(b). The Agreement also contains a two-year non-solicitation provision, which provides that Tsikouris may not directly or

indirectly "procure, solicit, accept, refer, or aid another in the procurement, solicitation, acceptance or referral of policies, applications, or inquiries about insurance" of UUIC customers within his previously assigned territories, or directly or indirectly "solicit encourage or attempt to induce" any UUIC customers within such territories to discontinue, cancel, terminate or decline renewal of their insurance policies with UUIC.  *See* Verified Complaint, Ex. A at ¶ 7(a) and (c).

Tsikouris resigned his employment with UUIC effective May 17, 2007.  Cmpl at ¶ 40.  Tsikouris accepted a position with Lamb, Little & Co. ("Lamb, Little"), a competitor of UUIC that is also in the business of selling commercial insurance products and services to business customers.  Cmpl at ¶ 41.  It is clear from his actions that Tsikouris has decided that it would be easier to poach UUIC's existing customers utilizing UUIC information he acquired while working at UUIC than it would be to start competing with UUIC in a fair manner consistent with the post-restrictive covenants contained in the Agreement.

UUIC believes that Tsikouris copied and provided to Lamb, Little or other third parties information relating to, among other things, UUIC's customers such as premiums charged, expiration dates of policies, the loss experience and profitability of each customer account, UUIC's prospect list, and rate computations.  With this information in hand, it is easy to actively solicit UUIC customers with whom Tsikouris had a relationship while employed by UUIC.  *See*, Cmpl at ¶¶ 31-32, 43-51.  Lamb, Little is aware that Tsikouris is bound by valid post-employment restrictive covenants.  *See*, letter from J. Hedrick to S. Bennett dated August 29, 2007, a copy of which is attached hereto as Exhibit A.

Since his employment with UUIC terminated, Tsikouris, taking advantage of his relationships with his former UUIC clients and the confidential and proprietary information that he obtained while at UUIC, has already poached at least one UUIC customer causing it to move its business from UUIC, has unsuccessfully solicited another, *and currently has a proposal to take UUIC's business pending with a third customer*.  Cmpl at ¶¶ 15, 46-51.  UUIC has every reason to believe that Tsikouris intends to continue on his mission to selectively raid UUIC's business as other UUIC customers' policies expire and come up for renewal with UUIC.

UUIC seeks a temporary restraining order to enjoin these blatant breaches of Defendant's contractual and other legal obligations.  If temporary injunctive relief is not issued immediately, there is a chance that UUIC will lose yet another significant business account *at the*

*end of the week* as a direct result of Tsikouris' actions in violation of his post-employment restrictive covenants.

## ARGUMENT

A party seeking preliminary injunctive relief must show: (i) a reasonable likelihood of success on the merits; (ii) the absence of an adequate remedy at law or the presence of irreparable harm if injunctive relief is not granted; (iii) that the threatened injury to the plaintiff outweighs the harm that the defendant would suffer if an injunction were granted; and (iv) that granting the injunction will serve the public interest. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1267, n.3 (7th Cir. 1995). As demonstrated below, UUIC is entitled to injunctive relief because it can easily satisfy these requirements.

### I.     UUIC Likely Will Succeed on the Merits.

In the Seventh Circuit, the threshold for a plaintiff to demonstrate a likelihood of success on the merits is low. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). In fact, a plaintiff "need only demonstrate a 'better than negligible chance of succeeding.'" *Id.* (quoting *Boucher v. School Bd. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998)). Once the Court finds that the plaintiff has demonstrated some likelihood of success, it must evaluate how likely that success is. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need to weigh in his favor." *Id.*

#### A.     UUIC Likely Will Succeed on Its Breach of Contract Claim.

To establish a breach of contract, UUIC must establish (i) the existence of a contract between the parties; (ii) consideration; (iii) plaintiff's performance or willingness to perform in compliance with the contract; (iv) defendant's breach of the contract; and (v) that plaintiff was damaged by the breach. *Bradbury Co. v. Teissier-duCros*, 387 F. Supp. 2d 1167, 1171 (D. Kan. 2005). UUIC can easily satisfy each of these elements.

First, the post-employment restrictive covenants contained in Tsikouris' Agreement are clearly valid and enforceable under Kansas law, which governs the Agreement. *See* Verified Complaint, Ex. A at ¶ 14. Under Kansas law, a post-employment restrictive covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public interest. *See Weber v. Tillman*,

259 Kan. 457, 462, 913 P.2d 84, 89 (Kan. 1996). To determine whether a non-solicitation clause is reasonable, courts employ a four-part test: "(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable?" 259 Kan. at 464, 913 P.2d at 90. Each requirement is easily met here.

Second, Kansas courts have recognized that companies have a legitimate protectable interest in protecting their customer lists and contacts, particularly where, as here, the company has expended significant time and resources developing their customer bases. *See, e.g., Weber*, 259 Kan. at 467-68, 913 P.2d at 91 (customer contacts are a legitimate interest to be protected by a covenant not to compete); *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1108 (D. Kan. 2000) (same); *Am. Fid. Assurance Corp. v. Leonard*, 81 F. Supp. 2d 1115, 1120 (D. Kan. 2000) (same). In *American Fidelity*, an insurance company sought to enforce a non-competition covenant when a former employee lured customers over to his new employer. In granting a preliminary injunction, the court noted, "[t]he employer should be given a reasonable time to overcome the employee's personal hold over the customers. This is especially true where the business is one in which the employee is the sole or primary contact with the customers and in which a close personal relationship with them is fostered." *Id.* (internal citations and quotation marks omitted); s*ee also Equifax Services, Inc. v. Hitz*, No. 91-3109, 1992 U.S. App. LEXIS 16557, at *14 (10th Cir. July 9, 1992)[1]. UUIC's insurance customer contacts thus clearly are a protectable interest under Kansas law.

Moreover, the covenant does not place an undue burden on Tsikouris. The Agreement specifically permits Tsikouris to continue to work and fairly compete in the insurance industry, so long as he competes with UUIC within the terms of the post-employment restrictive covenant. *See* Verified Complaint, Ex. A at ¶ 7(b). The covenant essentially restricts Tsikouris only from soliciting or doing business with UUIC customers in the territories to which he was assigned, or from encouraging UUIC customers in such territories from canceling or not renewing their policies with UUIC, for a period of two years. *See* Verified Complaint, Ex. A at ¶ 7(a) and (c). Kansas courts have held that far *more* restrictive covenants do not place an undue

---

[1] All unreported decisions referenced herein are attached hereto at Exhibit B for the Court's convenience.

burden on employees. In *Weber v. Tillman*, for example, the Kansas Supreme Court upheld a non-compete agreement that prevented a doctor from practicing dermatology in a 30-mile radius of his former practice for two years. 259 Kan. at 465, 913 P.2d at 90-91. In this case, Tsikouris is not even prevented from working in the insurance industry – only from soliciting his former employer's customers within his previous UUIC assigned territories. The fact that Tsikouris can (and will) continue to earn a living in his chosen profession eliminates any argument that enforcement of the Agreement would unduly burden Defendant in this case.

Similarly, the durational and geographic limits of the covenant are both reasonable and consistent with those that have previously been upheld by Kansas courts. Courts applying Kansas law have upheld non-competition covenants of a two-year duration, including covenants governing insurance sales. *See, e.g. Am. Fid.*, 81 F. Supp. 2d at 1120 (upholding a 2-year non-competition covenant preventing former employee from selling insurance to customers within his former territory); *see also Weber,* 259 Kan. at 465, 913 P.2d at 90-91 (upholding two-year covenant); *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1203 (D. Kan. 1999) (finding three-year covenant reasonable in duration). The geographical limit of the covenant – the territories assigned to Tsikouris during the period he worked for UUIC – also is reasonable and valid under Kansas law. In *American Fidelity*, for example, the court modified a non-competition covenant that prevented insurance salesmen from contacting any of their former employee's customers, regardless of their geographical location. 81 F. Supp. 2d at 1120-21. The court specifically found, however, that a covenant with a scope limited to the territories in which the salesmen had been assigned would have been reasonable, and so modified the covenant. *Id.* The temporal and geographical scope of the restrictive covenants therefore are reasonable under Kansas law.

Finally, the non-solicitation provision is not injurious to the public welfare. UUIC faces (and has already suffered) substantial loss of business, loss of goodwill, and devaluation of confidential information. By contrast, the only "hardship" facing Tsikouris is keeping him from exploiting the benefits of his association with UUIC. Any effect the covenant may have on the insurance market is extremely minimal, as customers are still free to choose from a wide range of insurance options, and is greatly outweighed by the benefit of restraining unfair competition. Moreover, upholding valid contracts clearly serves the public interest. *See Heldor Indus., Inc. v. Johnston*, No. 88-2544-O, 1988 U.S. Dist. LEXIS 13645, at *16 (D. Kan

7

Nov. 17, 1988) ("In fact, an injunction furthers the public interest. Clearly, the enforcement of valid contracts is in the public interest.") (internal quotation marks omitted). Thus, the non-competition covenants in Tsikouris' Agreement with UUIC are clearly enforceable under Kansas law.

UUIC has fully performed and complied with all of its obligations under the Agreement. By stark contrast, as detailed above, Tsikouris has repeatedly breached his contractual obligations, including without limitation, by directly soliciting UUIC's customers with whom he had previous relationships and by using UUIC's confidential information and trade secrets for his own competitive purposes. Tsikouris has already poached one of UUIC's former customers costing the company a significant amount of revenue, solicited the business of another, and currently has a proposal pending with a third client. UUIC has suffered (and will continue to suffer in the near term) direct, irreparable harm by losing its customers and confidential information, both of which it spent years and countless resources cultivating. If Tsikouris is permitted to continue to use his personal contacts and other customer and confidential information to solicit UUIC's customer base, UUIC will not only lose future income, but also lose its initial investment in attracting and retaining its customers. The remedy at law is inadequate because, by the expiration of the post-employment restriction, Defendant might successfully lure away a significant proportion of UUIC's client base, causing inestimable damage. *See Heldor Indus.,* 1988 U.S. Dist. LEXIS 13645, at *15 (damages resulting from a former employee's solicitation of customers are unforeseeable). Thus, given the nature of the breaches and the threats of continuing misconduct in the future, UUIC has suffered and will continue to suffer damages that are not easily quantified. UUIC therefore has raised more than a "negligible chance" of succeeding on its breach of contract claim.

### B. UUIC Likely Will Succeed on its Illinois Trade Secrets Act Claim.

To establish a violation of the Illinois Trade Secrets Act, 1065/1 *et seq.* ("ITSA"), UUIC must show that Tsikouris misappropriated a trade secret. 765 ILCS § 1065/3-4. Under 765 ILCS § 1065/2(d):

> "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

First, the information that UUIC seeks to protect here is similar to information that repeatedly has been afforded trade secret status under the ITSA. For example, in *RKI, Inc. v. Grimes*, the court afforded trade secret protection to "1) names and addresses of all customers and potential customers and contact persons; 2) historical sales information; 3) details of pending sales quotations; 4) year-to-date sales figures; and 5) shipping, pricing, cost and profit margin information." 177 F.Supp.2d at 873-74; *see also PepsiCo*, 54 F.3d at 1265 (affirming district court's decision that found that strategic plans, operating plans, financial goals, marketing plans, and pricing information all were protectable trade secrets); *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (determining that the ITSA "protects IDS's interest in confidential information such as customer identity, addresses, and financial data"); *Elmer Miller, Inc. v. Landis*, 253 Ill.App.3d 129, 133-34, 625 N.E.2d 338, 341-42 (1st Dist. 1993) (finding customer information to be a trade secret protected by the ITSA).

Similarly, information about customers' insurance policy expiration dates – which contains crucial information needed for a competitor to win over the customers' accounts before renewal occurs – also constitutes a valuable and protectable trade secret under the ITSA. *See*, *Burt Dickens Co. v. Bodi*, 155 Ill.App.3d 875, 880-81, 494 N.E.2d 817, 820-21 (1st Dist. 1986) ("As defendant himself acknowledges, the renewal of existing insurance policies is the most important part of the insurance agency . . . It is not surprising then that such lists come to be regarded as valuable proprietary documents and great precaution is taken to safeguard their confidentiality."). Here, Tsikouris is believed to have retained information afforded protection under the ITSA, including customer contact information, historical sales information, pricing information, and information regarding policy expiration.

Second, UUIC has taken considerable measures to ensure that such trade secret information remains confidential. UUIC stores electronic copies of such trade secret information on a computer network that is password-protected and access-controlled. Similarly, UUIC controls access to hard copies of such trade secret information. Not all of UUIC's employees are given access to UUIC's trade secret information — rather, such access is granted to employees on a need-to-know basis. Finally, UUIC protects its trade secret and other confidential

9

information by requiring its employees, including Tsikouris, to execute agreements with explicit confidentiality restrictions. *See* Verified Complaint, Ex. A at ¶ 5. UUIC therefore has taken sufficient steps to protect the confidentiality of its trade secret information. *See Strata Marketing, Inc., v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (1st Dist. 2000).

There is no question that Tsikouris has misappropriated and threatened to misappropriate UUIC's trade secrets. Under the ITSA, "misappropriation" means either

> (1) *acquisition* of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
>> (A) used improper means to acquire knowledge of the trade secret; or
>>
>> (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) derived from or through a person who utilized improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use, or
>>
>> (C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS §1065/2(b)(1) and (2) (emphasis added). "Improper means" includes theft, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy, or espionage through electric means. *Id.* § 1065/2(a). Accordingly, under the ITSA, acquisition by improper means constitutes misappropriation of a trade secret, as does improper use or disclosure. *RKI*, 177 F.Supp.2d at 875 (citing *Stampede Tool v. May*, 272 Ill.App.3d 580, 586, 651 N.E.2d 217, 214 (1st Dist. 1995)).

UUIC's evidence clearly meets these standards. Tsikouris has acquired by improper use, improperly used, and disclosed UUIC's trade secrets for his own benefit and the benefit of Lamb, Little. Indeed, the quickness with which Tsikouris has successfully stolen at least one UUIC client is clear evidence of his misappropriation of UUIC's trade secrets. *Burt Dickens & Co.*, 144 Ill.App.3d at 883, 494 N.E. at 822 ("The quickness with which defendant successfully solicited plaintiff's clients for his new business, however, raises the question

whether defendant actually honored his promise not to take and use plaintiff's expiration list for his own benefit.").

Moreover, Illinois law allows this Court to enjoin the "inevitable disclosure" of trade secrets as a "threatened misappropriation." *See Strata Marketing, Inc.*, 317 Ill. App. 3d at 1069-70, 740 N.E.2d at 1177-78; *PepsiCo*, 54 F.3d at 1272. Unless Tsikouris possesses an uncanny ability to compartmentalize information, in his position with Lamb, Little, Tsikouris necessarily will be making decisions regarding how to position and market Lamb, Little's product offerings by relying on confidential and secret information – including his knowledge and understanding of UUIC's customer lists, customer policy renewal dates, pricing information and cost structure – learned during his employment with UUIC. Such facts clearly support the injunction sought here. *See PepsiCo.*, 54 F.3d at 1271.

In addition, given Tsikouris' indisputably unlawful and dishonest past actions, it is highly likely that he will continue to use and disclose UUIC's confidential and proprietary information in violation of the ITSA. Courts consider an individual's prior deceitfulness and lack of judgment as proof of the individual's willingness to misuse trade secrets. *See PepsiCo.*, 54 F.3d at 1270-71; *see also RKI*, 177 F.Supp.2d at 876-77 (holding that because direct evidence of use of trade secrets is often unavailable, a plaintiff can rely on circumstantial evidence to establish misappropriation by drawing inferences from ambiguous circumstantial evidence). As the above facts and those detailed in UUIC's Complaint and supporting Affidavits make clear, Tsikouris has consistently demonstrated his ability and willingness to cavalierly misappropriate UUIC's trade secrets in blatant violation of the ITSA.

### C.     UUIC Likely Will Succeed on Its Breach of Fiduciary Duty Claim.

UUIC also is highly likely to succeed on the merits of its breach of fiduciary duty claim. It is well-settled that employees owe to their employer fiduciary duties of the highest order, including a strict duty of trust and loyalty. *See Dames & Moore v. Golden*, 21 F. Supp. 2d 817, 823 (N.D. Ill. 1998); *Mullaney Wells & Co. v. Savage*, 78 Ill.2d 534, 546, 402 N.E.2d 574, 580 (1980); *ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill.App.3d 671, 683, 379 N.E.2d 1228, 1237 (1st Dist. 1978). As agents of the corporation, employees are "obligated to act solely for the benefit of the [corporation] in all matters connected with [their] agency, and to refrain from competing with" the corporation. *Mullaney*, 78 Ill.2d 534, 546, 402 N.E.2d 574, 580. It is clear that an employee breaches those fiduciary duties to his employer

11

when he solicits another customer of his employer to join a competing company while still employed. *See Dames & Moore*, 21 F. Supp. 2d at 823; *Labor Ready, Inc.*, 149 F.Supp.2d at 414-15; *ABC*, 62 Ill.App.3d at 683, 379 N.E.2d at 1237; *Diamond Blade Warehouse, Inc.,* 420 F.Supp.2d at 871. It also is clear that an employee breaches those fiduciary duties to his employer when he misappropriates a corporate opportunity that he learned of during his employment. *See, e.g., Kerrigan v. Unity Savs. Ass'n*, 58 Ill.2d 20, 28, 317 N.E.2d 39, 43 (1974); *Mullaney*, 78 Ill.2d at 549-50, 402 N.E.2d at 581-82. A fiduciary's duty not to misappropriate corporate opportunities that he learned of while employed continues post-termination. *See Kerrigan*, 58 Ill.2d at 28, 317 N.E.2d at 43; *Mullaney*, 78 Ill.2d at 549, 402 N.E.2d at 582.[2] *See also, Comedy Cottage, Inc. v. Berk*, 145 Ill. App. 3d 355, 360 (1986) (finding that duty of loyalty continues following resignation were knowledge acquired during his employment is used post-employment to former employer's detriment); *LCOR Inc. v. Murray*, 1997 WL 136278, at *8-9 (N.D. Ill., Mar. 20, 1997) (same).

There is no doubt that UUIC can prove that Tsikouris repeatedly and egregiously breached his fiduciary duties in such manner. As set forth in detail above, the evidence uncovered thus far clearly demonstrates that Defendant planned to, and has successfully usurped UUIC corporate opportunities for his and Lamb, Little's benefit. Thus, UUIC is highly likely to succeed on its breach of fiduciary duty claim given the clear evidence of Tsikouris' pervasive disloyalty.

## II.      UUIC Will Suffer Irreparable Harm Because of Defendant's Actions.

UUIC will suffer irreparable injury if Defendant is not enjoined from continuing his pattern of misappropriating UUIC's confidential information and stealing UUIC's customers in blatant disregard of his post-employment obligations owed to UUIC. "Once a protectable interest has been established, injury to plaintiff will presumably follow if that interest is not protected." *Donald McElroy, Inc. v. Delaney*, 72 Ill.App.3d 285, 294, 389 N.E.2d 1300, 1308 (1st Dist. 1979) (holding that evidence that a former employee acquired confidential information from his former employer and called upon several customers of his former employer was

---

[2] Tsikouris' post-resignation misconduct breached his fiduciary duties to UUIC because he was remained bound by the non-compete covenants and confidentiality provisions contained in the Agreement. *See Labor Ready*, 149 F.Supp.2d at 414 (holding fiduciary duties extend beyond employment where contract contains valid restrictive covenant).

sufficient to show a threat of irreparable harm). Should Defendant be allowed to continue to disclose UUIC's confidential information and pilfer UUIC's customers, UUIC will lose goodwill, competitive position, and continuity of business relationships with its customers. *See Diamond Blade Warehouse, Inc.*, 420 F. Supp. 2d at 872. Such harms are oftentimes fatal to businesses and cannot be cured by an award of money damages. *Id.*

### III. The Harm to UUIC Outweighs Any Harm that Defendant Would Suffer by the Issuance of a Temporary Restraining Order.

The threat of harm to UUIC in the absence of injunctive relief far outweighs the threat of any harm to the Defendant if an injunction is granted. UUIC seeks only to protect what rightfully belongs to UUIC, and is suffering considerable and continuing daily harm to its business opportunities, confidential information, goodwill, and other protectable interests through the Defendant's misconduct. In contrast, the only "hardship" imposed on Defendant is to prevent him from reaping any illicit gain or benefit from his wrongful and unfair conduct. *See IDS Financial Services*, 843 F. Supp. at 419. Moreover, UUIC is not seeking through this Motion to prevent Tsikouris from working in the insurance industry entirely. *Id.* Finally, there is no question that Tsikouris agreed to abide by the terms of the restrictive covenant when he began working with UUIC. He cannot now complain that he is harmed unfairly by enforcement of the covenant. *Id.*

### IV. The Public Interest Favors Granting Injunctive Relief.

In this case, the public interest will be amply served by the issuance of an injunction because an injunction, among other things, will set a standard of behavior and ethics for the Defendant and others to follow in the future. *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965 at *31 (N.D. Ill. Jan. 2. 1996); *see also Diamond Blade Warehouse, Inc.*, 420 F. Supp. 2d at 872 (granting injunction after concluding that prohibiting a company from soliciting its competitor's customers and divulging its competitor's trade secrets would not harm the public interest).

### **CONCLUSION**

For the foregoing reasons, UUIC respectfully requests that the Court grant UUIC's request for a temporary restraining order.

                                      Respectfully submitted,

                                      UNIVERSAL UNDERWRITERS
                                      INSURANCE COMPANY


                                      By:   /s/Sarah M. Konsky
                                                     One of Its Attorneys

Dated:  May 19, 2008

Nigel F. Telman
Sarah M. Konsky
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Temporary Restraining Order has been served by hand delivery to:

> Bryan Tsikouris
> 5947 Rosinweed Lane
> Naperville, Illinois  60565

This 19th day of May, 2008.

                                                          /s/Sarah M. Konsky

CH1 4272051v.1